Exhibit "A"

# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LUIS MANUEL RODRIGUEZ, MARIA TERESA RODRIGUEZ, a/k/a MARIA TERESA LANDA, ALFREDO RAMON FORNS, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | |
| IMPERIAL BRANDS PLC, CORPORACIÓN HABANOS, S.A., WPP PLC, YOUNG & RUBICAM LLC, and BCW LLC, a/k/a BURSON COHN & WOLFE LL | ) ) ) | Civil Action No. 1:20-cv-23287-DPG |
| *Defendant* | ) | |

# AMENDED SUMMONS IN A CIVIL ACTION

To:     *(Defendant's name and address)*     CORPORACIÓN HABANOS, S.A.
Centro de Negocios Miramar, Edificio Habana, 3ra. Planta,
Avenida 3ra. e/ 78 y 80, C.P.: 11300, Cuba

A lawsuit has been filed against you. You are being served with this amended summons, a copy of the complaint, and translations of the amended summons and complaint into Spanish.

Within 60 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Paulino A. Nunez Jr.
Rodirguez Tramont & Nunez, P.A.
255 Alhambra Circle, Suite 1150
Coral Gables, FL 33134

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**SUMMONS**

Date:  Dec 9, 2020  ___

*s/ Mary Etienne*

Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

## TRIBUNAL DE DISTRITO DE LOS
## ESTADOS UNIDOS PARA EL
## DISTRITO SUR DE FLORIDA

LUIS MANUEL RODRIGUEZ, MARIA TERESA
RODRIGUEZ, a/k/a MARIA TERESA LANDA,
ALFREDO RAMON FORNS, et al.                                    )

           *Demandante*                                          )

           v.                                                          )

IMPERIAL BRANDS PLC, CORPORACI-N HABANOS, S.A.,        )      Acción Civil No. 1:20-cv-23287-DPG
WPP PLC, YOUNG & RUBICAM LLC,                            )
y BCW LLC, a/k/a BURSON COHN & WOLFE LL                 )

           *Demandado*                                           )

# CITACIÓN ENMENDADA EN UNA ACCIÓN CIVIL

**Para:** *(Nombre y dirección del demandado)*

    CORPORACIÓN HABANOS, S.A.
    Centro de Negocios Miramar, Edificio Habana, 3ra. Planta, Avenida 3ra.
    e/ 78 y 80, C.P.: 11300, Cuba

       Se ha presentado una demanda en su contra. Se le está notificando con esta citación enmendada, una copia de la demanda y traducciones al español de la citación enmendada y la demanda.

       Dentro de los 60 días posteriores al servicio de esta citación a usted (sin contar el día en que la recibió) debe servir al demandante una respuesta a la demanda adjunta o a una moción bajo la Regla 12 de las Reglas Federales de Procedimiento Civil. La respuesta o moción debe ser notificada al demandante o al abogado del demandante, cuyo nombre y dirección son los siguientes:

    Paulino A. Núñez Jr.
    Rodirguez Tramont & Núñez, P.A.
    255 Alhambra Circle, Suite 1150
    Coral Gables, FL 33134

       Si usted no responde por omisión a realizar una presentación o articulación procesal, una sentencia en rebeldía o por falta de presentación de las debidas defensas puede ser ingresada en su contra por la reparación judicial reclamada en la demanda. También debe presentar su respuesta o moción ante el tribunal.



CITACIÓN

**SUMMONS**

Fecha:  9 de diciembre de 2

*s/ María Etienne*

Angela E. Noble
Clerk of Court

Deputy Clerk
U.S. District Courts

## <u>AFFIDAVIT OF TRANSLATION</u>

STATE OF NEW YORK      )

COUNTY OF NEW YORK   ) ss.:

          JAMES L. BERENTHAL, being duly sworn, deposes and says the following:

        1.    That the translation into English of the accompanying document, which document is written in Spanish, was made by the deponent and is a true and accurate and complete translation of said document.

        2.    That deponent is ably qualified to make such translation of said document from Spanish into English virtue of the following qualifications: deponent is fluent in both Spanish and English.

**JAMES L. BERENTHAL**

Sworn to be before me
this 14th  day of December, 2020

_____
**AILEEN M. JENNER**
Notary Public, State of New York
№ 02JE6241529
Qualified in New York County
My Commission Expires May 23, 2023

Case 1:20-cv-23287-XXXX   Document 1   Entered on FLSD Docket 08/06/2020   Page 5 of 91

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

(Jury Trial Demanded)

LUIS MANUEL RODRIGUEZ,
MARIA TERESA RODRIGUEZ, a/k/a MARIA TERESA LANDA,
ALFREDO RAMON FORNS,
RAMON ALBERTO RODRIGUEZ,
RAUL LORENZO RODRIGUEZ,
CHRISTINA CONROY, and
FRANCISCO RAMON RODRIGUEZ,

        Plaintiffs,

v.

IMPERIAL BRANDS PLC,
CORPORACIÓN HABANOS, S.A.,
WPP PLC, YOUNG & RUBICAM LLC,
and BCW LLC, a/k/a BURSON COHN & WOLFE LLC

        Defendants.

_____/

## **Complaint**

    Plaintiffs, LUIS MANUEL RODRIGUEZ, MARIA TERESA RODRIGUEZ, a/k/a

MARIA TERESA LANDA, ALFREDO RAMON FORNS, RAMON ALBERTO RODRIGUEZ,

RAUL LORENZO RODRIGUEZ, CHRISTINA CONROY, and FRANCISCO RAMON

RODRIGUEZ, sue Defendants, IMPERIAL BRANDS PLC, CORPORACIÓN HABANOS, S.A.,

WPP PLC, YOUNG & RUBICAM LLC, and BCW LLC, a/k/a BURSON COHN & WOLFE

LLC, and allege as follows:

## **Introduction**

    1.    Plaintiffs (collectively, the "Rodriguez Family") are the heirs and successors of

Ramón Rodriguez Gutiérrez ("RRG") and the owners of a 90% interest[1] in Ramón Rodriguez e

_____

[1]   The remaining 10% interest is owned by two individuals who obtained their interest, by

Hijos Sociedad en Comandita[2] ("RRHSC"). Before 1961, RRHSC owned and operated the former Partagás cigarette factory building (the "RRHSC Property") in Havana.[3]

2.　　　In 1955, RRHSC erected a modern mixed-use building adjacent and connected to the main building of the Partagás factory at the corner of Calle 23 y 16 (23rd Street and 16th). The new building's structure included a ground level garage for the factory's fleet of trucks, a storage facility, a mezzanine suite of executive offices and a six-story tower.[4] Today, the RRHSC Property, rebranded "Empresa de Tabaco Torcido 'José Martí,'" prominently displays the names Tabacuba (the Cuban state tobacco monopoly company) and H. Upmann on its façade.[5]

3.　　　After taking control of power in 1959, the Castro Regime and Cuba's communist government systematically "nationalized" the major privately-owned business enterprises in Cuba without compensation to the lawful owners of the property. In 1961, as part of its takeover of the entire tobacco industry, the Castro government confiscated ownership of RRHSC and the RRHSC Property. Before the RRHSC Property was confiscated, the Partagás Factory produced world-renowned cigarettes under the Partagás brand and had grown to become the third largest manufacturer of cigarettes in Cuba with a 16.3% share of the market.

---

operation of law, through their deceased father, who was not a U.S. citizen as of 1996.

[2]　　Ramon Rodriguez and Sons, a Limited Partnership.

[3]　　A picture of Partagás cigarette boxes with a drawing of the Partagás (RRHSC) factory and a photograph of the factory believed to have been taken in the 1950s is shown at Composite Exhibit 1.

[4]　　A picture of the modern mixed-use building that was erected as an annex to the main Partagás cigarette factory is shown at Composite Exhibit 2.

[5]　　Pictures of the modern façade are shown at Composite Exhibit 3.

4.     The "Rodriguez Family are the owners of a "Claim" under the Cuban Liberty and Democratic Solidarity Act also known as Helms-Burton (the "Liberty Act" or "Libertad Act") due to the Cuban government's confiscation and trafficking in the RRHSC Property.[6] The Liberty Act took effect in 1996:

> It is the purpose of statute to deter third party foreign investors from trafficking in the confiscated property (defined as '**purchas[ing] an equity interest in, manag[ing], or enter[ing] into joint ventures** using property and assets some of which were confiscated from United States nationals.')

*Glen v. Club Mediterranee S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (emphasis added) (quoting 22 U.S.C. § 6081(5)); *see also* 22 U.S.C. § 6022(6) (Liberty Act is designed "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime.").

5.     In 2007, Defendant Imperial Brands PLC ("Imperial"), well-aware of the Liberty Act, purchased Altadis S.A. and its "50% ownership interest in [Habanos], a company which distributes cigars manufactured in Cuba."[7] Corporacion Habanos S.A. ("Habanos") is a joint venture company 50% owned by Cuba, or one or more Cuban-owned companies, and 50% owned by Imperial.

---

[6]    As a recent decision in this District explained that: "'[t]he **Helms-Burton Act refers to the property interest that former owners of confiscated property now have as ownership of a 'claim to such property**.'" *Glen II*, 450 F.3d at 1255 (quoting 22 U.S.C. § 6082(a)(1)(A)); *see also id.* (noting that actions brought under Title III are "actions brought 'on a claim to the confiscated property' against traffickers in the property" (quoting 22 U.S.C. § 6082(a)(4))). *See Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 19-CV-23590, 2020 WL 1905219, at *7 (S.D. Fla. Apr. 17, 2020) (emphasis added).

[7]    *See* October 12, 2007 letter from Imperial to the SEC's Office of Global Security at 2. (Copy attached as Exhibit 4).

6.　　Imperial, both through Habanos and other joint-venture subsidiaries, as well as through the Cuban tobacco monopoly company, Tabacuba, Imperial's joint-venture partner in Habanos, has and continues to use the RRHSC Property without compensation to, or authorization from, the Rodriguez Family. The unauthorized use of the RRHSC Property has included the production and shipping of millions of hand-rolled cigars (sold under various premium brand names) manufactured at the RRHSC Property, or manufactured at other nearby factories, and processed, stored, and shipped from the RRHSC Property. The unauthorized use of the RRHSC Property also extends to Tabacuba's management of the day to day business of all Cuban tobacco products from offices it maintains in the RRHSC Property. Imperial's trafficking also includes use of the RRHSC Property for marketing of Habanos' products.

7.　　All Defendants are liable to Plaintiffs under the Liberty Act for "trafficking"[8] because they participate in, or profit from, trafficking of the RRHSC Property by the Cuban government, through Tabacuba and its joint venture partner, Defendant Imperial. Tabacuba and Imperial traffic in the RRHSC Property through their jointly owned and controlled joint venture company Habanos and through the distribution network that Tabacuba and Imperial own.

8.　　Imperial and its partner Tabacuba, together with the subsidiaries they own and control, have expanded their use of and benefit from the RRHSC Property by retaining agents to

---

[8]　For purposes of the Act, a person "traffics" in confiscated property if that person "knowingly" and intentionally: (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property, (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property. *See* 22 U.S.C. § 6023(13).

market and publicize the products produced at the confiscated RRHSC Property. The agents retained by Imperial and Habanos include Defendant WPP PLC ("WPP") through its U.S.-based advertising agency subsidiaries, Defendants Young & Rubicam LLC ("Y&R"), and BCW LLC, a/k/a Burson Cohn & Wolfe LLC ("BCW").

9.    Beginning no later than 2017, Y&R and BCW assisted in setting up, or directly set up, sponsored official "portals" for Imperial to market Habanos products on the U.S.-based social media platforms Twitter, YouTube, and Instagram.[9]

10.    Imperial's agent, WPP, through Y&R, BCW, and previously through a third WPP subsidiary, Ogilvy, has continuously marketed and publicized the RRHSC Property and the Habanos' products made at and shipped from there since at least 2010.

## Parties, Jurisdiction, and Venue

### Parties

11.    Plaintiffs Luis Manuel Rodriguez, Maria Teresa Rodriguez, Alfredo Ramon Forns, Ramon Alberto Rodriguez, Raul Lorenzo Rodriguez, and Francisco Ramon Rodriguez are individuals residing in Miami-Dade County, Florida.

12.    Plaintiff Christina Conroy is an individual residing in Montgomery County, Maryland.

13.    Each Plaintiff was a U.S. citizen prior to 1996, and each is a U.S. National under 22 U.S.C. § 6023(15)(B).

---

[9]    These portals include:
https://www.instagram.com/habanos_oficial/
https://twitter.com/Habanos_Oficial
https://www.youtube.com/channel/UCstGLy96wdZG7eCM4855_DA.

14. Plaintiff Luis Manuel Rodriguez is the last surviving son of RRG. He obtained his interest in the Claim through RRG's will upon RRG's death in 1964.

15. Plaintiff Maria Teresa Rodriguez, a/k/a Maria Teresa Landa, is the last surviving daughter of RRG. She obtained her interest in the Claim through RRG's will upon RRG's death in 1964.

16. Plaintiff Alfredo Ramon Forns is the only child of RRG's daughter, Maria Mercedes Rodriguez ("MMR"). MMR, who was a U.S. citizen prior to 1996, obtained her interest in the Claim through RRG's will upon RRG's death in 1964. Plaintiff Alfredo Ramon Forns obtained his interest in the Claim by operation of law upon MMR's death in 2013.

17. Plaintiff Ramon Alberto Rodriguez is the son of Ramon Francisco Rodriguez, ("RFR") who predeceased RRG. Plaintiff Ramon Alberto Rodriguez obtained his interest in the Claim through RRG's will upon RRG's death in 1964.

18. Plaintiffs Raul Lorenzo Rodriguez and Francisco Ramon Rodriguez are the sons of Raul Bernardo Lupo Rodriguez ("RBLR"), and Christina Conroy is the only child of Alex Lorenzo Rodriguez ("ALR"), the third son of RBLR. ALR predeceased RBLR. RBLR obtained his interest in the Claim through RRG's will upon RRG's death in 1964. Plaintiffs Raul Lorenzo Rodriguez, Francisco Ramon Rodriguez, and Christina Conroy obtained one-half of their interest in the Claim by operation of law upon RBLR's death in 1986. The other half of RBLR's interest in the Claim was transferred by operation of law to his wife Esther Beltran Rodriguez ("EBR") upon RBLR's death in 1986. EBR, who was a U.S. citizen prior to 1996, passed her interest in the Claim to Plaintiffs Raul Lorenzo Rodriguez, Francisco Ramon Rodriguez, and Christina Conroy through her will upon EBR's death in 2019.

6

19.     Upon information and belief, Defendant Imperial, is a limited liability company incorporated in England and Wales, having its principal place of business in England.

20.     Upon information and belief, Defendant Habanos is a Cuban joint venture corporation 50% owned by Imperial, either directly or through one or more subsidiaries, and 50% owned by the Cuban government, either directly or through one or more Cuban-controlled entities. According to Imperial, "The international marketing of Cuban hand-made cigars is carried out through Habanos S.A., in which we have a 50 per cent stake."[10]

21.     Upon information and belief, Defendant WPP PLC ("WPP"), is limited liability company incorporated in the UK. WPP earns more income from the U.S than any other country.[11] WPP also leases over 2.8 million square feet of office space in the U.S.[12]

22.     Upon information and belief, Defendant Young & Rubicam LLC ("Y&R"), is a limited liability company incorporated in Delaware having its principal place of business in New York. Y&R is a subsidiary of WPP and has offices in Miami-Dade.

23.     Upon information and belief, Defendant BCW LLC, a/k/a Burson Cohn & Wolfe LLC ("BCW"), is a limited liability company incorporated in Delaware having its principal place of business in New York. BCW is a subsidiary of WPP and has offices in Miami-Dade.

### Jurisdiction and Venue

24.     Plaintiffs' claim arises under 22 U.S.C. § 6021, et seq., and the amount in controversy exceeds the sum or value of $50,000, exclusive of interest, costs, and attorneys' fees.

---

[10]   *See* https://www.imperialbrandsplc.com/about-us/our-companies/tabacalera.html

[11]   *See* WPP Form 20-F filing with SEC for year ended 12/31/2017 at 10, https://www.sec.gov/Archives/edgar/data/806968/000119312518141442/d462033d20f.htm

[12]   *See id*. at 12.

Therefore, this Court has subject matter jurisdiction (federal question) pursuant to 28 U.S.C. § 1331.

25.     As further set out below, Habanos committed tortious acts in Miami-Dade County, Florida. In particular: (1) Habanos leases, possesses, controls, manages, uses, or otherwise acquired or holds an interest in the confiscated RRHSC Property[13]; (2) Habanos has engaged and continues to engage "in a commercial activity using or otherwise benefiting from" the RRHSC Property confiscated by Cuba[14]; and (3) Habanos "causes, directs [or] participates in . . . trafficking" by Imperial, WPP, Y&R, BCW, and by non-defendants, Twitter, YouTube, and Instagram.[15] These acts have caused damage to Plaintiffs, six of whom reside in Florida.

26.     As further set out below, Imperial committed tortious acts in Miami-Dade County, Florida. In particular, Imperial through its ownership in and its control of Habanos: (1) leases, possesses, controls, manages, uses, or otherwise acquired or holds an interest in the confiscated RRHSC Property[16]; (2) has engaged and continues to engage "in a commercial activity using or otherwise benefiting from" the RRHSC Property confiscated by Cuba[17]; and (3) "causes, directs [or] participates in, or profits from, trafficking" by Habanos and other joint venture companies owned by Imperial and Tabacuba, including Altabana, S.L.[18], as well as by WPP, Y&R, BCW,

_____

[13]   *See* 22 U.S.C. § 6023(13)(A)(i).

[14]   *See* 22 U.S.C. § 6023(13)(A)(ii).

[15]   *See* 22 U.S.C. § 6023(13)(A)(iii).

[16]   *See* 22 U.S.C. § 6023(13)(A)(i).

[17]   *See* 22 U.S.C. § 6023(13)(A)(ii).

[18]   Altabana is a joint venture corporation 50% owned by Imperial, either directly or through one or more subsidiaries, and 50% owned by Cuba or Cuban-controlled entities. According to Imperial, Altabana holds Imperials "investments in subsidiary companies involved in the marketing and sale

Twitter, YouTube, and Instagram.[19] In addition, Imperial has further profited, or is attempting to further profit, from the confiscated RRHSC Property through its recent agreement to sell some or all of its interests in Habanos and other joint venture companies owned by Imperial and Tabacuba, involved in the manufacture, sale, marketing, and distribution of Cuban tobacco products that have value at least in part as a result of their engagement "in a commercial activity using or otherwise benefiting from" the confiscated RRHSC Property. The These acts have caused damage to Plaintiffs, six of whom reside in Florida.

27.     As further set out below, WPP committed tortious acts in Miami-Dade County, Florida. In particular, WPP through its ownership in and its control of Y&R and BCW "causes, directs [or] participates in, or profits from, trafficking" by Imperial, Habanos, Y&R, BCW, Twitter, YouTube, and Instagram.[20] These acts have caused damage to Plaintiffs, six of whom reside in Florida.

28.     Y&R committed tortious acts in Miami-Dade County, Florida. In particular, Y&R "causes, directs [or] participates in, or profits from, trafficking" by Imperial, Habanos, Twitter, YouTube, and Instagram.[21] These acts have caused damage to Plaintiffs, six of whom reside in Florida.

29.     BCW committed tortious acts in Miami-Dade County, Florida. In particular, BCW "causes, directs [or] participates in, or profits from, trafficking" by Imperial, Habanos, Twitter,

---

of Cuban cigars." *See* Imperial 2019 Annual Report at 166.

[19]   *See* 22 U.S.C. § 6023(13)(A)(iii).

[20]   *See* 22 U.S.C. § 6023(13)(A)(iii).

[21]   *See* 22 U.S.C. § 6023(13)(A)(iii).

YouTube, and Instagram.[22] These acts have caused damage to Plaintiffs, six of whom reside in Florida.

30.     Imperial knew in 2007, years after the passage of the Liberty Act, when it purchased its interest in Habanos and other entities engaged in trafficking in property confiscated by the Cuban government, that Habanos' operations would "be restricted . . . by the nationality of the personnel that" Imperial could "involve in" the Cuban cigar business that it decided to acquire whose business was based on trafficking in property confiscated by the Cuban government.[23]

31.     Notwithstanding, Imperial decided, beginning no later than 2010 and continuing at least through February 2020, to retain, either directly or through Habanos, WPP and its U.S.-based "U.S. Corporate Agents," Ogilvy and later Y&R and BCW, to engage in the marketing of, i.e., trafficking in, Cuban cigars manufactured at, stored in, or distributed from the confiscated RRHSC Property.[24] In addition, no later than 2017, Imperial also decided, either directly or through Habanos, WPP or its U.S. Corporate Agents, to contract for the use of social media "portals" operated by still additional U.S. corporations. These corporations include Twitter,

---

[22]   *See* 22 U.S.C. § 6023(13)(A)(iii).

[23]   *See* Imperial's October 12, 2007 "Response" to SEC inquiry at 2 (acknowledging that by acquiring "Altadis' 50% ownership interest in [Habanos] a company which distributes cigars manufactured in Cuba," Imperial "may be restricted . . . by the nationality of the personnel that we involve in these activities. In particular, Altadis' cigar operations in Cuba could be materially limited by the operation of the" the Liberty Act). Copy attached at Exhibit 4; *see id*. at 4 ("Altadis owns a 50% interest in Habanos, the remaining 50% of which is owned by the Cuban state.")

[24]   The marketing, merchandizing, or advertising services provided by Y&R and BCW are not exempted by the Liberty Act nor by the Cuban Assets Control Regulations, 31 C.F.R. Part 515. *See* 31 C.F.R § 515.206 (excluding from "exempt transactions" the: "provision of marketing and business consulting services" and "provision of services to market, produce or co-produce, create or assist in the creation of information or informational materials.").

Instagram and YouTube[25], all for the purpose of furthering Imperial and Habanos' ability to profit from the trafficking of property confiscated by the Cuban government, including the RRHSC Property.

32.     WPP similarly knew that its extensive U.S. business activities, conducted both directly and through its many wholly-owned subsidiaries, including Ogilvy, Y&R, and BCW, would render it "subject to the laws of the US . . . that impose sanctions and regulate the supply of services to certain countries." [26] These laws include, of course, the Liberty Act. WPP nevertheless decided to involve these three U.S. subsidiaries in marketing and publicizing products produced at, stored in and shipped from, the confiscated RRHSC Property. WPP thereafter used or allowed its U.S. subsidiaries to contract for the use of social media "portals" operated by still additional U.S. corporations, Twitter, Instagram and YouTube.

33.     Each of the acts described in paragraphs 25 – 32, above, constituted trafficking in violation of the Liberty Act. Further, each act of trafficking in the RRHSC Property caused damage to Plaintiffs, six of whom reside in Miami-Dade County.

---

[25]   The sponsored official social media "portals" established by Twitter, Instagram, and YouTube are not exempted by the Liberty Act nor by the Cuban Assets Control Regulations, 31 C.F.R. Part 515. *See* 31 C.F.R. § 515.578(a) (authorizing the exportation to Cuba of "services incident to the exchange of communications over the internet, such as . . . social networking [and] sharing of photos" but only if "such services are widely available to the public *at no cost to the user*") (emphasis added); *id.*, §515.578(b)(1) (expressly excluding from authorized services the: "direct or indirect exportation . . . of services with knowledge or reason to know that such services are intended for . . . *organizations administered or controlled by the Government of Cuba*.") (emphasis added); *see also* 31 C.F.R § 515.206.

[26]   *See* WPP Form 20-F filing with SEC for year ended 12/31/2017 at 5, https://www.sec.gov/Archives/edgar/data/806968/000119312518141442/d462033d20f.htm (disclosing busines "risks" and acknowledging that: "Failure to comply with these laws could expose the Group [WPP] to civil and criminal penalties . . ..")

34.     Due to their extensive use of U.S. Corporate agents to market, publicize and assist in the trafficking, in violation of the Liberty Act, of property confiscated by the Cuban government, Defendants Habanos, Imperial and WPP should reasonably have anticipated the possibility that they would be sued in the United States by U.S. Nationals holding claims to property confiscated by the Cuban government, including this lawsuit on the Claim to the RRHSC Property.

35.     Due to their actions described above, all Defendants should further have reasonably anticipated the possibility that they would be sued in the United States by U.S. Nationals holding claims to property confiscated by the Cuban government, including this lawsuit on the Claim to the RRHSC Property, in the Southern District of Florida, which is widely-known to be home to over a million Cuban refugees and their successors, many of whom are U.S. Nationals owning claims to property confiscated by the Cuban government.

36.     This Court has personal jurisdiction over each Defendant pursuant to the Florida "long-arm" statute, Section 48.193(1)(a), Florida Statutes, because each Defendant committed a tortious act within this state, either directly or through an agent, and the cause of action asserted against each Defendant arises from that tortious conduct.

37.      In the alternative, if Defendants are deemed not to have sufficient contacts with Florida despite their commission of multiple acts of trafficking in violation of the Liberty Act causing damage to Plaintiffs in Florida, Defendants are nevertheless subject to personal jurisdiction under the federal "long-arm" statute set out in Rule 4(k) of the Federal Rules of Civil Procedure.[27] If Defendants' personal contacts with any single state are not sufficient to subject

---

[27]     Rule 4(k) provides in relevant part: "(2) For a claim that arises under federal law, serving a summons . . . establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."

them to personal jurisdiction in any particular state, Rule 4(k) allows the Court to consider a defendant's contacts with the U.S. as a whole where the claim asserted against the defendant arises under federal law. Plaintiffs' claim here arises under the federal Liberty Act. Therefore, Defendants' contacts with the U.S. as a whole, including Imperial, Habanos and WPP's reliance on Y&R, BCW, Twitter, YouTube, and Instagram to conduct marketing and social media campaigns in violation of the Liberty Act, are sufficient to satisfy the applicable constitutional requirements.

38. Venue is proper in the Southern District of Florida under 28 U.S.C. §§ 1391(b)(2) and 1391(d), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Florida.

### Facts

39. Plaintiffs are U.S. Nationals as defined by the Libertad Act. *See* 22 U.S.C. § 6023(15).

40. The RRHSC Property was owned and improved by RRHSC until the Cuban Government confiscation in 1961.

41. As part of its takeover of the entire tobacco industry, the Castro government confiscated ownership of RRHSC and the RRHSC Property on June 30, 1961.[28]

42. The communist Cuban Government maintains possession and control of the RRHSC Property and has not paid any compensation to Plaintiffs, or their predecessor RRG, for

---

[28] On June 30, 1961, by decision of the "Junta Central de Planificacion," Cuba's Central (Economic) Planning Board, Cuba's communist government confiscated ownership of RRHSC as part of it takeover of the entire tobacco industry. *See* excerpt at Exhibit 5; English translation of excerpt at Exhibit 5A; Spanish text of excerpt at Exhibit 5B. The Junta Central de Planificacion's decision and proclamation appears in Cuba's government register, the "Gaceta Oficial," No. 131 dated July 7, 1961, page 13203.

its seizure. Nor has any claim to the RRHSC Property been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

43.     Plaintiffs are the rightful owners of the Claim arising from Cuba's "nationalization" and uncompensated taking of the RRHSC Property.

44.     Upon information and belief, Imperial acquired its interest in Habanos in 2007 when it acquired "Altadis' 50% ownership interest in" Habanos "a company which distributes cigars manufactured in Cuba."  Imperial knew that its joint venture partner in Habanos and Altabana, Cuba (through its monopoly company, Tabacuba), acquired its interest in and control over the Cuban tobacco industry and the RRHSC Property by "nationalizing" assets when the rightful owners of the property fled the brutal Castro dictatorship.

45.     The RRHSC Property is currently in the exclusive control of the Cuban government through Tabacuba, Habanos and its joint venture partner, Imperial. Upon information and belief, Tabacuba and Habanos have continuously used the RRHSC property without authorization from the Rodriguez Family since at least 2010, and likely for many years before that. The unauthorized use of the RRHSC Property includes the production and shipping of millions hand-rolled cigars (sold under various premium brand names) and other tobacco products manufactured at the property, or manufactured at other nearby factories, and stored, processed or shipped from the RRHSC Property. Imperial and Habano's trafficking also includes use of the RRHSC Property for marketing and publicity of Habanos' products.[29]

---

[29]     *See* Composite Exhibit 6 containing pictures published by the Habanos website of "visit the factories" tours promoted by Habanos at the RRHSC Property. Exhibit 7 is a picture of the loading dock at the RRHSC Property in operation.

46.     Habanos itself documented its possession, control of, management, and use of the RRHSC Property. In a February 2010 publicity piece entitled: "Cigar Factory Readings and Readers," Habanos referred to the factory (the RRHSC Property) "Standing on famous 23rd Street in Havana's bustling Vedado neighborhood right between the 14th and 16th streets," as the "humongous and modern H. Upmann cigar factory." [30] The continuous use of the RRHSC Property includes the use of a portion of the RRHSC Property by Imperial's joint venture partner, Tabacuba, for its executive offices, and the use of the loading dock[31] and space for warehousing and shipping Habanos' products. Tabacuba's name appears prominently on the building.[32]

47.     Imperial, Habanos, and Tabacuba, (collectively, the "Direct Traffickers") knowingly and intentionally lease, possesses, control, manage, use, or otherwise acquired or hold an interest in the confiscated RRHSC Property, without the authorization of the Rodriguez Family. Each also has and continues to engage in a commercial activity using or otherwise benefiting from the confiscated RRHSC Property without the authorization of the Rodriguez Family.

48.     Imperial and its partner Tabacuba, through the joint venture companies they jointly control, have expanded their use of and benefit from the RRHSC Property by retaining agents to market and publicize the products produced at the confiscated RRHSC Property. The agents retained by Imperial and Habanos include WPP through its advertising agency subsidiaries, Y&R and BCW. Among other things, those agencies assisted in setting up, or directly set up, the sponsored "official" portals listed above on the Twitter, YouTube, and Instagram platforms (Y&R, BCW, Ogilvy, Twitter, YouTube, and Instagram, collectively, the "U.S. Corporate Agents"). The

---

[30]     *See* http://habanosnews.habanos.com/en/cigar-factory-readings-and-readers .

[31]     *See* Exhibit 7.

[32]     *See* Composite Exhibits 2 and 3.

work of the U.S. Corporate Agents on behalf of Imperial, Habanos and Tabacuba has included marketing and publicizing the Habanos' products manufactured in, stored at, or shipped from, the RRHSC Property. WPP, acting in serial and uninterrupted fashion first through Ogilvy and later through Y&R, and BCW, has continuously marketed and publicized the RRHSC Property, and the Habanos' products made at, stored in, or shipped from the RRHSC Property, since at least 2010.

49.     Between 2010 and 2015, WPP used a subsidiary known as Ogilvy to market Habanos products. Beginning in 2016, marketing of Habanos products was switched to Y&R, another WPP subsidiary. Most recently, beginning in 2019, marketing of Habanos products was again switched to still another WPP subsidiary, BCW. In each instance, the switch from one to another WPP subsidiary was done without any apparent break or interruption in marketing services. Indeed, although WPP ostensibly switched from using Y&R to using BCW as the Habanos trafficking marketer, BCW continued using the same contact address as Y&R had been using -- (press.habanos@yr.com).

50.     The Direct Traffickers have expanded their trafficking by retaining agents to assist in and further their trafficking in the property. The U.S. Corporate Agents have and, with the possible exception of Twitter, Instagram and Ogilvy, continue to, knowingly and intentionally, act as agents for the Direct Traffickers. Each has and continues to cause, direct, participate in, or profit from, the trafficking of the RRHSC Property by the Direct Traffickers, all without the authorization of the Rodriguez Family.

51.     Imperial recently announced that it "has agreed the sale of its worldwide premium cigar businesses," including the non-U.S. business it calls "the Rest of the World business

("Premium Cigar RoW").[33] By Imperial's own admission, these "assets" consist primarily of Imperial's interest in Cuban joint venture companies, including:

> A 50 per cent stake in Habanos S.A., which exports hand-made cigars from Cuba and is responsible for international marketing activities. . . .
>
> A 50 per cent stake in Altabana S.L., which is responsible for the distribution of Cuban cigars worldwide through its network of over 20 subsidiary distributors.
>
> A 50 per cent stake in Internacional Cubana de Tabaco, S.A., which is responsible for the manufacturing of Cuban premium machine-made cigars.
>
> A 50 per cent stake in Promotora de Cigarros, S.L., which manages the distribution of the Cuban premium machine-made cigar portfolio worldwide.
>
> Other sales of premium cigar products through Tabacalera SA including:
>
> Exclusive distribution of Cuban handmade cigars in Spain;

52.     Imperial has further profited, or is attempting to further profit, from the confiscated RRHSC Property through its recent agreement to sell some or all of its interests in Habanos and other Imperial subsidiaries involved in the manufacture, sale, marketing, and distribution of Cuban tobacco products that have value at least in part as a result of their engagement "in a commercial activity using or otherwise benefiting from" the confiscated RRHSC Property.

53.     Consistent with its purpose of "deter[ing] third party foreign investors from trafficking in confiscated property (defined as '**purchas[ing] an equity interest in, manag[ing], or enter[ing] into joint ventures** using property and assets some of which were confiscated from United States nationals.')[34], the Liberty Act defines trafficking in property confiscated by the

---

[33]     *See Imperial Brands PLC agrees sale of Worldwide Premium Cigar Business* at 1, https://www.imperialbrandsplc.com/media/key-announcements/2020/imperial-brands-plc-agrees-sale-of-worldwide-premium-cigar-busin.html

[34]     *See Glen v. Club Mediterranee S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (emphasis added) (quoting 22 U.S.C. § 6081(5)).

Cuban government broadly. For purposes of the act, a person "traffics" in confiscated property if that person "knowingly"[35] and intentionally:

> (i)      sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, *leases*, receives, *possesses*, *obtains control of*, *manages*, *uses*, or otherwise acquires or holds an interest in confiscated property,
>
> (ii)      *engages in a commercial activity using or otherwise benefiting from* confiscated property, or
>
> (iii)      *causes*, *directs*, *participates in*, *or profits from*, *trafficking* (as described in clause (i) or (ii)) *by another person*, *or otherwise engages in trafficking* (as described in clause (i) or (ii)) *through another person*, without the authorization of any United States national who holds a claim to the property.

*See* 22 U.S.C. § 6023(13) (emphasis added).

54.      Property is also broadly defined in the Liberty Act:

> The term "property" means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest.

55.      The conduct described above constitutes trafficking in the RRHSC Property by Imperial and Habanos. In particular, each knowingly and intentionally engages or engaged in a commercial activity using or otherwise benefiting from the confiscated RRHSC Property, without the authorization of the Rodriguez Family. Each also causes, directs, participates in, or profits from, trafficking of the RRHSC Property by Cuba (and Tabacuba), again without the authorization of the Rodriguez Family.

---

[35]      The term "knowingly" is defined in the Act as meaning "with knowledge or having reason to know." *See* 22 U.S.C. § 6023(9).

56. The conduct described above also constitutes trafficking in the RRHSC Property by WPP, Y&R, and BCW. In particular, by assisting Imperial, Habanos, and Tabacuba in marketing and publicizing the Habanos' products manufactured, stored at or shipped from the RRHSC Property, each causes, directs, participates in, or profits from, or otherwise engages in, trafficking in the RRHSC Property by Imperial, Habanos, and Cuba, all without the authorization of the Rodriguez Family.

57. Imperial and its joint venture partner Cuba (Tabacuba) have profited substantially from trafficking in the confiscated RRHSC Property. According to data reported in Imperial's Annual Reports for the period from 2009 to 2019, "profits" earned by Imperial and Cuba from sales and distribution of Cuban cigars totaled over $1.5 billion. Total "revenues" exceeded $6.7 billion.[36] A significant portion of that profit and revenue was earned by trafficking in the confiscated RRHSC Property.

58. Plaintiffs provided a thirty-day notice each to Imperial, WPP, Y&R and BCW (and to Habanos in care of Imperial) stating, as provided by 22 U.S.C. § 6082 (3)(B) –(D), Plaintiffs' intention to commence this action and demanding that each Defendant immediately cease unlawfully trafficking in the RRHSC Property.

59. Notwithstanding Plaintiffs' notice, after the end of the 30-day period beginning on the date the notice was provided, each Defendant (with the possible exception of Y&R) continued to traffic in the confiscated RRHSC Property.

---

[36] Imperial's profits and revenues are reported in GBP. The over $1.5 billion in "profits" and over $6.7 billion in "revenues" were calculated by adding the "profits" and "revenues" reported in GBP by Imperial for its Habanos and Altabana joint ventures for the years 2009 to 2019. Those figures were then converted to dollars at an exchange rate of 1.25 GBP per dollar. That result was then doubled two to reflect the presumably equal distribution of profits and revenues between Imperial and Cuba in their 50-50 joint venture companies.

**Claim for Damages**

60.     Plaintiffs incorporate and reallege paragraphs 1 through 59 as if fully set forth herein.

61.     This claim is brought pursuant to the Liberty Act, 22 U.S.C. § 6082.

62.     As set out above, beginning no later than 2010 (Imperial, Habanos, and WPP), or no later than 2016 (Y&R) or no later than 2019 (BCW), each Defendant trafficked in the RRHSC Property which was confiscated by the Cuban Government on or after January 1, 1959 in violation of the Liberty Act and is therefore liable to Plaintiffs, who own the Claim to the RRHSC Property, for money damages.

63.     Plaintiffs are entitled to money damages under 22 U.S.C. § 6082(a)(1)(A), including:

(i)      the amount which is the greater of--

. . . (II) the amount determined [by a special master pursuant to 22 U.S.C. § 6083(a)(2)]; or (III) the "fair market value" of the RRHSC Property, "calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater" ; and

(ii)     court costs and reasonable attorneys' fees.

64.     In addition, treble damages are warranted. Because Defendants (with the possible exception of Y&R) continued to traffic in the RRHSC Property after receiving notice from Plaintiffs pursuant to § 6082 (3)(B)–(D), Plaintiffs are entitled to three times the money damages

determined pursuant to § 6082(a)(1)(A), plus court costs and reasonable attorneys' fees. *See* 22 U.S.C. § 6082(a)(3)(B)-(C).

## Jury Trial Demand

Plaintiffs hereby demand a trial by jury.

Dated: August 6, 2020                    Respectfully submitted,

Rodriguez Tramont & Nuñez P.A.           Berenthal & Associates, P.A.


By: /s/ *Paulino A. Núñez Jr.*           By: /s/ *James L. Berenthal*
Frank R. Rodriguez                       James L. Berenthal
Florida Bar No. 348988                   Florida Bar No.126035
Email: frr@rtgn-law.com                  Email: jlb@berenthalaw.com
Paulino A. Núñez Jr.                     777 Third Avenue, Suite 22D
Florida Bar No. 814806                   New York, NY 10017-1426
Email: pan@rtgn-law.com                  Telephone: (212) 302-9494
255 Alhambra Circle
Suite 1150
Coral Gables, FL 33134
Telephone: (305) 350-2300

COMPOSITE EXHIBIT 1







# COMPOSITE EXHIBIT 2

Case 1:20-cv-23287-XXXX Document 1-2 Entered on FLSD Docket 08/06/2020 Page 2 of 2





Case 1:20-cv-23297-XXXX Document 1-3 Entered on FLSD Docket 08/06/2020 Page 1 of 2

# COMPOSITE EXHIBIT 3





Case 1:20-cv-23326-XXXX Document 1-4 Entered on FLSD Docket 08/06/2020 Page 1 of 9

EXHIBIT 4

CORRESP 1 filename1.htm

Imperial Tobacco Group PLC
PO Box 244, Southville, Bristol BS99 7UJ
Tel: +44 (0) 117 933 7286
Fax: +44 (0) 117 933 7430

Ms Cecilia Blye
Office of Global Security Risk
Division of Corporation Finance
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
United States of America

October 12, 2007

Re:     **Imperial Tobacco Group PLC**
        **Form 20-F for Fiscal Year Ended September 30, 2006**
        **Filed February 2, 2007**
        **Form 6-K filed July 23, 2007**
        **File No. 1-14874**

Dear Ms Blye

Thank you for your letter of September 28, 2007. Having had the opportunity to carefully consider your comments I have set out below our responses. Where requested we have provided supplemental explanation and information and we will revise future filings to expand and enhance our disclosures.

In responding to your comments we acknowledge that:

•   the Company is responsible for the adequacy and accuracy of the disclosure in its filings;

•   staff comments or changes to disclosure in response to staff comments do not foreclose the Commission from taking any action with respect to the Company's filings; and

•   the Company may not assert staff comments as a defence in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

For your convenience, we have included each of your comments from your letter, in order and in italics, followed by our responses.

_General_

1.  *We note the disclosure on page 9 of your Form 20-F, and in Exhibit 99.1, regarding your operations and the operations of the Enlarged Group in Iran, Syria and Cuba. In future filings, please revise the disclosure to make clear that the referenced countries are identified by the U.S. State Department as state sponsors of terrorism, so that it will be clear that the risk of "adverse public reaction or reputational harm as a result of doing business in countries that have been identified as state sponsors of terrorism by the U.S. State Department…" to which you refer relates specifically to your operations, and the Enlarged Group's operations, in Iran, Syria and Cuba.*

    **Imperial Tobacco Response**

    We will revise our disclosures in future filings to make clear that the referenced countries are identified by the U.S. State Department as state sponsors of terrorism. In this regard, we would propose including a risk factor to the following effect:
    "**_We do business in certain countries subject to international sanctions_**

Some of the countries in which we do business or with whom we have commercial dealings through third parties, such as Iran, Syria and Cuba, have been identified by the U.S. State Department as state sponsors of terrorism. Our activities in these jurisdictions are currently limited principally to selling tobacco products and purchasing tobacco leaf and are not material to our revenue, profit and financial condition. However, following completion of the proposed acquisition of Altadis, our business in Cuba, from which we have previously only sourced tobacco leaf, will become more significant as a result of Altadis' 50% ownership interest in Corporacion Habanos S.A. ("Habanos") a company which distributes cigars manufactured in Cuba.

We seek to comply fully with international sanctions to the extent they are applicable to us and will continue to do so following completion of the proposed acquisition of Altadis. However, in doing so we may be restricted in the sources of products that we supply to these jurisdictions, in our sources of funding for our operations in these jurisdictions or by the nationality of the personnel that we involve in these activities. In particular, Altadis' cigar operations in Cuba could be materially limited by the operation of the United States Cuban Assets Control Regulations and the United States Cuban Liberty and Democratic Solidarity (Libertad) Act 1996 (commonly known as Helms-Burton). New future sanctions or changes in existing sanctions could further restrict or entirely prevent us and the Enlarged Group from doing business in or having commercial dealings with certain jurisdictions, including Cuba, which could have an adverse effect on our revenue, profit and financial condition and that of the Enlarged Group.

Furthermore, we may suffer from adverse public reaction or reputational harm as a result of doing business in or having commercial dealings through third parties with countries that have been identified as state sponsors of terrorism by the U.S. State Department, including Iran, Syria and Cuba, or that are subject to international sanctions, notwithstanding that our activities comply with applicable international sanctions and regardless of the materiality of our operations in such countries to our operations or financial condition. Any such reaction could have an adverse effect on our revenue, profit and financial condition and that of the Enlarged Group or on the market price for our ordinary shares and ADSs."

2.  *We refer you to the description of your operations in countries identified by the U.S. State Department as state sponsors of terrorism, and your purchase of tobacco leaf grown in Cuba, included in your letter to the staff dated February 11, 2005. Please provide us with an updated description of your operations in, and other contacts with, these countries, and a description of the Enlarged Group's operations in, and other contacts with, these countries.*

**Imperial Tobacco Response**

As requested we set out below an updated description of our operations in and other contact with nations identified by the U.S. State Department as state sponsors of terrorism.

*Iran*: The contract manufacturing arrangement with the Iranian Tobacco Company entered into by the group in 2002 remains in force. Under the arrangement we manufacture cigarettes for importation into Iran via a third party distributor. In the year ended September 30, 2006 the value of such net revenue was £4,234,000 and we generated an operating profit of £553,000. No cigarettes have been manufactured and no sales have been made under this arrangement in fiscal 2007.

*Syria*: We manufacture cigarettes for importation into Syria. In the year ended September 30, 2006 the value of our net revenues for Syria was £2,630,000 (of which £573,000 was for the domestic market and £2,057,000 for the duty free market), generating an operating profit of £1,348,000. Sales in fiscal 2007 were £564,000 in the domestic market and at £3,037,000 in the duty free market, giving a total of £3,601,000. All of the increase between 2006 and 2007 came from the duty free market.

We do not consider our current activity in these countries to be material to the group's financial results, either individually or in the aggregate. The table below illustrates our net revenues and operating profit in Iran and Syria in amount and as a percentage of total group net revenues and operating profit in fiscal 2006.

|  | Group | Iran | | Syria | |
|---|---|---|---|---|---|
|  | (£ millions) | (£ millions) | (% of Group) | (£ millions) | (% of Group) |
| Net revenues | 3,162 | 4.2 | 0.13 | 2.6 | 0.08 |
| Operating profit | 1,311 | 0.6 | 0.05 | 1.3 | 0.01 |

We have not yet released our group financial results for 2007, but expect that our operations in Syria will have a similar level of significance to our group net revenues and operating profit. As mentioned above, we had no sales in Iran in fiscal 2007.

We have no subsidiaries, facilities or group personnel based in either Iran or Syria.

*Cuba, North Korea and Sudan*: Currently, we do not conduct business in Cuba, North Korea or Sudan. However, we advise the Staff that we purchase tobacco leaf grown in Cuba. These purchases, which are made via an international tobacco leaf dealer, totalled £290,000 in fiscal 2006 and £802,000 in fiscal 2007.

*Altadis/the Enlarged Group*: We have additionally provided a description of the Altadis operations in these countries. However, given that we have not had access to perform significant due diligence on the Altadis Group, our understanding of Altadis' operations in these countries is based on information included in public documents filed by Altadis or published by Altadis on its website.

The acquisition of Altadis was approved by our shareholders at an extraordinary general meeting held on August 13, 2007. The formal offer document (*folleto informativo*) is currently being reviewed by the *Comisión Nacional del Mercado de Valores*, the Spanish securities regulator (the "CNMV"). Following approval by the CNMV, we will commence our tender offer for Altadis, which has three conditions: (i) EU competition clearance, (ii) tender of at least 80% of the outstanding ordinary shares of Altadis and (iii) removal of the 10% limitation on the exercise of voting rights contained in Altadis' by-laws. We have applied for EU competition clearance and are currently awaiting the decision of the regulator. Following the launch of our tender offer, there would be an acceptance period of approximately 60 days during which an extraordinary general meeting of Altadis shareholders would be called in order to remove the voting limitation. As the acquisition is subject to the satisfaction of conditions that are outside of our control, we cannot be certain that the acquisition will be completed.

In 2000 Altadis acquired a 50% interest in Corporacion Habanos S.A. ("Habanos") a company based in Cuba. Habanos distributes cigars manufactured in Cuba on a global basis. Habanos sales included in the accounts of Altadis for the year ended December 31, 2006 totalled €135million (£93 million) representing 3.4% of the Altadis Group's economic sales.

We also understand that Altadis manufactures cigarettes for importation into Syria. Altadis have not publicly disclosed the value of its sales to Syria; however, we do not believe such sales will be material to the Enlarged Group. We are not aware of any Altadis operations in Iran, North Korea or Sudan.

3.  *Please clarify for us whether the operations of the Enlarged Group in Syria and Cuba will be material to the revenue, profit and financial condition of the Enlarged Group.*

**Imperial Tobacco Response**

Based upon the information that has been made available to us, if the acquisition of Altadis is completed, we estimate that the operations in Syria and Cuba will represent less than 2% of the revenue and profits of the Enlarged Group. As such we do not consider the operations to be material to the revenue, profit and financial condition of the Enlarged Group.

4. *Please advise us whether, and the extent to which, the governments of Iran, Syria, and Cuba, or persons or entities controlled by those governments, receive cash or act as intermediaries in connection with your and Altadis' operations.*

**Imperial Tobacco Response**

The Iranian Tobacco Company is a state-owned monopoly. However, because the transactions in which we were involved were the manufacture of cigarettes for sale to them via a third party distributor based in the UAE, we received no revenues from them directly and did not provide them with any cash. As mentioned above, we did not manufacture any cigarettes for import to Iran in fiscal 2007.

Similarly, in Syria, we sold cigarettes for the Syrian domestic market to the General Organisation for Trade, which is a state-owned monopoly. Sales of duty free cigarettes were made through a third party distributor based in the Lebanon. We have no knowledge of the parties or arrangements by which Altadis operates in Syria.

In Cuba, we purchase tobacco leaf grown in Cuba from an international tobacco leaf dealer, and do not deal directly with any Cuba entities. In addition, Altadis owns a 50% interest in Habanos, the remaining 50% of which is owned by the Cuban state. However, as discussed above, the acquisition of Altadis remains subject to the satisfaction of certain conditions which are outside of our control.

## Closing comments

I trust our responses to your comments are satisfactory. If you require any further explanations or information when considering our responses to your comments please contact Nick Keveth (Group Financial Controller) on 011 44 117 933 7557.

Yours sincerely

Matthew Phillips

Company Secretary

# EXHIBIT 5

## "Gaceta Oficial" No. 131 dated July 7, 1961, page 13204

sea a que se refiere el anterior Por Cuanto, concentren circunstancias análogas a las constitutivas de las causas de utilidad pública y de interés social que justificaron la nacionalización de las empresas relacionadas en la Ley 890 de 1960.

Por Cuanto: La Disposición Transitória única de la pre-citada Ley No. 890 de 13 de octubre de 1960, faculta a la Junta Central de Planificación para proceder, de acuerdo con los principios de dicha Ley, a la nacionalización de las empresas, no incluídas en la misma, que en la fecha de su promulgación se encontraban intervenidas por disposición de organismos estatales.

Por Tanto: En uso de las facultades que le están conferidas el Comité Ejecutivo de la Junta Central de Planificación acuerda dictar la siguiente:

### Resolución

Primero: Se dispone la nacionalización mediante expropiación forzosa y, en consecuencia, se adjudican a favor del Estado Cubano en pleno dominio todos los bienes y empresas ubicadas en el territorio nacional y los derechos y acciones emergentes de la explotación de los mismos, cualesquiera que sean el título y modo de su disfrute, que pertenecen a las siguientes personas naturales o jurídicas:

1. Gasolinera Pintec, S. A.
2. Combustibles El Recodo, S. A.
3. Centro Comercial Palacios, S. A.
4. Comercial Garbo, S. A.
5. Fregadora de Autos de Cuba, S. A.
6. Servicentro Diana, S. A.
7. Motores Cojímar, S. A.
8. Aluminio Estructural Cubano, S. A.
9. Industrial Siré, S. A.
10. Compañía Cajonera Cubana, S. A.
11. Minera Occidental Bosch, S. A.
12. Compañía Inspiración Cubana de Cobre, S. A.
13. Tintas Sinclair y Valentine de Cuba, S. A.
14. Distribuidora de Alta Costura Internacional. S. A.
15. Compañía Textilera Cafardin, S. A.
16. Compañía Textil Doble Vía, S. A.
17. Compañía Moldeadora de Plásticos, S. A.
18. Distribuidora de Tabacos y Cigarros Montemán, S. A.
19. Industrial Alfarera Cubana.
20. Muebles de Arte de Mimbre, S. A.
21. Mueblería La Parisién, S. A.
22. Maderera Occidental, S. A.
23. Fundición de Metales Cadena, S. A.
24. Aguas de Mesa, S. A.
25. Republic Hosiery Mill, S. A. (en español: Fábrica de Tejidos República, S. A.)
26. Compañía Textil Cubanacán, S. A.
27. Pollack y Compañía S. A., exportadores de tabaco en rama.
28. Fábrica de Cigarros y Picaduras, Torres Gener Hermaes, S. A.
29. Cigarros H. Hupmann, S. A.
30. Fábrica de Cigarros y Tabacos de Trinidad y Hermanos, S. A.
31. Trinidad Industrial, S. A.
32. Fábrica de Cigarros Kim, S. A.
33. Compañía Nacional de Calzado Alex, S. A.
34. Compañía Calzado Toldrá, S. A.
35. Compañía Fabril de Calzado Kino, S. A.
36. La Sin Rival, S. A., Pastas y Fideos.
37. Compañía Galletera Gilda, S. A.
38. Panificadora Pinova, S. A.
39. Textilera Amazona, S. A.
40. Tejas Infinitas, S. A.
41. Tambores Arbuckle de Cuba, S. A.
42. Minasgrande, S. A.
43. Compañía Minera Bahía de Moa.
44. Compañía Minera Masvidal, S. A.
45. Empaques Celloprint, S. A.
46. Nuevas Creaciones Textiles, S. A.
47. Empresas Petroleras Jones de Cuba, S. A.
48. Esso (Cuba) Inc.
49. Esso Standard (Cuba) Inc.
50. La Compañía Limitada de Texas (Indias Occidentales).
51. Compañía de Navegación Sinclair de Cuba.
52. Servicios Metropolitanos de Gas, S. A.
53. Compañía Comercial El Condado, S. A.
54. Refinería de Petróleo Santa María, S. A.
55. Panadería Billy, S. A.
56. Castañeda Montero, Fonseca, S. A.
57. Confecciones Paraná, S. A.
58. Textilera Versalles, S. A.
59. Curtidora Pombo, S. A.
60. Comercial La Curtiduría, S. A.
61. Hidro Eléctrica de Cumanayagua, S. A.
62. Compañía Cubana de Acumuladores, S. A.
63. Cigarrera Nacional, S. A.
64. Compañía Cubana Primadera, S. A.
65. Compañía Comercial Danpeco, S. A.
66. Tabacalera Moya, S. A.
67. Confecciones Oro, S. A.
68. Fábrica de Cigarros Camagüey, S. A.
69. Compañía Pepsi Cola de Cuba.
70. Compañía Embotelladora Metropolitana, S. A.
71. Compañía Embotelladora Corona Real Cola.
72. Compañía de Tabaco de Cuba, S. A.
73. Compañía Nacional de Acumuladores.
74. Partes de Autos Marca de Calidad, S. A, (Quality Brand Auto Part).
75. Inmobiliaria Arroyo Arenas, S. A.
76. Compañía Novedades Textiles, S. A.
77. Muebles Marvin, S. A.
78. Hijos de Domingo Méndez, Cigarros y Tabacos, S. A.
79. José Toraño y Cía. en C.
80. Martín Dosal y Cía.
81. Villamil, Santalla y Cía. S. L.
82. Compañía Comercial e Industrial Ermoto, S. A.
83. Fomento Eléctrico Rural, S. A.
84. Compañía Eléctrica Oriental Baracoa, S. A.
85. Jaruco Eléctrica.
86. Compañía Eléctrica del Noroeste, S. A.
87. Tenería Modelo, S. A.
88. Rafael Díaz Salazar (Salazar Muebles).
89. Juan J. Rodríguez e Hijos, S. L.
90. Aurelio Oliva Sánchez (Fundición Aurelio Oliva).
91. J. B. Díaz y Cía., S. en C.
92. Junco y Cía.
93. Leslie Pantin e Hijos.
94. Joaquín López (La Cristina, Panadería, Galletería y Dulcería).

## "Gaceta Oficial" No. 131 dated July 7, 1961, page 13205

95. Esperanza Carrió Ajaray (Fábrica de Velas La Ideal).
96. **Ramón Rodríguez e Hijos, S. en C.**
97. Hijos de J. Cano y Cía.
98. Trajes Paramount, S. A. (Cía de Trajes Paramount).
99. Eugenia Behar Behar (Confecciones Allyson)
100. Hijos de Domingo Méndez, Cigarros y Tabacos, S. A.
101. Tabacalera Severiano Jorge, S. A.
102. Productos Cubanos de Bájaro, S. A.
103. Reina y Susana Cohen Behar (Alton Original).
104. Talar Un Confecciones Irma Monasterio.

Segundo: La Administración y dirección de las empresas que por la presente Resolución se adjudican al Estado Cubano, se asigna a los organismos que actualmente tienen a su cargo dichas empresas, los que podrán designar para cada una de ellas los administradores que elijan, sin perjuicio de las facultades de la Junta Central de Planificación.

Tercero: Se autoriza expresamente a los organismos a que se refiere el Apartado anterior para que, mediante las oportunas Resoluciones, extiendan la nacionalización que por esta Resolución se dispone a cuantos bienes, empresas, derechos y acciones resulten vinculados o afines a los nacionalizados, cualquiera que sea el modo, forma y título de la vinculación o afinidad.

Cuarto: Se declaran como causas de utilidad pública y de interés social y nacional, así como de la necesidad de la expropiación, las expuestas en los Por Cuantos de la presente Resolución.

Quinto: De conformidad con lo dispuesto en el Artículo 7 de la Ley 890 de 1960, los medios y formas de pago que correspondan a las personas naturales o jurídicas afectadas por las expropiaciones que se disponen en esta Resolución, serán reguladas mediante una Ley.

Y para su publicación en la GACETA OFICIAL de la República, en cumplimiento de lo expresamente ordenado por el Cmdte. Raúl Castro Ruz, Vicepresidente de la Junta Central de Planificación, se expide la presente certificación en La Habana, a cinco de julio de mil novecientos sesenta y uno.

Regino G. Botí
Ministro de Economía
Secretario Técnico
Junta Central de Planificación
8—5365

— ‹ •••••••••••• › —

### CONSEJO SUPERIOR DE LA REFORMA URBANA

#### EDICTO

El Consejo Superior de la Reforma Urbana, ha dispuesto, en cumplimiento de lo preceptuado en el Artículo 40, en relación con el Artículo 42 de la Ley de Reforma Urbana, y de conformidad con el procedimiento establecido por el Acuerdo nú-

mero 55, de 10 de enero del año en curso, emplazar como por el presente se emplaza a los señores que a continuación se relacionarán, promoventes de expedientes sobre indemnización por su condición de antiguos acreedores hipotecarios por ante la Delegación Provincial de la Reforma Urbana en Santa Clara, Las Villas, conforme con lo que autoriza el Artículo 37 de dicha Ley, para que se personen ante esa Delegación mediante escrito en el que deberán hacer sus alegatos y acompañar las pruebas documentales y proponer los testigos que estimen convenientes dentro del término de quince días hábiles contados a partir de este emplazamiento.

Expediente número 1, promovente Paulino Fernández Figueroa; expediente número 2, promovente Alejo Cañizares; expediente número 3, promovente Juan Antonio Romero; expediente número 4, promovente Isaura Rodríguez Díaz; expediente número 5, promovente María Luisa Treto Silverio; expediente número 6, promovente Rosario Correa Pedrera; expediente número 7, promovente María Isabel Morales; expediente número 8, promovente Juan F. Bendoiro González; expediente número 9, promovente César Pernas Salas; expediente número 10, promovente María Teresa Coraides Salva; expediente número 11, promovente María Gonzáles Tellés; expediente número 12, promovente Belén Vitalina Fleites; expediente número 13, promovente Elena Bracelán Delgado; expediente número 14, promovente Manuel Paz Lago; expediente número 15, promovente Sergio Luis Pulido; expediente número 16, promovente Clara Luz Guerra Pérez de Alejo; expediente número 17, promovente Francisco Fleites Monteagudo; expediente número 18, promovente Abelardo Agüero Pichardo; expediente número 19, promovente Jesús Flores Fernández; expediente número 20, promovente Julián Machado Martí; expediente número 24, promovente Aurora Fondón y Zaraboso; expediente número 25, promovente Manuel Enrique García Valdés; expediente número 26, promovente Joaquín Sebares Acebal; expediente número 27, promovente Modesto Lucilo Pérez de Prado; expediente número 28, promovente Felipa Sosa Rubio; expediente número 29, promovente Rosa Cristina Ruíz del Valle; expediente número 30, promovente Ignacio Gustavo Machado Cárdenas; expediente número 31, promovente José Gutiérrez García; expediente número 32, promovente Serafín Ríos y Cruz; expediente número 33, promovente Rafael A. Díaz Canel Herrera; expediente número 41, promovente Manuela Gutiérrez Rodríguez; expediente número 42, promovente José Valle; expediente número 43, promovente Otilio González Palmero; expediente número 44, promovente María del Carmen Labera y Pérez; expediente número 45, promovente Teodoro Alvarez Menéndez; expediente número 46, promovente Angela Margarita Brisuela; expediente número 47, promovente María del Rosario Carbonell Echemendía; expediente número 48, promovente Jacobo Stiefiel y Ramírez; expediente número 49, promovente Sebastián Sandalio Escofet; expediente número 50, promovente Antonio Reyes Reyes; expediente número 51, promovente Resti-

EXHIBIT 5A

## Resolution

First: The Nationalization, by means of forced expropriation, is decreed, and consequently the Cuban State, in complete authority, is awarded all the interest in assets and business entities located in the national territory and the rights and actions arising from the exploitation of the same, whatever the interest, title or mode of their ownership, of the following natural persons or judicial entities:

. . . .

      96. Ramón Rodriguez e Hijos, S. en C.

. . . .

Second: The administration and management of the companies that by this Resolution are awarded to the Cuban State, are assigned to the organizations that are currently in charge of said companies, which may appoint for each of them the administrators they choose without prejudice to the powers of the Central Planning Board.

Third: The organizations referred to in the previous Section are expressly authorized, by appropriate Resolutions, to extend the nationalization that this Resolution provides to as many assets, business entities, rights and stocks as are linked or related to those nationalized, whatsoever the form and title of the bond of affinity to the nationalized entities.

Fourth: By reason of this Resolution. As detailed, they are declared to be matters of public necessity and of social and national interest, as well as the need for the expropriation.

Fifth: In accordance with the provisions of Article 7 of Law 890 of 1960, the means and forms of payment which correspond to the individuals or legal entities affected by the expropriations provided in this Resolution will be regulated by Law.

And in compliance with the expressed orders of Commander Raúl Castro Rus, Vice President of the Central Planning Board that it be published in the OFFICIAL GAZETTE of the Republic, this certification is issued in Havana as of July 5, 1961.

**Regino G. Boti**
Minister of the Economy
Technical Secretary
Central Planning Board
S -5365

Case 1:20-cv-23307-XXXX Document 1-5 Entered on FLSD Docket 08/06/2020 Page 6 of 7

EXHIBIT 5B

## Resolución

Primero: Se dispone la nacionalización mediante expropiación forzosa y, en consecuencia, se adjudican a favor del Estado Cubano en pleno dominio todos las bienes y empresas ubicadas en el territorio nacional y los derechos y acciones emergentes de la explotación de los mismos, cualquiera que sean el título y modo de su disfrute, que pertenecen a las siguientes personas naturales o jurídicas:

. . . .

    96. Ramón Rodriguez e Hijos, S. en C.

. . . .

Segundo: La Administración y dirección de las empresas que por la presente Resolución se adjudican al Estado Cubano, se asigna a los organismos que actualmente tiene a su cargo dichas empresas, los que podrán designar para cada una de ellas los administradores que elijan sin perjuicio de las facultades de la Junta Central de Planificación.

Tercero: Se autoriza expresamente a los organismos a que se refiere el Apartado anterior para que, mediante las oportunas Resoluciones, extiendan la racionalización que por esta Resolución se dispone a cuantos bienes, empresas, derechos y acciones resulten vinculados o afines a los nacionalizados, cualquiera que sea el modo, forma y título de la vinculación o afinidad.

Cuarto: Se declaran como causas de utilidad pública y de interés social y nacional, así como de la necesidad de la expropiación, las expuestas en ellas. Por Cuantos de la presente Resolución.

Quinto: De conformidad con lo dispuesto en el Artículo 7 de la Ley 890 de 1960, los medios y formas de pago que correspondan a las personas naturales o jurídicas afectadas por las expropiaciones que se disponen en esta Resolución, serán reguladas mediante una Ley.

Y para su publicación en la GACETA OFICIAL de la República, en cumplimiento de lo expresamente ordenado por el Cmdte. Raúl Castro Rus, Vicepresidente de la Junta Central de Plantificación, se expide la presente certificación en La Habana, a cinco de julio de mil novecientos sesenta y uno.

**Regino G. Boti**
Ministro de Economia
Secretario Técnieo
Junta Central de Planification
S -5365

COMPOSITE EXHIBIT 6

http://www.habanos.com/en/festival-habanos-noticias/festivales/xi-festival-del-habano/galeria-de-imagenes-del-xi/







Case 1:20-cv-23287-XXXX Document 1-6 Entered on FLSD Docket 08/06/2020 Page 9 of 9

http://www.habanos.com/en/festival-habanos-noticias/festivales/xi-festival-del-habano/galeria-de-imagenes-del-xi/



# EXHIBIT 7

http://cubancigarsculturelifestyle.blogspot.com/2013/01/,



TRIBUNAL DE JURISDICCIONAL DE LOS ESTADOS UNIDOS
DISTRITO DEL SUR DE LA FLORIDA

(Juicio con Jurado es Solicitado)

LUIS MANUEL RODRIGUEZ,
MARIA TERESA RODRIGUEZ, a/k/a MARIA TERESA LANDA,
ALFREDO RAMON FORNS,
RAMON ALBERTO RODRIGUEZ,
RAUL LORENZO RODRIGUEZ,
CHRISTINA CONROY, and
FRANCISCO RAMON RODRIGUEZ,

                Demandantes,

v.

IMPERIAL BRANDS PLC,
CORPORACIÓN HABANOS, S.A.,
WPP PLC, YOUNG & RUBICAM LLC,
and BCW LLC, a/k/a BURSON COHN & WOLFE LLC

                Demandados.

## Demanda

Los Demandantes LUIS MANUEL RODRIGUEZ, MARIA TERESA RODRIGUEZ, a/k/a (también conocida como) MARIA TERESA LANDA, ALFREDO RAMON FORNS, RAMON ALBERTO RODRIGUEZ, RAUL LORENZO RODRIGUEZ, CHRISTINA CONROY, and FRANCISCO RAMON RODRIGUEZ demandan a los Demandados IMPERIAL BRANDS PLC, CORPORACIÓN HABANOS, S.A., WPP PLC, YOUNG & RUBICAM LLC, and BCW LLC, a/k/a (también conocida como) BURSON COHN & WOLFE LLC y alegan lo siguiente:

Introducción

1.      Los Demandantes (en conjunto, la "Familia Rodriguez" son los herederos y descendientes de Ramón Rodríguez Gutiérrez ("RRG") y los dueños de un 90% por ciento del caudal[1] de valor de Ramón Rodríguez e Hijos Sociedad en Comandita[2]. Antes del año 1961,

---

[1]      El 10% por ciento restantes lo poseen dos individuos que obtuvieron sus intereses por operación legal a través de su decendencia de su fallecido padre que no fue ciudadano de los Estados Unidos en el año1996.

[2]      Ramón Rodríguez e Hijos, una Sociedad de Responsabilidad Limitada.

1

RRHSC fue deña y operadora de la que fue el edificio de la fábrica de cigarrillos Partagás ("el inmueble "RRHS") en la ciudad de la Habana[3].

2.      En el año 1955, RRHSC edifico un inmueble de uso mixto adyacente y conectado al inmueble principal de la fábrica Partagás localizada en la esquina of Calle 23 and 16. La estructura del nuevo inmueble incluyo un garaje a nivel de calle para el uso de la flota de camiones de la fábrica, un espacio de almacenamiento, un mezanine compuesto de oficinas ejecutivas y una torre de seis niveles.[4] Hoy día, el inmueble RRHSC, renombrada como "Empresa de Tabaco Torcido 'José Martí'" despliegan prominentemente en su fachada los nombres Tabacuba (la entidad del monopolio del tabaco del gobierno de Cuba) y H. Upmann.[5]

3.      Subsecuente a la toma de poder en el año 1959, el Régimen de Castro y del gobierno comunista de Cuba sistemáticamente "nacionalizaron" la mayoría de los negocios privados en Cuba sin recompensar a los legítimos dueños de esas propiedades. En el año 1961 como parte de la apropiación de toda la industria del tabaco, el gobierno de Castro confisco el derecho a la propiedad de RRHSC y la propiedad de RRHSC. Antes de que la propiedad de RRHSC fuese confiscada, la fábrica de Partagás producía cigarrillos de renombre bajo la marca Partagás fueron reconocidos así mundialmente y había alcanzado a ser el tercer productor más grande en Cuba con una cuota del mercado de un16.3%.

4.      La "Familia Rodríguez" son poseedores del derecho a reclamar según La Ley Libertad y Solidaridad Democrática Cubana también conocido como el Helms-Burton (la "Ley Libertad" o " Libertad Act") dado a que el gobierno cubano confisco y opera con los derechos de RRHSC y el Inmueble de la propiedad RRHSC.[6] La Ley Libertad tomo efecto en el año 1996:

---

[3]      Una fotografía de la cajetilla de cigarrillo Partagás que contiene un dibujo de la fábrica Partagás (RRHSC) y una fotografía de la fábrica, que se cree fue tomada en los años 1950, se exhibe en el anexo marcado Nº1.

[4]      Una fotografía del moderno inmueble de uso mixto que se erigió como un anexo a la fábrica de cigarrillos Partagás se exhiben el anexo mixto marcado Nº 2

[5]      Fotografías de la moderna fachada se exhiben en el anexo marcado Nº3.

[6]      En una decisión del Tribunal jurisdiccional de este Distrito explico que "*[e]l Acto e Helms-Burton se refiere al interés en propiedades que los dueños anteriores de las propiedades confiscadas tienen ahora como dueños del 'derecho al reclamo sobre tales propiedades.'*"Glen II a 1255 (citando 22U.S.C. § 6082 2(a)(1)(A)); ver también id.(señalando que las acciones legales basadas en el Titulo III son "acciones basadas en reclamos de propiedades confiscadas en contra de los "traficantes de dicha propiedad"citando 22 U.S.C. § 6082 (a) (4))). Ver Havana Docks Corp. v. Royal Caribbean Cruises, Ltd., 19-CV-23590, 2020 WL 1905219, al *7 (S.D. Fla. Apr. 17, 2020) (énfasis añadido).

El propósito del estatuto es disuadir a los inversores extranjeros de operar en y con propiedades confiscadas (definidas como "**comprar una participación en el capital social, administración o participación en empresas conjuntas** utilizando propiedades y activos, algunos de los cuales fueron confiscados a Nacionales de los Estados Unidos").

Glen v. Club Mediterranee S.A., 450 F.3d 1251, 1255 (11th Cir.2006) (énfasis agregado) (citando a
22 U.S.C. § 6081 (5)); ver también 22 U.S.C. § 6022 (6) (La Ley de Libertad está diseñada "para proteger a ciudadanos de los Estados Unidos contra las expropiaciones y el tráfico ilícito de bienes confiscados por el régimen de Castro ").

     5.      En el año 2007, el Defendido Imperial Brands PLC ("Imperial"), muy consciente de La Ley Libertad compró Altadis S.A. y su "participación del 50% en [Habanos], empresa que distribuye puros fabricados en Cuba ".[7]  Corporación Habanos S.A. ("Habanos") es una empresa mixta de la cual el 50% es propiedad de Cuba, o de   una o más empresas de propiedad cubana, y 50% de la propiedad por Imperial.

     6.      Imperial, tanto a través de Habanos y de otras filiales de tipo de empresa conjunta, así como a través de la empresa monopolista tabacalera cubana Tabacuba, que es socia de la empresa mixta de Imperial en Habanos, ha utilizado y sigue utilizando la Propiedad y el Inmueble de RRHSC sin compensación a ni autorización de la Familia Rodríguez.  El uso de la propiedad y el Inmueble sin la autorización de RRHSC ha incluido la producción y envío de millones de cigarros hechos a mano (vendidos bajo varias marcas de calidad superior) fabricadas en el Inmueble propiedad de RRHSC, o fabricados en otras fábricas cercanas, y procesadas en el Inmueble, y despachadas desde el Inmueble al comercio. La también y se extiende a la gestión diaria de Tabacuba de todos los productos tabacaleros cubanos desde de las oficinas que esta mantiene en el Inmueble propiedad RRHSC. El uso sin autorización por parte de RRHSC del Inmueble de RRHSC también se extiende a la administración diurna por parte de Tabacuba de todos los productos de tabaco que se realizan desde las oficinas que ocupa Tabacuba en el Inmueble de RRHSC.  La operación con propiedad confiscada de RRHSC se le atribuye a Imperial en uso y operación del Inmueble para la comercialización de los productos de Habanos.

---

[7]     Vea la carta de Imperial a la Oficina de Seguridad Global del SEC de fecha del 12 de octubre de 2007 a 2. (Copia adjunta como Anexo 4)

3

7.      Todos los Demandados son responsables ante los Demandantes en virtud de la Ley Libertad por "operar con propiedad confiscada"[8] por razón de participar en o ser beneficiado en la operación de una propiedad confiscada, el Inmueble, por parte del gobierno cubano a través de Tabacuba y su socio de empresa asociada el Demandado Imperial. Tabacuba e Imperial trafican en comercio ilegal con el Inmueble propiedad de RRHSC a través de su sociedad en la empresa conjunta, Habanos, la cual controlan conjuntamente, y a través de que permite el control conjunto y a través de la red de distribución que Tabacuba e Imperial poseen.

8.      Imperial y su socio Tabacuba, conjunto con las subsidiarias que poseen y controlan han ampliado el uso y beneficio sobre el Inmueble que es propiedad de RRHSC al retener agentes para comercializar y publicitar los productos producidos en el Inmueble confiscado que es propiedad de RRHSC. Los agentes contratados por Imperial y Habanos incluyen al Demandado WPP PLC ("WPP") a través de sus agencias subsidiarias de publicidad con sede en EE. UU., los Demandados Young & Rubicam LLC ("Y&R"), y BCW LLC, a / k / (también conocidos como) a Burson Cohn & Wolfe LLC ("BCW").

9.      Comenzando no más tarde que en el año 2017, Y&R y BCW ayudaron a establecer, o directamente establecieron, "portales" patrocinados oficialmente que permitieran a Imperial comercializara productos Habanos en las plataformas de redes sociales con sede en EE. UU., Twitter, YouTube e Instagram.[9]

10.     El agente de Imperial, WPP, desde al menos el año 2010, y a través de Y&R, BCW, y con anterioridad a través de una tercera subsidiaria de WPP, Ogilvy, han comercializado y publicitado continuamente el Inmueble propiedad de RRHSC y los productos de Habanos fabricados y enviados desde allí.

## Las Partes, Jurisdicción y Competencia

---

[8]

A los efectos de la Ley, una persona "trafica" en propiedad confiscada si esa persona "a sabiendas" e intencionalmente: (i) vende, transfiere, distribuye, dispensa, negocia, administra o de otra manera dispone de propiedad confiscada, o compra, arrienda, recibe, posee, obtiene el control de, administra, usa o adquiere o tiene un interés en la propiedad confiscada, (ii) se dedica a una actividad comercial utilizando o se beneficia de otra manera de la propiedad confiscada, o (iii) causa, dirige, participa en, o lucra con el tráfico (como se describe en la cláusula (i) o (ii)) por parte de otra persona, o se involucra en el tráfico (como se describe en la cláusula (i) o (ii)) a través de otra persona, sin la autorización de cualquier Estado nacional que tiene un reclamo sobre la propiedad.   *Ver* 22 U.S.C. § 6023 (13).

[9]Estos portales incluyen:
https://www.instagram.com/habanos_oficial/
https://twitter.com/Habanos_Oficial
https://www.youtube.com/channel/UCstGLy96wdZG7eCM4855_DA.

4

**Las Partes**

11.     Los Demandantes Luis Manuel Rodríguez, María Teresa Rodríguez, Alfredo Ramón Forns, Ramón Alberto Rodríguez, Raúl Lorenzo Rodríguez y Francisco Ramón Rodríguez son personas que residen en el condado de Miami-Dade, Florida.

12.     La demandante Christina Conroy es una persona que reside en el condado de Montgomery, Maryland.

13.     Cada uno de los Demandantes era ciudadano de los EE. UU. antes del año 1996, y cada uno es hoy día un ciudadano de EE. UU. Según 22 U.S.C. § 6023 (15) (B).

14.     El Demandante Luis Manuel Rodríguez es el último hijo sobreviviente de RRG. Obtuvo su interés en la Reclamación a través del testamento de RRG tras la muerte de RRG en el año 1964.

15.     La Demandante María Teresa Rodríguez, a / k / a (también conocida como) María Teresa Landa, es la última hija sobreviviente de RRG. Obtuvo su interés en la Reclamación a través del testamento de RRG tras la muerte de RRG en el año 1964.

16.     El Demandante Alfredo Ramón Forns es el hijo único de la hija de RRG, María Mercedes Rodríguez ("MMR"). MMR, que era ciudadana estadounidense antes del año 1996, obtuvo su interés en el Reclamo a través del testamento de RRG tras la muerte de RRG en el año1964. El Demandante Alfredo Ramón Forns obtuvo su interés en el Reclamo por aplicación legal tras la muerte de MMR en el año 2013.

17.     El demandante Ramón Alberto Rodríguez es hijo de Ramón Francisco Rodríguez, ("RFR"), quien falleció antes que RRG. El demandante Ramón Alberto Rodríguez obtuvo su interés en la Reclamación a través del testamento de RRG tras la muerte de RRG en el año1964.

18.     Los demandantes Raúl Lorenzo Rodríguez y Francisco Ramón Rodríguez son los hijos de Raúl Bernardo Lupo Rodríguez ("RBLR"), y Christina Conroy es la única hija de Alex Lorenzo Rodríguez ("ALR"), el tercer hijo de RBLR. ALR murió antes de la muerte de RBLR. RBLR obtuvo su interés en el Reclamo a través del testamento de RRG tras la muerte de RRG en el año 1964. Los Demandantes Raúl Lorenzo Rodríguez, Francisco Ramón Rodríguez y Christina Conroy obtuvieron la mitad de su interés en el Reclamo por aplicación de la ley tras la muerte de RBLR en el año1986. El otro la mitad del interés de RBLR sobre el Reclamo fue transferida por aplicación de ley a su esposa Esther Beltrán Rodríguez ("EBR") tras la muerte de RBLR en el año 1986. EBR, que fue ciudadana estadounidense antes de año 1996, pasó su interés en el Reclamo a los Demandantes Raúl Lorenzo Rodríguez, Francisco Ramón Rodríguez y Christina Conroy a través de su testamento tras la muerte de EBR en el año 2019.

5

19.     Conforme al saber y entender, el Demandado Imperial es una sociedad de responsabilidad limitada constituida en Inglaterra y Gales, que tiene su sede comercial principal en Inglaterra.

20.     Conforme al saber y entender, el Demandado Habanos es una empresa asociada cubana de la cual Imperial es propietaria de 50% de ésta, ya sea directamente o a través de una o más subsidiarias, y el gobierno cubano es propietario de un 50% de esta, ya sea directamente o a través de una o más entidades controladas por Cuba. Según Imperial, "La comercialización internacional de puros cubanos hechos a mano se realiza a través de Habanos S.A., en la que tenemos una participación del 50 por ciento".[10]

21.     Conforme al saber y entender, el Demandado WPP PLC ("WPP"), es una sociedad de responsabilidad limitada constituida en el Reino Unido de Inglaterra. WPP obtiene más ingresos de los EE. UU. que cualquier otro país.[11] WPP también alquila más de 2.8 millones de pies cuadrados de espacio para uso de sus oficinas en los EE. UU.[12]

22.     Conforme al saber y entender, el Demandado Young & Rubicam LLC ("Y&R"), es una compañía de responsabilidad limitada constituida en el estado de Delaware que tiene su sede principal de negocios en Nueva York. Y&R es una subsidiaria de WPP y tiene oficinas en Miami-Dade.

23.     Conforme al saber y entender, el Demandado BCW LLC, también conocido como Burson Cohn & Wolfe LLC ("BCW"), es una compañía de responsabilidad limitada constituida en el estado de Delaware que tiene su sede principal de negocios en Nueva York. BCW es una subsidiaria de WPP y tiene oficinas en Miami-Dade.

## Jurisdicción y Competencia

24.     El reclamo de los demandantes surge con conformidad por lo prescripto en 22 U.S.C. § 6021, et seq., y el monto en controversia excede la suma o valor de $ 50,000, sin incluir intereses, costos y honorarios de abogados. Por lo tanto, este Tribunal tiene jurisdicción sobre la materia (cuestión federal) de conformidad con lo prescripto en 28 U.S.C. § 1331.

---

[10]     Ver https://www.imperialbrandsplc.com/about-us/our-companies/tabacalera.html

[11]     Ver la presentación del formulario WPP 20-F ante la SEC del año que finalizó el 31/12/2017 página 10, https://www.sec.gov/Archives/edgar/data/806968/000119312518141442/d462033d20f.htm

[12]     Ver la información en la página 12 de la nota anterior

25.     Como se establece a continuación, Habanos cometió actos delictivos en el condado de Miami-Dade, Florida. En particular: (1) Habanos arrienda, posee, controla, administra, usa o de otra manera adquirió o tiene un interés en el Inmueble de la Propiedad de RRHSC que fue confiscada[13]; (2) Habanos se ha involucrado y continúa participando "en una actividad comercial utilizando o beneficiándose de otra manera" en el uso de la Propiedad de RRHSC que confiscada por Cuba[14]; y (3) Habanos "causa, dirige [o] participa. . . en el tráfico ilegal"por parte de Imperial, WPP, Y&R, BCW, y de los no demandados, Twitter, YouTube e Instagram.[15] Estos actos han causado daños a los Demandantes, seis de los cuales residen en Florida.

26.     Como se establece a continuación, Imperial cometió actos delictivos en el condado de Miami-Dade, Florida. En particular, Imperial a través de su interés en y su control de Habanos: (1) arrienda, posee, controla, administra, usa o de otra manera adquirió o tiene una participación en el inmueble de la propiedad de RRHSC que fue confiscada[16]; (2) se ha involucrado y continúa participando "en una actividad comercial utilizando o beneficiándose de otra manera" la Propiedad de RRHSC confiscada por Cuba[17]; y (3) "causa, dirige [o] participa o lucra con el tráfico" de Habanos y otras empresas conjuntas propiedad de Imperial y Tabacuba, incluyendo Altabana, S.L.[18] así como de WPP, Y&R, BCW, Twitter, YouTube e Instagram.[19] Además, Imperial se ha beneficiado aún más, o está intentando obtener más ganancias, del uso del inmueble que es la propiedad de RRHSC y que fue confiscada, a través de su reciente acuerdo para vender algunos o todos sus intereses en Habanos y otras empresas asociadas que son propiedad de Imperial y Tabacuba que están involucradas en la fabricación, venta, mercadeo y distribución de productos de tabaco cubanos que tienen valor al menos en parte como resultado de su participación "en una actividad comercial que usa o se beneficia de otra manera" del inmueble propiedad de RRHSC que fue confiscada. Estos actos han causado daños a los demandantes, seis de los cuales residen en el estado de la Florida.

---

[13]     Ver 22 U.S.C. Sección 6023 (13) (A) (i).

[14]     Ver 22 U.S.C. 14 Ver 22 U.S.C. Sección 6023 (13) (A) (ii).

[15]     15 Ver 22 U.S.C. § 6023 (13) (A) (iii).

[16]     Ver 22 U.S.C. Sección 6023 (13) (A) (i).

[17]     Ver 22 U.S.C. Sección 6023 (13) (A) (ii).

[18]     Altabana es una empresa asociada compuesta por un 50% por Imperial, ya sea directamente o a través de una o más subsidiarias, y en un 50% por Cuba o de entidades controladas por Cuba. Según Imperial, Altabana mantiene las inversiones en Imperial en empresas subsidiarias involucradas en la comercialización y venta de puros cubanos". Ver Informe Anual de Imperial 2019 en la pagina166.

[19]     Ver 22 U.S.C. Sección 6023 (13) (A) (iii).

27.     Como se establece a continuación, WPP cometió actos delictivos en el condado de Miami-Dade, Florida. En particular, WPP a través de su titularidad y control de Y&R y BCW "causa, dirige [o] participa o se beneficia del tráfico ilegal" por parte de Imperial, Habanos, Y&R, BCW, Twitter, YouTube e Instagram.[20] Estos actos han causado daños a los demandantes, seis de los cuales residen en Florida.

28.     Y&R cometió actos delictivos en el condado de Miami-Dade, estado de la Florida. En particular, Y&R "causa, dirige [o] participa o se beneficia del tráfico ilegal" de Imperial, Habanos, Twitter, YouTube e Instagram.[21] Estos actos han causado daños a los Demandantes, seis de los cuales residen en Florida.

29.     BCW cometió actos delictivos en el condado de Miami-Dade, estado de la Florida. En particular, BCW "Causa, dirige [o] participa o se beneficia del tráfico ilegal" por Imperial, Habanos, Twitter, YouTube e Instagram.[22] Estos actos han causado daños a los Demandantes, seis de los cuales residen en Florida.

30.     Imperial ya sabía en el año  2007, años después de la aprobación de la Ley de Libertad, cuando compró su participación en Habanos y otras entidades dedicadas al tráfico de propiedades confiscadas por el gobierno cubano y estaba consciente de que las operaciones de Habanos "serían restringidas. . . por la nacionalidad del personal" y que Imperial se "involucraría"en el negocio de los puros cubanos cuando decidió adquirir, sus intereses en Habanos, cuyo negocio se basaba en el tráfico ilegal de propiedades confiscadas por el gobierno cubano[23].

31.     No obstante, Imperial decidió, comenzando a más tardar que en el año 2010 y continuando al menos hasta febrero del 2020, retener, ya sea directamente o a través de Habanos, WPP y su empresa estadounidense "Agentes Corporativos Estadounidenses," Ogilvy y posteriormente Y&R y BCW, para participar en la comercialización, es decir, en el tráfico de puros cubanos fabricados, almacenados o distribuidos desde el Inmueble confiscada propiedad de

---

[20]      Ver 22 U.S.C. Sección 6023 (13) (A) (iii).

[21]      Ver 22 U.S.C. Sección 6023 (13) (A) (iii).

[22]      Ver 22 U.S.C. Sección 6023 (13) (A) (iii).

[23] Véase la "Respuesta" de Imperial del 12 de octubre de 2007 a la consulta de que le hace el SEC en la página 2 (reconociendo que al adquirir "el 50% de la participación de Altadis en la propiedad de [Habanos] una empresa que distribuye puros fabricados en Cuba," Imperial "pueda ser restringida... por la nacionalidad del personal que involucramos en estas actividades. En particular, las operaciones tabacaleras de Altadis en Cuba podrían verse limitadas materialmente por la operación de la "Ley de Libertad". Copia adjunta en el Anexo 4; ver id. en 4 ("Altadis posee una participación del 50% en Habanos, el 50% restante es propiedad del Estado cubano").

RRHSC.[24] Además, a más tardar en el año 2017, Imperial también decidió, ya sea directamente o a través de Habanos, WPP o sus agentes corporativos estadounidenses, contratar el uso de "portales" de redes sociales operadas por corporaciones estadounidenses adicionales. Estas entidades incluyen a Twitter, Instagram and YouTube[25], todo con el propósito de promover la capacidad de Imperial y Habanos de poder beneficiarse del tráfico ilícito de propiedades confiscadas por el gobierno cubano, incluyendo el Inmueble propiedad de RRHSC.

32.     De similar manera, WPP sabía que sus extensas actividades comerciales en los EE. UU., realizadas tanto directamente como a través de sus muchas subsidiarias, de completa propiedad, incluyendo a Ogilvy, Y&R y BCW, le harían "sujeta a las leyes de los EE. UU. que imponen sanciones y regulan la prestación de servicios a determinados países ".[26] Estas leyes incluyen, por supuesto, la Ley de Libertad. No obstante, WPP decidió involucrar a estas tres subsidiarias estadounidenses en la comercialización y publicidad de los productos producidos, almacenados y enviados desde el Inmueble de la propiedad confiscada de RRHSC. A partir desde entonces, WPP utilizó o permitió que sus subsidiarias estadounidenses contrataran el uso de "portales" de redes sociales operados por otras corporaciones estadounidenses, Twitter, Instagram y YouTube.

33.     Cada uno de los actos descritos en los párrafos 25 a 32 supra constituyeron

---

[24]     Los servicios de mercadeo, comercialización o publicidad proporcionados por Y&R y BCW no están exentos por la Ley de Libertad ni por las Regulaciones de Control de Activos Cubanos, 31 C.F.R. Parte 515. Ver 31 CFR § 515.206 (excluyendo de "transacciones exentas" la "provisión de servicios de consultoría comercial y de marketing" y "provisión de servicios para comercializar, producir o coproducir, crear o ayudar en la creación de información o materiales.").

[25]     Los "portales" de redes sociales oficiales establecidas y patrocinadas por Twitter, Instagram y YouTube no están ni exentas por la Ley de Libertad ni por las Regulaciones de Control de Activos Cubanos, 31 C.F.R. Parte 515. Ver 31 C.F.R. § 515.578 (a) (que autoriza la exportación a Cuba de "servicios incidentes con el intercambio de comunicaciones a través de Internet, tales como ... las redes sociales [y] el intercambio de fotos", pero solo si "dichos servicios están ampliamente disponibles para el público *sin costo para el usuario* ") (énfasis agregado); id., §515.578 (b) (1) (excluyendo expresamente de los servicios autorizados la: "exportación directa o indirecta ... de servicios con conocimiento o razón para saber que dichos servicios están destinados a ... organizaciones administradas o controladas por el Gobierno de Cuba ") (énfasis agregado); ver también 31 C.F.R § 515.206.

[26]
        Ver la presentación del formulario WPP 20-F ante la SEC para el año que finalizó el 31/12/2017 en 5, https://www.sec.gov/Archives/edgar/data/806968/000119312518141442/d462033d20f.htm (exponiendo los "riesgos" comerciales y reconociendo que: "El incumplimiento de estas leyes podría exponer al Grupo [WPP] a sanciones civiles y penales ...")

traficación ilegal en violación de la Ley de Libertad. Además, cada acto de tráfico ilícito del Inmueble de la propiedad de RRHSC causó daños a los Demandantes, seis de los cuales residen en el condado de Miami-Dade.

34.     Debido al uso extensivo de agentes corporativos estadounidenses para comercializar, publicitar y ayudar a operar, propiedades confiscadas por el gobierno cubano en violación de la Ley de Libertad los Demandados Habanos, Imperial y WPP deberían haber anticipado la razonable posibilidad de que serían demandados en los Estados Unidos por ciudadanos estadounidenses que tienen reclamos debido a la confiscación propiedades por el gobierno cubano, incluyendo esta demanda sobre el Reclamo del Inmueble de la propiedad de RRHSC.

35.     Debido a sus acciones como están descritas anteriormente, todos los Demandados deberían razonablemente haber anticipado la posibilidad de que fueran demandados en los Estados Unidos por ciudadanos estadounidenses que tuvieran reclamos por la confiscación de propiedades confiscada por el gobierno cubano, incluida esta demanda sobre el Reclamo a la propiedad de RRHSC. , en el Tribunal del Distrito Sur de la Florida, que es ampliamente conocido por albergar a más de un millón de refugiados cubanos y sus sucesores, muchos de los cuales son ciudadanos estadounidenses que poseen derechos sobre propiedades confiscadas por el gobierno cubano.

36.     Este Tribunal tiene jurisdicción personal sobre cada uno de los Demandados de conformidad con el estatuto de "Brazo Largo /Largo Alcance" (*leyes estadounidenses que permiten extender l jurisdicción personal de los tribunales de los distintos estados que las dictan a personas no residentes en tales estados, siempre que cumplan ciertos requisitos en cuanto a la realización de actos en tales estados* [**explicación intercalada**]) del Estado de la Florida, Sección 48.193 (1) (a), Estatutos del Estado de la Florida, porque cada Demandado cometió un acto delictivo dentro de este estado, ya sea directamente o a través de un agente, y la causa de acción impuesta contra cada Demandado surge de esa conducta delictiva.

37.     Como alternativa, si se considera que los Demandados no tienen suficientes contactos con el Estado de la Florida, a pesar de haber cometido múltiples actos de traficación ilícita en violación de la Ley de Libertad causando daño a los Demandantes en el Estado de la Florida, los Demandados están, no obstante, sujetos a la jurisdicción personal bajo la ley federal "Brazo Largo/ Largo Alcance"establecido en la Regla 4 (k) de las Reglas Federales de Procedimiento Civil.[27]Si los contactos personales de los Demandados con un solo estado no son suficientes para someter a la entidad a la jurisdicción personal en cualquier estado en particular, la Regla 4 (k) permite que el Tribunal considere los contactos totales en  EE. UU. del Demandados

---

[27]     La Regla 4 (k) dispone en la parte pertinente: "(2) Para un reclamo que surja bajo la ley federal, al servir una citación se. . . establece jurisdicción personal sobre un acusado si: (A) el acusado no está sujeto a jurisdicción en los tribunales de jurisdicción general de ningún estado; y (B) ejercer jurisdicción es consistente con la Constitución y las leyes de los Estados Unidos ".

cuando el reclamo presentado contra el Defendido surge de conformidad con la ley federal. El reclamo de los Demandantes aquí surge bajo la ley Federal de la Ley de Libertad. Por lo tanto, los contactos en total de los Demandados con los EE. UU., incluyendo a Imperial, Habanos y WPP dependiendo de Y&R, BCW, Twitter, YouTube e Instagram para realizar campañas de marketing y enlaces en redes sociales en violación de la Ley de Libertad, son suficientes para satisfacer los requisitos constitucionales.

38.     La competencia jurisdicción territorial es propia en el Tribunal Jurisdiccional del Distrito Sur del Estado de la Florida según lo previsto en 28 U.S.C. §§ 1391 (b) (2) y 1391 (d), porque una parte sustancial de los eventos u omisiones que dieron lugar a los reclamos del Demandante ocurrieron en el Distrito Sur de Florida.

## Hechos

39.     Los demandantes son ciudadanos estadounidenses según lo define la Ley Libertad. Ver 22 U.S.C. § 6023 (15).

40.     La propiedad de RRHSC fue la propiedad de RRHSC y continúo siendo mejorada hasta su confiscación por parte del gobierno cubano en al año 1961.

41.     Como parte de la apropiación de toda la industria del tabaco, el gobierno de Castro confiscó la posesión de la propiedad y el Inmueble de RRHSC el 30 de junio de 1961.[28]

42.     El gobierno comunista cubano mantiene la posesión y control del Inmueble RRHSC y no ha pagado debido a confiscación de dicha propiedad compensación alguna a los demandantes ni a su predecesor anterior RRG, Tampoco se ha resuelto ninguna reclamación sobre el Inmueble RRHSC de conformidad con un acuerdo internacional de resolución de reclamaciones u otro procedimiento de resolución mutuamente aceptable.

43.     Los Demandantes son los legítimos propietarios de la Reclamación derivada de la "nacionalización" e incautación del Inmueble RRHS efectuada por Cuba.

44.     Conforme al saber y entender, Imperial adquirió su participación en Habanos en el año 2007 cuando adquirió su participación del 50% de "Altadis" en "Habanos", "que es una

---

[28]     El 30 de junio de 1961, por decisión de la "Junta Central de Planificación", la Junta Central de Planificación (Económica) de Cuba, el gobierno comunista de Cuba confiscó la propiedad de RRHSC como parte de la toma de control de toda la industria tabacalera. Ver extracto en el Anexo 5; Traducción al inglés del extracto del Anexo 5A; Texto en español del extracto del Anexo 5B. La decisión y proclamación de la Junta Central de Planificación aparece en el registro del gobierno de Cuba, la "Gaceta Oficial", No. 131 del 7 de julio de 1961, folio 13203.

empresa que distribuye puros fabricados en Cuba ". Imperial sabía que su socio de riesgo compartido en Habanos y Altabana, Cuba (a través de su empresa monopolista, Tabacuba), adquirió su interés y control sobre la industria tabacalera cubana y el Inmueble RRHSC al "nacionalizar" activos al huir sus legítimos dueños de la brutal dictadura de Castro.

45.     La propiedad y el Inmueble de RRHSC está actualmente bajo el control exclusivo del gobierno cubano a través de Tabacuba, Habanos y su socio de riesgo compartido, Imperial. Según información y creencia, Tabacuba y Habanos, desde al menos del año 2010, han utilizado continuamente el Inmueble RRHSC sin la autorización de la Familia Rodríguez, y probablemente durante muchos años antes de eso. El uso no autorizado del Inmueble RRHSC incluye la producción y envío de millones de puros hechos a mano (vendidos bajo varias marcas preferenciales) y otros productos de tabaco fabricados en el Inmueble RRHSC, o fabricados en otras fábricas cercanas, y almacenados, procesadas o enviados desde el Inmueble RRHSC. El tráfico ilícito por parte de Imperial y Habano también incluye el uso del Inmueble RRHSC para el uso de la comercialización y publicidad de los productos de Habanos.[29]

46.     Habanos por sí mismo documentó su posesión, control, administración y uso del Inmueble RRHSC. En un artículo publicitario de fecha de febrero de 2010 titulado: "Lecturas y lectores de la fábrica de puros", Habanos se refirió a la fábrica (Inmueble RRHSC) "Situada en la famosa calle 23 en el bullicioso barrio del Vedado de La Habana, justo entre las calles 14[ce] y 16[ce] ", como la "enorme y moderna fábrica de puros H. Upmann ".[30] El uso continuo del Inmueble RRHSC incluye el uso de una parte del Inmueble RHSC por parte del socio de empresa conjunta de Imperial, Tabacuba, para el uso de oficinas ejecutivas, el uso del muelle de carga[31] y espacio para el almacenamiento y envío de productos de Habanos. El nombre de Tabacuba aparece de manera destacada en el Inmueble.[32]

47.     Imperial, Habanos y Tabacuba, (colectivamente, los "Traficantes Directos") intencionalmente y a en su conocimiento arriendan, poseen, controlan, administran, usan o de otra manera adquirieron o mantienen un interés en el Inmueble RRHSC que fue confiscada, sin la autorización de Familia Rodríguez. Cada uno de ellos también tiene y continúa participando en actividad comercial utilizando o beneficiándose de otra manera del Inmueble RRHSC que fue confiscada sin la autorización de la Familia Rodríguez.

---

[29]  Ver el Anexo compuesto N° 6 que contiene imágenes publicadas en el sitio web de Habanos sobre los recorridos "visitas a las fábricas" promovidos por Habanos en el Inmueble RRHSC. El Anexo N°7 es una imagen del muelle de carga en funcionamiento en el Inmueble de la propiedad RRHSC.

[30]     Ver http: //habanosnews.habanos.com/en/cigar-factory-readings-and-readers.

[31]     Ver Anexo N°7.

[32]      Ver Anexo CompuestoN°s 2 y 3

48.     Imperial y su socio Tabacuba, a través de las empresas conjuntas que estos controlan conjuntamente, han ampliado su uso y beneficio del Inmueble RRHSC al retener agentes para comercializar y publicitar los productos producidos en el plantel del confiscado Inmueble RRHSC. Los agentes contratados por Imperial y Habanos incluyen a WPP a través de sus agencias subsidiarias de publicidad, Y&R y BCW. Entre otras cosas, esas agencias ayudaron a configurar, o directamente configuraron, los portales patrocinados "oficiales" enumerados anteriormente en las plataformas de Twitter, YouTube e Instagram (Y&R, BCW, Ogilvy, Twitter, YouTube e Instagram, colectivamente, los "Agentes Corporativos de EE. UU.").  Las labores de los Agentes Corporativos de EE. UU. que, en nombre de Imperial, Habanos y Tabacuba ha incluido, por lo menos desde el año 2010, la comercialización y publicidad de los productos de Habanos fabricados, almacenados o enviados desde el Inmueble RRHSC. WPP, actuando seguidamente y sin interrupción, primeramente, a través de Ogilvy y luego a través de Y&R y BCW, comercializado y publicitado continuamente el Inmueble RRHSC y los productos que Habanos han fabricado, almacenado o enviados desde el Inmueble RRHSC.

49.     Entre el 2010 y el 2015, WPP utilizó una subsidiaria conocida como Ogilvy para comercializar los productos de Habanos. A partir del 2016, la comercialización de productos de Habanos se substituyo por Y&R, otra subsidiaria de WPP. Más recientemente, a partir del 2019, la comercialización de productos de Habanos se cambió nuevamente a otra subsidiaria de WPP, BCW. En cada caso, el cambio de una subsidiaria de WPP a otra se realizó sin ninguna ruptura o interrupción aparente en los servicios de marketing. De hecho, aunque WPP aparentemente cambió de usar Y&R comenzó a usar BCW como el comercializador del tráfico de Habanos, BCW continuó usando la misma dirección de contacto que Y&R había estado usando - (press.habanos@yr.com).

50.     Los Traficantes Directos han ampliado su tráfico reteniendo agentes para ayudar y promover el tráfico de la propiedad. Los Agentes Corporativos de EE. UU. han actuado y, con la posible excepción de Twitter, Instagram y Ogilvy, continúan actuando con conocimiento e intencionalmente como agentes de los Traficantes Directos. Cada uno a y continúa causando, dirigiendo, participando o beneficiándose del tráfico ilegal del Inmueble RRHSC por parte de los Traficantes Directos, todo sin la autorización de la Familia Rodríguez.

51.     Imperial anunció recientemente que "ha acordado la venta de sus negocios de puros premium" mundiales, incluyendo sus negocios que figuran fuera de los EE. UU. que le califican como "el negocio del resto del mundo" ("Premium Cigar RoW"). [33] Según la propia admisión de Imperial, estos "activos" consisten principalmente en la participación de Imperial en empresas conjuntas cubanas, que incluyen:

   Una participación del 50 por ciento en Habanos S.A., la cual exporta puros hechos

---

[33] Ver Imperial Brands PLC acuerda la venta de Worldwide Premium Cigar Business en 1,https://www.imperialbrandsplc.com/media/key-announcements/2020/imperial-brands-plc-agre es-sale-of-worldwide-premium-cigar-busin.html

a mano desde Cuba y es responsable de las actividades de mercadeo internacional....

Una participación del 50 por ciento en Altabana S.L., que se responsabiliza en la distribución de puros cubanos en todo el mundo a través de su red de subsidiaras de más de 20 distribuidores.

Una participación del 50 por ciento en Internacional Cubana de Tabaco, S.A., responsable de la fabricación a máquina de puros premium cubanos.

Una participación del 50 por ciento en Promotora de Cigarros, S.L., que gestiona la distribución de la cartera de puros premium cubanos hechos a máquina en todo el mundo.

Otras ventas de puros premium a través de Tabacalera SA que incluyen:

Distribución exclusiva de puros cubanos hechos a mano en España;

52.     Imperial se ha beneficiado aún más, o intenta aumentar ganancias, sobre el Inmueble RRHSC confiscado a través de su reciente acuerdo para vender algunos o todos sus intereses en Habanos y otras subsidiarias de Imperial involucradas en la fabricación, venta, mercadeo y distribución de productos de tabaco cubano que tienen valor en parte por el resultado de su participación en "actividades comerciales usando o beneficiándose de otra manera" en el confiscado Inmueble RRHSC.

53.     De acuerdo con su propósito de "disu[adir] a inversionistas extranjeros en el tráfico ilegal de propiedades confiscadas (definiéndose como '**adquirir una participación accionaria en, administrar o ingresar en empresas conjuntas** utilizando propiedades y activos, algunos de los cuales fueron confiscados a ciudadanos estadounidenses.')[34], la Ley Libertad define el tráfico de bienes confiscados por el gobierno cubano en general. A los efectos de la ley, una persona "trafica" con bienes confiscados si esa persona "a conciencia"[35] e intencionalmente:

(i) vende, transfiere, distribuye, dispensa, negocia, administra o dispone de otra manera de la propiedad confiscada, o compra, arrienda, recibe, posee, obtiene el control, administra, utiliza o adquiere o mantiene un interés en la propiedad confiscada,

(ii) participa en una actividad comercial utilizando o beneficiándose de alguna otra

---

[34]     Ver Glen v. Club Mediterranee S.A., 450 F.3d 1251, 1255 (11th Cir.2006) (énfasis agregado) (citando 22 U.S.C.§ 6081 (5)).

[35]     El término "a sabiendas" se define en la Ley con el significado de "con conocimiento o con motivos para saber". Ver 22 U.S.C. § 6023 (9).

14

forma de propiedad confiscada, o

(iii) causa, dirige, participa o se beneficia del tráfico ilegal (como se describe en la cláusula (i) o (ii)) por parte de otra persona, o se dedica al tráfico ilegal (como se describe en la cláusula (i) o (ii)) a través de otra persona, sin la autorización de ningún ciudadano de los Estados Unidos que tenga un reclamo sobre dicha propiedad.

54.     La propiedad también se define ampliamente en el (Ley Libertad):

El término "propiedad" significa cualquier propiedad (incluyendo patentes, derechos de autor, marcas registradas y cualquier otra forma de propiedad intelectual), ya sea real, personal o mixta, y cualquier derecho, garantía u otro interés presente, futuro o contingente en el mismo, incluyendo cualquier interés de contrato de arrendamiento.

55.     La conducta descrita anteriormente por parte de Imperial y Habanos constituye un tráfico ilícito del Inmueble RRHSC. En particular, cada uno se involucró o participa a conciencia e intencionalmente en una actividad comercial usando o beneficiándose de otra manera del Inmueble RRHSC que fue confiscada, sin la autorización de la Familia Rodríguez. Cada uno también causa, dirige, participa o se beneficia del tráfico ilícito del Inmueble RRHSC por parte de Cuba (y Tabacuba), nuevamente sin la autorización de la Familia Rodríguez.

55     La conducta descrita anteriormente parte de Imperial y de Habanos constituye un tráfico ilícito en el Inmueble RRHSC. En particular cada uno intencionalmente y a conciencia se involucró o participó en una actividad comercial utilizando o beneficiándose de otra manera del Inmueble RRHSC que dicho inmueble fue confiscado sin la autorización de la Familia Rodríguez. Cada uno de ellos también causa, dirige, participa o se beneficia del tráfico del Inmueble y la Propiedad RRHSC por parte de Cuba (y Tabacuba), nuevamente sin la autorización de la Familia Rodríguez.

56.     La conducta descrita anteriormente también constituye tráfico de la propiedad del Inmueble RRHSC por parte de WPP, Y&R y BCW. En particular, al ayudar a Imperial, Habanos y Tabacuba en la comercialización y publicidad de los productos de Habanos fabricados, almacenados o enviados desde el Inmueble RRHSC, de esa manera cada uno causa, dirige, participa o se beneficia de, o de otra manera se involucra en el tráfico ilícito del Inmueble RRHSC por parte de Imperial, Habanos y Cuba, todo sin la autorización de la Familia Rodríguez.

57.     Imperial y su socio de empresa conjunta cubana (Tabacuba) se han beneficiado sustancialmente del tráfico del Inmueble RRHSC. Según los datos reportados en los Informes Anuales de Imperial durante el período del 2009 al 2019, las "ganancias" obtenidas por Imperial y Cuba a través de la venta y distribución de puros cubanos totalizaron en más de $1.5 mil

15

millones.[36] Los "ingresos" totales excedieron los $ 6.7 mil millones. Una parte significativa de esas ganancias e ingresos se obtuvo mediante el tráfico ilícito del Inmueble RRHSC que fue confiscado.

58      Los Demandantes le proveyeron a cada uno de los Demandados, Imperial, WPP, Y&R y BCW (y a Habanos a cuenta de Imperial), con un aviso de treinta días, informándoles que, según lo dispuesto por 22 U.S.C. § 6082 (3) (B) - (D), a los Demandantes les notificaban de su intención de iniciar esta acción y exigir que cada Demandado cesara de inmediato el tráfico ilegal del Inmueble y la Propiedad de RRHSC.

59.     No obstante dichos avisos de parte de los Demandantes, al final del período de 30 días que comenzó en la fecha en que se proporcionó el aviso, cada Demandado (con la posible excepción de Y&R) continuó traficando en el Inmueble y la Propiedad de RRHSC confiscadas.

## Reclamación por Daños Sufridos

60.     Los Demandantes incorporan y alegan de nuevo los párrafos 1 al 59 como si estuvieran completamente invocados nuevamente.

61.     Este reclamo se presenta de conformidad con la Ley Libertad, 22 U.S.C. § 6082.

62.     Según lo establecido anteriormente, a más tardar en el año 2010 (Imperial, Habanos y WPP), o a más tardar en el año 2016 (Y&R) o a más tardar en el 2019 (BCW), cada Demandado tráfico ilícitamente en el Inmueble RRHSC que fue confiscado por el gobierno cubano en o después del 1 de enero de 1959 en violación de la Ley de Libertad y, por lo tanto, es responsable por daños monetarios sufridos por los Demandantes, que poseen el Reclamo del Inmueble RRHSC.

63.     Los demandantes tienen derecho a ser indemnizados monetariamente por daños y perjuicios según lo provisto por 22 U.S.C. § 6082 (a) (1) (A), que incluye:

(i) la cantidad cual sea mayor de:

. . . (II) la cantidad determinada [por un maestro especial de conformidad con 22 U.S.C. § 6083 (a) (2)]; o

---

[36]     Los beneficios e ingresos de Imperial fueron reportados en libras esterlinas. Más de $1.5 mil millones en "ganancias" y más de $ 6.7 mil millones en "ingresos" se calcularon sumando las "ganancias" e "ingresos" publicadas en GBP (Libras Esterlinas Inglesas) por Imperial a favor de sus empresas conjuntas Habanos y Altabana durante el periodo de los años 2009 al 2019. Esas cifras fueron luego convertidas a dólares a un tipo de cambio de 1,25 libras esterlinas por dólar. Ese resultado se duplicó luego para reflejar la distribución presuntamente equitativa de ganancias e ingresos entre Imperial y Cuba en sus empresas conjuntas 50-50 por ciento.

(III) el "valor justo de mercado" del Inmueble RRHSC, "calculado como el valor actual del Inmueble o el valor del Inmueble propiedad cuando esa fue confiscada más intereses, el valor que sea mayor"; y

(ii) costos judiciales y honorarios razonables de abogados.

64. Además, están justificados los daños triplicados. Debido a que los Demandados (con la posible excepción de Y&R) continuaron traficando ilegalmente en con el Inmueble RRHSC después de recibir la notificación de los Demandantes de conformidad con la § (Sección) 6082 (3) (B) - (D), los Demandantes tienen derecho a tres veces los daños monetarios sufridos determinados de conformidad con la  § (Sección) 6082 (a) (1) (A), más costos judiciales y honorarios de abogados razonables. Ver 22 U.S.C. Sección 6082 (a) (3) (B) - C).

## Juicio por Jurado es Requerido

Por la presente, los Demandantes exigen un juicio compuesto por jurado.

Fechado: 6 de agosto de 2020

| | |
|---|---|
| Rodríguez Tramont y Nuñez P.A. | Respetuosamente, |
| Por: / s / ***Paulino A. Núñez Jr.*** | Berenthal & Associates, P.A. |
| Frank R. Rodriguez | Por: / s / ***James L. Berenthal*** |
| Colegio de Abogados de Florida No. 348988 | James L. Berenthal |
| Correo electrónico: frr@rtgn-law.com | Colegio de Abogados de Florida No 126035 Correo |
| Paulino A. Núñez Jr. | electrónico: jlb@berenthalaw.com |
| Colegio de Abogados de Florida No. 814806 | 777 Third Avenue, Suite 22D |
| Correo electrónico: pan@rtgn-law.com | New York, NY 10017-1426 |
| 255 Alhambra Círcle | Teléfono: (212) 302-9494 |
| Suite 1150 | |
| Coral Gables, FL 33134 | |
| Teléfono: (305) 350-2300 | |

17

## <u>AFFIDAVIT OF TRANSLATION</u>

STATE OF NEW YORK        )
COUNTY OF NEW YORK   ) ss.:

       JAMES L. BERENTHAL, being duly sworn, deposes and says the following:

     1.     That the translation into English of the accompanying document, which document is written in Spanish, was made by the deponent and is a true and accurate and complete translation of said document.

     2.     That deponent is ably qualified to make such translation of said document from Spanish into English virtue of the following qualifications: deponent is fluent in both Spanish and English.

**JAMES L. BERENTHAL**

Sworn to be before me
this 14th day of December, 2020

**AILEEN M. JENNER**
Notary Public, State of New York
№ 02JE6241529
Qualified in New York County
My Commission Expires May 23, 2023

# Anexo No. 1





# Anexo No. 2

Case 1:20-cv-23327-XXXX Document 1-2 Entered on FLSD Docket 08/06/2020 Page 2 of 2





# Anexo No. 3





# Anexo No. 4

https://www.sec.gov/Archives/edgar/data/1072670/000110465907074649...

CORRESP 1 filename1.htm

Imperial Tobacco Group, PLC
PO Box 244, Southville, Bristol BS99 7UJ
Tel: +44 (0) 117 933 7286
Fax: +44 (0) 117 933 7430

Sra. Cecilia Blye
Oficina de Riesgo Global de Valores
División de Finanzas Corporativas
Comisión del Mercado de Valores
100 F Street, N.E. Washington, D.C. 20549
Estados Unidos de América

12 de octubre de 2007

**Re:   Imperial Tobacco Group PLC**
**Formulario 20-F para el año fiscal terminado el 30 de septiembre de 2006**
**Presentado el 2 de febrero de 2007**
**Formulario 6-K presentado el 23 de julio del 2007**
**Expediente No. 1-14874**

Estimada Sra. Blye

Gracias por su carta del 28 de septiembre de 2007. Habiendo tenido la oportunidad de considerar cuidadosamente sus comentarios que he expuesto a continuación nuestras respuestas. Cuando se solicite, hemos proporcionado una explicación e información suplementarias y revisaremos futuras presentaciones para ampliar y mejorar nuestras divulgaciones.

Al responder a sus comentarios reconocemos que:

- la Compañía es responsable por la adecuación y exactitud de la divulgación en sus presentaciones;

- comentarios del personal o cambios en la divulgación en respuesta a los comentarios del personal no impiden que la Comisión tome ninguna medida con respecto a las presentaciones de la Compañía; y

- la Compañía no puede hacer valer comentarios del personal como defensa en ningún procedimiento iniciado por la Comisión o cualquier persona bajo las leyes federales de valores de los Estados Unidos.

Para su comodidad, hemos incluido cada uno de sus comentarios de su carta, en orden y en cursiva, seguido de nuestras respuestas.

*General*

1. *Observamos la divulgación en la página 9 de su Formulario* 20-F, y *en la Prueba documental 99.1, con respecto a sus operaciones y las operaciones del Grupo Ampliado en Irán, Siria y Cuba. En futuras presentaciones, sírvase revisar la divulgación* para *dejar* claro que los países *a los que se hace referencia son identificados por el Departamento de Estado de EE. UU. como patrocinadores estatales del terrorismo, de modo que quede claro que el riesgo de "reacción pública adversa o daño reputacional como resultado de hacer negocios en países que han sido identificados como patrocinadores estatales del terrorismo por el Departamento de Estado de EE. UU. …" a la que se refiere se refiere específicamente a sus operaciones, y las* operaciones *del Grupo Ampliado, en Irán, Siria y Cuba.*

**Respuesta de Imperial Tobacco**

Revisaremos nuestras divulgaciones en futuras presentaciones para dejar claro que los países a los que se hace referencia son identificados por el departamento de Estado de EE. UU. como patrocinadores estatales del terrorismo. este respecto, propondríamos incluir un factor de riesgo en el siguiente efecto:
"***Hacemos negocios en ciertos países sujetos a sanciones internacionales***

---

Algunos de los países en los que hacemos negocios o con los que tenemos tratos comerciales a través de terceros, como Irán, Siria y Cuba, han sido identificados por el Departamento de Estado de Estados Unidos como patrocinadores estatales del terrorismo. Nuestras actividades en estas jurisdicciones se limitan actualmente principalmente a la venta de productos de tabaco y la compra de hoja de tabaco y no son importantes para nuestros ingresos, beneficios y condición financiera. Sin embargo, tras la finalización de la propuesta de adquisición de Altadis, nuestro negocio en Cuba, del cual previamente sólo hemos obtenido la hoja de tabaco, será más significativo como resultado de la participación de Altadis en el 50% en la Corporación Habanos S.A. ("Habanos") una empresa que distribuye puros fabricados en Cuba.

Buscamos cumplir plenamente con las sanciones internacionales en la medida en que nos sean aplicables y lo seguiremos haciendo una vez completada la propuesta de adquisición de Altadis. Sin embargo, al hacerlo podemos estar restringidos en las fuentes de productos que suministramos a estas jurisdicciones, en nuestras fuentes de financiación para nuestras operaciones en estas jurisdicciones o por la nacionalidad del personal que participamos en estas actividades. En particular, las operaciones de puros de Altadis en Cuba podrían verse limitadas materialmente por el funcionamiento del Reglamento de Control de Activos

Cubanos de los Estados Unidos y de la Ley de los estados Unidos de1996 Ley Libertad y Solidaridad Democrática Cubana (Libertad) de los Estados Unidos (comúnmente conocida como Helms-Burton). Nuevas sanciones futuras o cambios en las sanciones existentes podrían restringir o impedir completamente que nosotros y el Grupo Ampliado hagamos negocios o tengamos relaciones comerciales con ciertas jurisdicciones, incluyendo Cuba, que podrían tener un efecto adverso en nuestros ingresos, ganancias y condición financiera y la del Grupo Ampliado.

Además, podríamos sufrir una reacción pública adversa o daño reputacional como resultado de hacer negocios o tener relaciones comerciales a través de terceros con países que han sido identificados como patrocinadores estatales del terrorismo por el Departamento de EE. UU., incluyendo Irán, Siria y Cuba, o que están sujetos a sanciones internacionales, a pesar de que nuestras actividades cumplen con las sanciones internacionales aplicables e independientemente de la materialidad de nuestras operaciones en dichos países a nuestras operaciones o condición financiera. Cualquier reacción de este tipo podría tener un efecto adverso en nuestros ingresos, beneficios y condición financiera y la del Grupo Ampliado o sobre el precio de mercado de nuestras acciones ordinarias y ADSs."

*2. Le remitimos a la descripción de sus operaciones en países identificadas por el Departamento de Estado de EE. UU. como patrocinadores estatales del terrorismo, y su compra de hoja de tabaco cultivada en Cuba, incluida en su carta al personal de fecha 11 de febrero de 2005. Favor de proporcionar una descripción actualizada de sus operaciones en otros contactos con estos países y una descripción de las* operaciones del *Grupo* Ampliado en estos países y otros *contactos con estos países.*

**Respuesta de Imperial Tobacco**

Como se nos pidió, exponemos a continuación una descripción actualizada de nuestras operaciones y otros contactos con naciones identificadas por el Departamento de Estado de EE. UU. como patrocinadores estatales del terrorismo.

*Irán*: El acuerdo de fabricación por contrato con la compañía tabacalera iraní celebrado por el grupo en 2002 sigue en vigor. En virtud del acuerdo, fabricamos cigarrillos para su importación en Irán a través de un distribuidor externo. En el año terminado el 30 de septiembre de 2006 el valor de dichos ingresos netos fue de £4.234.000 y generamos un beneficio operativo de £553.000. No se han fabricado cigarrillos y no se han realizado ventas en virtud de este acuerdo en el año fiscal 2007.

*Siria*: Fabricamos cigarrillos para su importación en Siria. En el año terminado el 30 de septiembre de 2006, el valor de nuestros ingresos netos en Siria fue de £2.630.000 (de los cuales £573.000 fueron para el mercado nacional y £2.057.000 para el mercado libre de impuestos), generando un beneficio operativo de £1.348.000. Las ventas en el ejercicio fiscal 2007 fueron de £564.000 en el mercado nacional y de £3.037.000 en el mercado libre, dando un total de £3.601.000. Todo el aumento entre 2006 y 2007 provino del mercado libre de impuestos.

https://www.sec.gov/Archives/edgar/data/1072670/000110465907074649...

No consideramos que nuestra actividad actual en estos países sea importante para los resultados financieros del grupo, ya sea individualmente o en conjunto. El siguiente cuadro ilustra nuestros ingresos netos y beneficios operativos en Irán y Siria en cantidad y como porcentaje de los ingresos netos totales del grupo y los beneficios operativos en el año fiscal 2006.

| | Grupo (£ millones) | Irán (£ millones) | (% del Grupo) | Siria (£ millones) | (% del Grupo) |
|---|---|---|---|---|---|
| Ingresos netos | 3,162 | 4.2 | 0.13 | 2.6 | 0.08 |
| Beneficio operativo | 1,311 | .06 | 0.05 | 1.3 | 0.01 |

Todavía no hemos publicado los resultados financieros de nuestro grupo para 2007, pero esperamos que nuestras operaciones en Siria tengan un nivel similar de importancia a los ingresos netos de nuestro grupo y los beneficios operativos. Como se mencionó anteriormente, no tuvimos ventas en Irán en el año fiscal 2007.

No tenemos filiales, instalaciones o personal de grupo con sede en Irán o Siria.

*Cuba, Corea del Norte y Sudán*: Actualmente, no llevamos a cabo negocios en Cuba, Corea del Norte o Sudán. Sin embargo, aconsejamos al Personal que compremos hoja de tabaco cultivada en Cuba. Estas compras, realizadas a través de un distribuidor internacional de hojas de tabaco, ascendieron a £290.000 en el año fiscal 2006 y a £802.000 en el año fiscal 2007.

*Altadis/el Grupo Ampliado*: Además, hemos suministrado una descripción de las operaciones de Altadis en estos países. Sin embargo, dado que no hemos tenido acceso a una diligencia debida significativa en el Grupo Altadis, nuestra comprensión de las operaciones de Altadis en estos países se basa en la información incluida en documentos públicos presentados por Altadis o publicados por Altadis en su página web.

La adquisición de Altadis fue aprobada por nuestros accionistas en una junta general extraordinaria celebrada el 13 de agosto de 2007. El documento de oferta formal (*folleto informativo*) está siendo revisado por la Comisión *Nacional del Mercado de* Valores, el regulador de valores español (la "CNMV"). Tras la aprobación de la CNMV, iniciaremos nuestra oferta de licitación para Altadis, que tiene tres condiciones: (i) autorización de competencia de la UE, (ii) licitación de al menos el 80% de las acciones ordinarias en circulación de Altadis y (iii) eliminación de la limitación del 10% en el ejercicio de los derechos de voto contenidos en los reglamentos de Altadis. Hemos solicitado la autorización de la competencia de la UE y actualmente estamos a la espera de la decisión del regulador. Tras el lanzamiento de nuestra oferta de licitación, habría un plazo de aceptación de aproximadamente 60 días durante el cual se convocaría una junta general extraordinaria de

accionistas de Altadis con el fin de eliminar la limitación de votación. Dado a que la adquisición está sujeta a la satisfacción de las condiciones que están fuera de nuestro control, no podemos estar seguros de que la adquisición se completará.

En 2000 Altadis adquirió una participación del 50% en Corporación Habanos S.A. ("Habanos") una empresa con sede en Cuba. Habanos distribuye puros fabricados en Cuba a nivel mundial. Las ventas de Habanos incluidas en las cuentas de Altadis para el año terminado el 31 de diciembre de 2006 ascendieron a 135€millones de euros (£93 millones) lo que representa el 3,4% de las ventas económicas del Grupo Altadis.

También entendemos que Altadis fabrica cigarrillos para su importación en Siria. Altadis no ha revelado públicamente el valor de sus ventas a Siria; sin embargo, no creemos que tales ventas sean importantes para el Grupo Ampliado. No conocemos ninguna operación de Altadis en Irán, Corea del Norte o Sudán.

3.  *Sírvase aclararnos si las operaciones del Grupo Ampliado en Siria y Cuba serán importantes para los ingresos, los beneficios y la situación financiera del Grupo Ampliado.*

---

**Respuesta de Imperial Tobacco**
Sobre la base de la información que se nos ha puesto a nuestra disposición, si se completa la adquisición de Altadis, estimamos que las operaciones en Siria y Cuba representarán menos del 2% de los ingresos y beneficios del Grupo Ampliado. Como tal, no consideramos que las operaciones sean importantes para los ingresos, beneficios y condiciones financieras del Grupo Ampliado.

4.  *Sírvase informarnos si los gobiernos de Irán, Siria y Cuba, o las personas o entidades controladas por esos gobiernos, reciben dinero en efectivo o actúan como intermediarios en relación con sus operaciones y las de Altadis.*

**Respuesta de Imperial Tobacco**

La Compañía Tabacalera Iraní es un monopolio estatal. Sin embargo, debido a que las transacciones en las que estábamos involucrados fueron la fabricación de cigarrillos para su venta a ella a través de un distribuidor externo con sede en los EAU, no recibimos ingresos de ella directamente y no les proporcionamos dinero en efectivo. Como se mencionó anteriormente, no fabricamos ningún cigarrillo para su importación a Irán en el año fiscal 2007.

Del mismo modo, en Siria, vendimos cigarrillos para el mercado interno sirio a la Organización General del Comercio, que es un monopolio estatal. Las ventas de cigarrillos libres de impuestos se realizaron a través de un distribuidor externo con sede en el Líbano.

No tenemos conocimiento de las partes o acuerdos por los que Altadis opera en Siria.

En Cuba, compramos hoja de tabaco cultivada en Cuba de un distribuidor internacional de hojas de tabaco, y no tratamos directamente con ninguna entidad de Cuba. Además, Altadis es dueña de un 50% de Habanos, el 50% restante es propiedad del Estado cubano. Sin embargo, como se mencionó anteriormente, la adquisición de Altadis sigue estando sujeta a la satisfacción de ciertas condiciones que están fuera de nuestro control.

**Comentarios finales**

Confío en que nuestras respuestas a sus comentarios sean satisfactorias. Si necesita más explicaciones o información al considerar nuestras respuestas a sus comentarios, póngase en contacto con Nick Keveth (Controlador Financiero del Grupo) en el 011 44 117 933 7557.

Atentamente


Matthew Phillips

Secretario Corporativo

---

## <u>AFFIDAVIT OF TRANSLATION</u>

STATE OF NEW YORK    )

COUNTY OF NEW YORK  ) ss.:

          JAMES L. BERENTHAL, being duly sworn, deposes and says the following:

    1.    That the translation into English of the accompanying document, which document is written in Spanish, was made by the deponent and is a true and accurate and complete translation of said document.

    2.    That deponent is ably qualified to make such translation of said document from Spanish into English virtue of the following qualifications: deponent is fluent in both Spanish and English.

**JAMES L. BERENTHAL**

Sworn to be before me
this 14th  day of December, 2020

**AILEEN M. JENNER**
Notary Public, State of New York
№ 02JE6241529
Qualified in New York County
My Commission Expires May 23, 2023

# Anexo No. 5

| 13204 | GACETA OFICIAL | Julio 7 de 1961 |

sea a que se refiere el anterior Por Cuanto, concurren circunstancias análogas a las constitutivas de las causas de utilidad pública y de interés social que justificaron la nacionalización de las empresas relacionadas en la Ley 890 de 1960.

Por Cuanto: La Disposición Transitoria única de la pre-citada Ley No. 890 de 13 de octubre de 1960, faculta a la Junta Central de Planificación para proceder, de acuerdo con los principios de dicha Ley, a la nacionalización de las empresas, no incluídas en la misma, que en la fecha de su promulgación se encontraban intervenidas por disposición de organismos estatales.

Por Tanto: En uso de las facultades que le están conferidas el Comité Ejecutivo de la Junta Central de Planificación acuerda dictar la siguiente:

## Resolución

Primero: Se dispone la nacionalización mediante expropiación forzosa y, en consecuencia, se adjudican a favor del Estado Cubano en pleno dominio todos los bienes y empresas ubicadas en el territorio nacional y los derechos y acciones emergentes de la explotación de los mismos, cualesquiera que sean el título y modo de su disfrute, que pertenecen a las siguientes personas naturales o jurídicas:

1. Gasolinera Pintec, S. A.
2. Combustibles El Recodo, S. A.
3. Centro Comercial Palacios, S. A.
4. Comercial Garbo, S. A.
5. Fregadora de Autos de Cuba, S. A.
6. Servicentro Diana, S. A.
7. Motores Cojímar, S. A.
8. Aluminio Estructural Cubano, S. A.
9. Industrial Siré, S. A.
10. Compañía Cajonera Cubana, S. A.
11. Minera Occidental Bosch, S. A.
12. Compañía Inspiración Cubana de Cobre, S. A.
13. Tintas Sinclair y Valentine de Cuba, S. A.
14. Distribuidora de Alta Costura Internacional. S. A.
15. Compañía Textilera Garnt.lin, S. A.
16. Compañía Textil Doble Vía, S. A.
17. Compañía Moldeadora de Plásticos, S. A.
18. Distribuidora de Tabacos y Cigarros Monteman, S. A.
19. Industrial Alfarera Cubana.
20. Muebles de Arte de Mimbre, S. A.
21. Mueblería La Parisién, S. A.
22. Maderera Occidental, S. A.
23. Fundición de Metales Cadena, S. A.
24. Aguas de Mesa, S. A.
25. Republic Hosiery Mill, S. A. (en español: Fábrica de Tejidos República, S. A.)
26. Compañía Textil Cubanacán, S. A.
27. Pollack y Compañía S. A., exportadores de tabaco en rama.
28. Fábrica de Cigarros y Picaduras, Torres Gener Hermano, S. A.
29. Cigarros H. Hupmann, S. A.
30. Fábrica de Cigarros y Tabacos de Trinidad y Hermanos, S. A.
31. Trinidad Industrial, S. A.
32. Fábrica de Cigarros Kim, S. A.
33. Compañía Nacional de Calzado Alex, S. A.
34. Compañía Calzado Toldrá, S. A.
85. Compañía Fabril de Calzado Kino, S. A.
86. La Sin Rival, S. A., Pastas y Fideos.
87. Compañía Galletera Gilda, S. A.
88. Panificadora Pinova, S. A.
89. Textilera Amazona, S. A.
90. Tejas Infinitas, S. A.
91. Tambores Arbuckle de Cuba, S. A.
92. Minasgrande, S. A.
93. Compañía Minera Bahía de Moa.
94. Compañía Minera Masvidal, S. A.
95. Empaques Celloprint, S. A.
96. Nuevas Creaciones Textiles, S. A.
97. Empresas Petroleras Jones de Cuba, S. A.
98. Esso (Cuba) Inc.
99. Esso Standard (Cuba) Inc.
50. La Compañía Limitada de Texas (Indias Occidentales).
51. Compañía de Navegación Sinclair de Cuba.
52. Servicios Metropolitanos de Gas, S. A.
53. Compañía Comercial El Condado, S. A.
54. Refinería de Petróleos Santa María, S. A.
55. Panadería Billy, S. A.
56. Castañeda Montero, Fonseca, S. A.
57. Confecciones Paraná, S. A.
58. Textilera Versalles, S. A.
59. Curtidora Pombo, S. A.
60. Comercial La Curtiduría, S. A.
61. Hidro Eléctrica de Cumanayagua, S. A.
62. Compañía Cubana de Acumuladores, S. A.
63. Cigarrera Nacional, S. A.
64. Compañía Cubana Primadera, S. A.
65. Compañía Comercial Danpeco, S. A.
66. Tabacalera Moya, S. A.
67. Confecciones Oro, S. A.
68. Fábrica de Cigarros Camagüey, S. A.
69. Compañía Pepsi Cola de Cuba.
70. Compañía Embotelladora Metropolitana, S. A.
71. Compañía Embotelladora Corona Real Cola.
72. Compañía de Tabaco de Cuba, S. A.
73. Compañía Nacional de Acumuladores.
74. Partes de Autos Marca de Calidad, S. A. (Quality Brand Auto Part).
75. Inmobiliaria Arroyo Arenas, S. A.
76. Compañía Novedades Textiles, S. A.
77. Muebles Marvin, S. A.
78. Hijos de Domingo Méndez, Cigarros y Tabacos, S. A.
79. José Toraño y Cía., S. en C.
80. Martín Dosal y Cía.
81. Villamil, Santalla y Cía. S. L.
82. Compañía Comercial e Industrial Ermoto, S. A.
83. Fomento Eléctrico Rural, S. A.
84. Compañía Eléctrica Oriental Baracoa, S. A.
85. Jaruco Eléctrico.
86. Compañía Eléctrica del Noroeste, S. A.
87. Tenería Modelo, S. A.
88. Rafael Díaz Salazar (Salazar Muebles).
89. Juan J. Rodríguez e Hijos, S. L.
90. Aurelio Oliva Sánchez (Fundición Aurelio Oliva).
91. J. B. Díaz y Cía., S. en C.
92. Junco y Cía.
93. Leslie Pantin e Hijos.
94. Joaquín López (La Cristina, Panadería, Galletería y Dulcería).

## "Gaceta Oficial" No. 131 dated July 7, 1961, page 13205

Julio 7 de 1961      GACETA OFICIAL      13205

95. Esperanza Carrió Ajaray (Fábrica de Velas La Ideal).
96. **Ramón Rodríguez e Hijos, S. en C.**
97. Hijos de J. Cano y Cía.
98. Trajes Paramount, S. A. (Cía de Trajes Paramount).
99. Eugenia Behar Behar (Confecciones Allyson)
100. Hijos de Domingo Méndez, Cigarral y Tabacos, S. A.
101. Tabacalera Severiano Jorge, S. A.
102. Productos Cubanos de Bájaro, S. A.
103. Reina y Susana Cohen Behar (Allon Original).
104. Talkar Ua Confecciones Irma Montasterio.

Segundo: La Administración y dirección de las empresas que por la presente Resolución se adjudican al Estado Cubano, se asigna a los organismos que actualmente tienen a su cargo dichas empresas. Los que podrán designar para cada una de ellas los administradores que elijan, sin perjuicio de las facultades de la Junta Central de Planificación.

Tercero: Se autoriza expresamente a los organismos a que se refiere el Apartado anterior para que, mediante las oportunas Resoluciones, extiendan la nacionalización que por esta Resolución se dispone a cuantos bienes, empresas, derechos y acciones resulten vinculados o afines a los nacionalizados, cualquiera que sea el modo, forma y título de la vinculación o afinidad.

Cuarto: Se declaran como causas de utilidad pública y de interés social y nacional, así como de la necesidad de la expropiación, las expuestas en los Por Cuantos de la presente Resolución.

Quinto: De conformidad con lo dispuesto en el Artículo 7 de la Ley 890 de 1960, los modos y formas de pago que correspondan a las personas naturales o jurídicas afectadas por las expropiaciones que se disponen en esta Resolución, serán reguladas mediante una Ley.

Y para su publicación en la GACETA OFICIAL de la República, en cumplimiento de lo expresamente ordenado por el Cmdte. Raúl Castro Ruz, Vicepresidente de la Junta Central de Planificación, se expide la presente certificación en La Habana, a cinco de julio de mil novecientos sesenta y uno.

Regino G. Botí
Ministro de Economía
Secretario Técnico
Junta Central de Planificación
8—5365

— ( ◆◆◆◆◆◆◆◆ ) —

### CONSEJO SUPERIOR
### DE LA REFORMA URBANA

#### EDICTO

El Consejo Superior de la Reforma Urbana, ha dispuesto, en cumplimiento de lo preceptuado en el Artículo 40, en relación con el Artículo 42 de la Ley de Reforma Urbana, y de conformidad con el procedimiento establecido por el Acuerdo nú-

mero 55, de 10 de enero del año en curso, emplazar como por el presente se emplaza a los señores que a continuación se relacionarán, promoventes de expedientes sobre indemnización por ante la Delegación Provincial de la Reforma Urbana en Santa Clara, Las Villas, conforme con lo que autoriza el Artículo 37 de dicha Ley, para que se personen ante esa Delegación mediante escrito en el que deberán hacer sus alegatos y acompañar las pruebas documentales y proponer los testigos que estimen convenientes dentro del término de quince días hábiles contados a partir de este emplazamiento.

Expediente número 1, promovente Paulino Fernández Figueroa; expediente número 2, promovente Alejo Cañizares; expediente número 3, promovente Juan Antonio Romero; expediente número 4, promovente Isaura Rodríguez Díaz; expediente número 5, promovente María Luisa Treto Silverio; expediente número 6, promovente Rosario Correa Pedrera; expediente número 7, promovente María Isabel Morales; expediente número 8, promovente Juan F. Bendoiro González; expediente número 9, promovente César Pernas Salas; expediente número 10, promovente María Teresa Coraídes Salva; expediente número 11, promovente María González Tellés; expediente número 12, promovente Belén Vitalina Fleites; expediente número 13, promovente Elena Braclán Delgado; expediente número 14, promovente Manuel Paz Lago; expediente número 15, promovente Sergio Luis Pulido; expediente número 16, promovente Clara Luz Guerra Pérez de Alejo; expediente número 17, promovente Francisco Fleites Monteagudo; expediente número 18, promovente Abelardo Agüero Pichardo; expediente número 19, promovente Jesús Flores Fernández; expediente número 20, promovente Julián Machado Martí; expediente número 24, promovente Aurora Fondón y Zaraboso; expediente número 25, promovente Manuel Enrique García Valdés; expediente número 26, promovente Joaquín Sebares Acebal; expediente número 27, promovente Modesto Lucilo Pérez de Prado; expediente número 28, promovente Felipa Sosa Rubio; expediente número 29, promovente Rosa Cristina Ruiz del Valle; expediente número 30, promovente Ignacio Gustavo Machado Cárdenas; expediente número 31, promovente José Gutiérrez García; expediente número 32, promovente Serafín Ríos y Cruz; expediente número 33, promovente Rafael A. Díaz Canel Herrera; expediente número 41, promovente Manuela Gutiérrez Rodríguez; expediente número 42, promovente José Valle; expediente número 43, promovente Otilio González Palmero; expediente número 44, promovente María del Carmen Lahera y Pérez; expediente número 45, promovente Teodoro Alvarez Menéndez; expediente número 46, promovente Angela Margarita Brisuela; expediente número 47, promovente María del Rosario Carbonell Echemendía; expediente número 48, promovente Jacobo Stiefiel y Ramírez; expediente número 49, promovente Sebastián Sandallo Escofet; expediente número 50, promovente Antonio Reyes Reyes; expediente número 51, promovente Resti-

# Anexo No. 5A

## Resolution

First: The Nationalization, by means of forced expropriation, is decreed, and consequently the Cuban State, in complete authority, is awarded all the interest in assets and business entities located in the national territory and the rights and actions arising from the exploitation of the same, whatever the interest, title or mode of their ownership, of the following natural persons or judicial entities:

. . . .

96. Ramón Rodriguez e Hijos, S. en C.

. . . .

Second: The administration and management of the companies that by this Resolution are awarded to the Cuban State, are assigned to the organizations that are currently in charge of said companies, which may appoint for each of them the administrators they choose without prejudice to the powers of the Central Planning Board.

Third: The organizations referred to in the previous Section are expressly authorized, by appropriate Resolutions, to extend the nationalization that this Resolution provides to as many assets, business entities, rights and stocks as are linked or related to those nationalized, whatsoever the form and title of the bond of affinity to the nationalized entities.

Fourth: By reason of this Resolution. As detailed, they are declared to be matters of public necessity and of social and national interest, as well as the need for the expropriation.

Fifth: In accordance with the provisions of Article 7 of Law 890 of 1960, the means and forms of payment which correspond to the individuals or legal entities affected by the expropriations provided in this Resolution will be regulated by Law.

And in compliance with the expressed orders of Commander Raúl Castro Rus, Vice President of the Central Planning Board that it be published in the OFFICIAL GAZETTE of the Republic, this certification is issued in Havana as of July 5, 1961.

**Regino G. Boti**
Minister of the Economy
Technical Secretary
Central Planning Board
S -5365

# Anexo No. 5B

## Resolución

Primero: Se dispone la nacionalización mediante expropiación forzosa y, en consecuencia, se adjudican a favor del Estado Cubano en pleno dominio todos las bienes y empresas ubicadas en el territorio nacional y los derechos y acciones emergentes de la explotación de los mismos, cualquiera que sean el título y modo de su disfrute, que pertenecen a las siguientes personas naturales o jurídicas:

. . . .

    96. Ramón Rodriguez e Hijos, S. en C.

. . . .

Segundo: La Administración y dirección de las empresas que por la presente Resolución se adjudican al Estado Cubano, se asigna a los organismos que actualmente tiene a su cargo dichas empresas, los que podrán designar para cada una de ellas los administradores que elijan sin perjuicio de las facultades de la Junta Central de Planificación.

Tercero: Se autoriza expresamente a los organismos a que se refiere el Apartado anterior para que, mediante las oportunas Resoluciones, extiendan la racionalización que por esta Resolución se dispone a cuantos bienes, empresas, derechos y acciones resulten vinculados o afines a los nacionalizados, cualquiera que sea el modo, forma y título de la vinculación o afinidad.

Cuarto: Se declaran como causas de utilidad pública y de interés social y nacional, así como de la necesidad de la expropiación, las expuestas en ellas. Por Cuantos de la presente Resolución.

Quinto: De conformidad con lo dispuesto en el Artículo 7 de la Ley 890 de 1960, los medios y formas de pago que correspondan a las personas naturales o jurídicas afectadas por las expropiaciones que se disponen en esta Resolución, serán reguladas mediante una Ley.

Y para su publicación en la GACETA OFICIAL de la República, en cumplimiento de lo expresamente ordenado por el Cmdte. Raúl Castro Rus, Vicepresidente de la Junta Central de Plantificación, se expide la presente certificación en La Habana, a cinco de julio de mil novecientos sesenta y uno.

**Regino G. Boti**
Ministro de Economia
Secretario Técnieo
Junta Central de Planification
S -5365

# Anexo No. 6

Case 1:20-cv-23287-XXXX Document 1-6 Entered on FLSD Docket 08/06/2020 Page 2 of 3

http://www.habanos.com/en/festival-habanos-noticias/festivales/xi-festival-del-habano/galeria-de-imagenes-del-xi/







Case 1:20-cv-23287-XXXX Document 1-6 Entered on FLSD Docket 08/06/2020 Page 9 of 9

http://www.habanos.com/en/festival-habanos-noticias/festivales/xi-festival-del-habano/galeria-de-imagenes-del-xi/



# Anexo No. 7

http://cubancigarsculturelifestyle.blogspot.com/2013/01/,

