UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

LUIS MANUEL RODRIGUEZ, et al.,          Case No.: 1:20-cv-23287(DPG)(AMO)

       Plaintiffs,

v.

IMPERIAL BRANDS PLC, et al.,

       Defendants.

_____/

**<u>Memorandum of Law in Opposition to Motion to Dismiss Amended Complaint</u>**

Plaintiffs, Luis Manuel Rodriguez, Maria Teresa Rodriguez, a/k/a Maria Teresa Landa, Alfredo Ramon Forns, Ramon Alberto Rodriguez, Raul Lorenzo Rodriguez, Christina Conroy, and Francisco Ramon Rodriguez, pursuant to Local Rule 7.1, submit this memorandum of law in opposition to the motion to dismiss under Rule 12(b)(1) and (6) ("Motion") filed jointly by Defendants, Corporación Habanos, S.A. ("Habanos"), Imperial Brands plc ("Imperial"), WPP PLC ("WPP"), Young & Rubicam LLC ("Y&R"), and BCW LLC, a/k/a Burson Cohn & Wolfe LLC ("BCW," and collectively with WPP and Y&R, the "WPP Defendants").

## Preliminary Statement

Plaintiffs are the owners of a 90% interest in Ramón Rodriguez e Hijos Sociedad en Comandita ("RRHSC"). RRHSC was the owner of the Partagas cigarette factory building and a modern mixed-use building adjacent and connected to said factory at the corner of Calle 23 y 16 (23rd Street and 16th) in Havana, Cuba (collectively the "Property"). In 1961, the Castro government confiscated ownership of RRHSC and the Property. Plaintiffs are the owners of a "Claim" under the Helms-Burton Act ("HBA" or "Libertad Act") due to the Cuban government's confiscation and trafficking in the Property.

The HBA took effect in 1996:

> It is the purpose of statute ***to deter third party foreign investors from trafficking in the confiscated property*** (defined as '***purchas[ing] an equity interest in, manag[ing], or enter[ing] into joint ventures*** using property and assets some of which were confiscated from United States nationals.')

*Glen v. Club Mediterranee S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (emphasis added) (quoting 22 U.S.C. § 6081(5)); *see Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 125 (2d Cir. 2000) ("Congress sought to discourage business arrangements" like the joint venture arrangement at issue in that case that sought to challenge a U.S. trademark in the Havana Club mark).

Despite the clear warning, Imperial was neither deterred nor discouraged. Instead, in 2008, Imperial entered into a joint venture with Cuba and its tobacco monopoly company, "Tabacuba." Defendant Habanos is a joint venture company controlled by Cuba with financial interests owned 50% by Cuba and 50% by Imperial. *See* Amended Complaint (Am. Compl.) ¶7, (ECF 82). According to Imperial, its joint venture arrangements with Cuba and Tabacuba (the "Cuban Joint Ventures") collectively "manufacture, market, distribute and sell cigars manufactured in Cuba."[1] Plaintiffs allege that, in furtherance thereof, Imperial and its joint venture partnership, Habanos, together with the WPP Defendants as their agents, have "trafficked" in the Property without compensation to Plaintiffs in violation of the HBA. Among other things, the unauthorized use of the Property by Imperial and Habanos extended to Tabacuba's management of the day-to-day business of all Cuban tobacco products from offices it maintained in the RRHSC Property at all times from 2007 or 2008 until at least October 29, 2020. *See* Am. Compl., ¶ 9. This included use of a portion of the Property by Tabacuba, for its executive offices, and the use of the loading dock and space for warehousing and shipping Habanos' products. *See id*., ¶ 54.  Plaintiffs further allege that Imperial and Habanos retained WPP, through WPP's U.S. based subsidiaries Y&R and BCW, to market products produced, shipped, or stored at or from the confiscated RRHSC Property. The marketing arrangement included use of official "portals" on U.S. based social media companies. *See id*., ¶ 55.  Plaintiffs seek redress against the Defendants for violations of the HBA, as each of the Defendants have either participated in, or profited from, trafficking of the Property.

---

[1]     *See* Am. Compl. ¶6, citing Imperial *Prospectus* for "€15,000,000,000 Debt Issuance Programme," at 27. The Amended Complaint included a link to the Prospectus that was available on the Imperial Website. As that link has now apparently been removed or disabled, Plaintiffs are separately filing a copy of the Prospectus.

All Defendants collectively move to dismiss contending broadly that Plaintiffs do not have Article III standing and have otherwise supposedly failed to state a claim. Defendants repeatedly insist on and feature their contention that the Property was confiscated by "the Cuban Government" and try to separate themselves from its conduct. Among other things, Defendants argue that Plaintiffs fail to allege "trafficking" because the conduct at issue is that of Cuban companies, who Defendants contend, "are categorically incapable of committing trafficking." *See* Motion at 6. They also insist that Plaintiffs have failed to allege that Defendants knowingly trafficked in confiscated property. Significantly, Defendants' arguments completely ignore that, under the HBA, the Habanos joint venture controlled by Cuba is an "agency or instrumentality" of Cuba.[2] As a result, Defendant Habanos, Imperial's partner and the WPP Defendants' principal, therefore *is* the Cuban Government from which Defendants try so hard to separate.[3]   As demonstrated below, Defendants' arguments misconstrue both the complaint's allegations as well as the HBA and other governing legal doctrines.

I.    <u>**Plaintiffs' Have Standing to Pursue Their Claims Under the HBA**</u>

Defendants' primary argument is that Plaintiffs lack Article III standing to pursue their claims. Defendants acknowledge as they must that multiple courts, including two judges in this

---

[2]    Under the HBA, "The term 'agency or instrumentality of a foreign state' has the meaning given that term in section 1603(b) of Title 28. *See* 22 U.S.C. § 6023(1); *see also* 28 U.S.C. § 1603 (a) ("A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)"); *id*., § 1603 (b) ("An 'agency or instrumentality of a foreign state' means any entity-- (1) ***which is a separate*** legal person, ***corporate or otherwise***, ***and*** (2) which is an organ of a foreign state or political subdivision thereof, or ***a majority of whose*** shares or ***other ownership interest is owned by a foreign state*** or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . .  nor created under the laws of any ***third country***.") (emphasis added).

[3]    *See* 22 U.S.C. § 6023(5) (A) ("The term 'Cuban Government' ***includes*** the government of any political subdivision of Cuba, and any ***agency or instrumentality of the Government of Cuba***.") (emphasis added).

district have concluded that HBA plaintiffs do have Article III standing. *See Havana Docks Corp.*

*v. MSC Cruises SA Co.*, 484 F. Supp. 3d 1177, 1188-95 (S.D. Fla. 2020); *Havana Docks Corp. v.*

*Norwegian Cruise Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1226-31 (S.D. Fla. 2020); *Iglesias*

*v. Ricard*, 2020 U.S. Dist. LEXIS 164117, at *25-29 (S.D. Fla. Aug. 17, 2020). Later decisions

from the Districts of Delaware and D.C. agree that HBA plaintiffs have standing. *See Exxon Mobil*

*Corp. v. Corporacion CIMEX S.A.*, 19-CV-01277, 2021 WL 1558340, at *20-21 (D.D.C. Apr. 20,

2021); *Glen v. Trip Advisor LLC*, ("*Glen IV*") CV 19-1809, 2021 WL 1200577, at *7 (D. Del. Mar.

30, 2021).

All of the opinions that denied dismissal on standing grounds did so after the one contrary

decision from a Texas district court on which Defendants rely. That decision, referred to here as

"*Glen III*" for clarity, concluded that plaintiff Glen did not have standing because:

> ***Plaintiff complains that defendant fails to compensate plaintiff***
> ***when defendant earns commissions on reservations made at the***
> ***Subject Hotels***. It is unclear how plaintiff is injured by such an
> action. . . . [D]efendant merely does business with the Subject
> Hotels. It is unclear why plaintiff believes he should be entitled to
> defendant's commissions and is injured by not receiving such
> payment; plaintiff would not be entitled to a portion of defendant's
> commissions even if he owned the Properties and operated the
> Subject Hotels.

*Glen v. Am. Airlines, Inc.*, 4:20-CV-482-A, 2020 WL 4464665, at *2 (N.D. Tex. Aug. 3, 2020)

(emphasis added). The decision appears to be based on the specific claim and arguments made by

the plaintiff. As noted above, a later decision involving the same plaintiff had the benefit of *Glen*

*III* and rejected its reasoning on standing, concluding that Glen did have standing to sue two other

groups of defendants under the HBA. The *Glen IV* court first rejected arguments by the later

defendants that it should adopt *Glen III*'s reasoning on grounds of issue preclusion. *Glen IV* relied

in part on three Southern District opinions, the decisions in the Havana Docks cases, *MSC Cruises*

*SA Co.*, 484 F. Supp. 3d 1177, and *Norwegian Cruise Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, on *Iglesias v. Ricard*, 2020 U.S. Dist. LEXIS 164117, all decided after *Glen III*. The *Glen IV* court itself denied dismissal on standing grounds, reasoning that:

> Glen's ***alleged injury is fairly traceable to Defendants' conduct***. Since Glen alleges ***he was harmed by Defendants' trafficking in the Subject Properties without his authorization*** or paying compensation to him, ***it follows that he would not have been harmed if Defendants had not trafficked in the Subject Properties***. The chain of causation is also supported by the legislative findings in the Helms-Burton Act.

*Glen IV*, 2021 WL 1200577 at \*7 (emphasis added). The most recent decision on the subject agreed that the proper focus of analysis is on whether the HBA plaintiff has suffered a loss from trafficking in the property that is the subject of the "Claim" created by the HBA. *See Corporacion CIMEX S.A.*, 2021 WL 1558340, at \*20-21 ("***Congress has defined Exxon's injury in terms of the effects of trafficking in the confiscated property***, and ***that injury is plainly 'fairly traceable' to Defendants' alleged trafficking***—'not the result of the independent action of some third party not before the court.'") (emphasis added). Plaintiffs submit that these decisions, all rendered after *Glen III*, are correct.

Defendants standing arguments do not require a different decision. Defendants first confusingly cite to the 11th Circuit decision in *Glen v. Club Mediterranee S.A.*, 450 F.3d 1251 ("*Glen II*") as well as to the district court's decision in *Glen I*, that was affirmed by *Glen II*. Significantly, however, *Glen I* and *II* as well as O*debrecht Constr. v. Sec'y, Florida Dept. of Transportation*, 715 F.3d 1268 (11th Cir. 2013), were all decided at a time when Title III claims under the HBA were suspended. The discussion about the HBA in those cases serve to give historical context but had nothing to do with standing for HBA claims. To the contrary, *Glen II* affirmed dismissal of Glen's attempt to assert common law, non-HBA claims.

Defendants' arguments focus first on their contention that "this lawsuit does not seek to remedy any concrete harm caused by Defendants" because, they say, harm at issue here is the confiscation of the RRHSC Property by the "Cuban Government." *See* Motion at 7. As noted above this argument would not help Defendants, even if Plaintiffs did need to base standing for their HBA claim on Cuba's confiscation of the Property. As demonstrated above, Defendant Habanos is deemed to be Cuba for purposes of this HBA claim, and Imperial cannot escape the actions of its joint venture partner nor WPP those of its principal. But the HBA claim is not based on confiscation of the Property by these Defendants. Instead, the HBA Claim is a legislatively created claim designed to compensate victims of Cuba's uncompensated confiscation.

Nor is there any basis for concluding that Plaintiffs do not have standing to pursue their HBA Claim. The Eleventh Circuit's *en banc* decision in *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020), held that, in order to have standing, a party: "must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" 979 F.3d at 924 (quoting *Spokeo*, 136 S. Ct. at 1547). *Muransky* focused on injury, explaining that:

> Congress may "**elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law**" . . . Congress . . . [C]an also recognize and provide legal remedies for concrete injuries that already exist, but for which there is no cause of action.

*Muransky*, 979 F.3d at 925 (emphasis added, citations omitted). The court added that:

> [B]y looking to history, we can discern a **concrete injury where the "intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts**." **The fit between a new statute and a pedigreed common-law cause of action need not be perfect**, but we are called to consider at a minimum whether the harms match up between the two."

*Muransky*, 979 F.3d at 926 (emphasis added, citations omitted). This standard is readily met here.

Plaintiffs allege that Cuba confiscated the RRHSC property without any compensation. At common law, a taking of property without compensation is the essence of theft. *See Danopulos v. Am. Trading II, LLC*, 69 N.E.3d 157 (Ohio Ct. App. 2016). The true owner has then a claim for conversion: "Conversion is a common-law tort relating to the wrongful exercise of dominion over property in exclusion of the owner's right, or the withholding of property from the owner's possession under a claim inconsistent with the owner's rights." *Id.* at 159. And, significantly: "Under the common law, a thief does not acquire good title to stolen property and, therefore, 'one who purchases or acquires property from a thief,' even in good faith, does not have a right to the possession of the goods against 'the rightful owner.'"[4] *Id.* The common law also prevented the government from taking land without compensation. *See Appeal of Lord*, 368 Pa. 121, 124–25, 81 A.2d 533 (1951).[5]

When it enacted the HBA, Congress made express findings that explain its reasons for the creation of the statutory right at issue here:

> (1) Individuals enjoy a fundamental right to own and enjoy property which is enshrined in the United States Constitution.
> . . .
> (8) The international judicial system, as currently structured, lacks fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property by governments . . ..
> . . .

---

[4]    *See also In re Newpower*, 233 F.3d 922, 928–29 (6th Cir. 2000) (noting the "long established at common law [rule] that a thief has no title in the property that he steals"); *Richardson v. Seattle-First Nat. Bank*, 38 Wash. 2d 314, 315–16, 229 P.2d 341, 342 (1951) ("At common law, except in the market overt, *a thief could convey no title to his vendee*.") (emphasis added).

[5]    *See Appeal of Lord*, 81 A.2d at 534–35 (noting that: "As the King's power decreased and the power of his nobles increased, slowly *the right*, first of the nobles and then *of every land owner to freely and absolutely own, possess and enjoy the land which he owned* in freehold, *became recognized by all as a sacred, absolute, inviolable right*.") (emphasis added).

> (10) The United States Government has an obligation to its citizens
> to provide protection . . . including the provision of private remedies.

*See* 22 U.S.C § 6081. Congress's findings demonstrate that it was intent on creating statutory remedies to protect victims of Cuba's uncompensated takings. The remedy has a direct analogue to common law remedies available to the owner of property taken either by theft or by government taking: "[O]ne who purchases or acquires property from a thief,' even in good faith, does not have a right to the possession of the goods against 'the rightful owner.'" *Danopulos*, 69 N.E.3d at 159. The HBA does not attempt to take title back from the [not-so] innocent joint-venture partners or agents of the Cuban Government. But it does create a right intended at least in part to place victims of Cuba's takings in a position analogous to that of the true owner of stolen property – or that of an heir or successor to the true owner. Instead of requiring the "innocent" purchaser of property (or of a joint venture in property) stolen or taken without compensation by Cuba to return the property, Cuba's partner or vendee is required to compensate the true owner. Again: "The fit between a new statute and a pedigreed common-law cause of action need not be perfect." *Muransky*, 979 F.3d at 926. Nor, contrary to Defendant's insistence, is there any doubt that "the harms match up between the two." Cuba's joint venture partners and agents are in the exact position of someone who acquires property from a thief, even if innocently.

It does not matter, as Defendants argue, that Plaintiffs (who as the heirs of Ramon Rodriguez Gutierrez) would have had title to RRHSC and the Property had they not been deprived of possession and title by Cuba. The common law rule was designed to eventually provide compensation to the true owner, or its successor, even if years had passed and property had exchanged hands among truly innocent person who acquired through the thief. Nor is there any break in causation. The remedy Plaintiffs' seek is for Defendants trafficking in the Property in violation of the HBA. Even if they could somehow be deemed innocent partners or agents of Cuba,

there position would be no different than that of the pawnbroker in *Danopolous* or of the purchaser of a car from the auto dealership in *Richardson v. Seattle-First Nat. Bank*, 38 Wash. 2d 314, 315–16, 229 P.2d 341, 342 (1951). In each case truly innocent purchasers were required to compensate the true owner (or a successor) even though the thief was unknown to them and, in *Richardson*, had absolutely no dealings with the innocent purchaser. Defendants' standing arguments cannot support dismissal.

## II.    Plaintiffs' Amended Complaint States a Claim Under the HBA

Defendants next move to dismiss with a series of arguments under 12(b)(6). None of their arguments can support dismissal.

### A.    *Defendants' Improper Invocation of their Affirmative Defense of Limitations Does Not Support Dismissal*

Defendants next argue that Plaintiffs claims should be dismissed due to a statute of limitations. The argument misconstrues the law, the complaint, and the rules governing motions to dismiss. Defendants first say that a claim under the HBA "may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. While the statute is accurately quoted, it provides no basis for dismissal. Defendants state that that they call "the sole factual allegation on that topic" is supposedly that "Habanos, S.A. was using the RRHSC Property in February 2010." They then insist that "Plaintiffs cannot circumvent Section 6084 by asserting upon 'information and belief' that Habanos, S.A. has continually used the RRHSC Property since 2010." *See* Motion at 12.

Defendants' argument attempts to manufacture a requirement that Plaintiffs plead that the Property was in continuous use until 2018, but there is no basis for any such requirement. Defendants do not explain why Plaintiffs would be required to plead anything more than that the

Property was used, and therefore, "trafficked" as defined in the HBA. Nor can they. First, the law

is clear that, with respect to statute of limitations:

> 'A ***statute of limitations bar is an affirmative defense***, and
> ***plaintiffs are not required to negate an affirmative defense in their***
> ***complaint***.' *Id.* (quotation marks, ellipsis, and alterations omitted).
> As a result, '[a] dismissal for failure to state a claim on statute of
> limitations grounds is appropriate only if it is apparent from the face
> of the complaint that the claim is time-barred.'

*Roberts v. Carnival Corporation*, 824 Fed.Appx. 825 (11th Cir. 2020) (emphasis added) (quoting

La *Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). Plaintiffs did not plead

that Defendants use of the Property ceased in 2010 nor at any other time before October 2020,

when Plaintiffs believe that Imperial sold its interest in Habanos. Defendants' accusation that

Plaintiffs are attempting to "circumvent Section 6084" is wrong and baseless. This is nothing more

than an attempt to require Plaintiffs to negate Defendants affirmative defense. Again, Defendants

provide no basis for such a requirement. Without more, this argument fails.

Defendants' argument is not improved by their assertion that Plaintiffs cannot plead on

'information and belief.' Because Defendants have provided no basis for requiring any pleading

at all regarding their affirmative defense, Plaintiffs' purported failure to properly plead matters on

information and belief cannot serve to create a non-existent requirement to plead at all. Defendants,

in any event, are wrong about the pleading rules. While allegations based "upon information and

belief" generally do not have to be taken as true, "[p]leading on information [and] belief is still

permissible where [ ] the facts are 'peculiarly within the possession and control of the defendant.'"

*Palm Partners LLC v. Palm Beach Treatment Ctr., LLC*, 9:17-CV-80582, 2017 WL 5668050, at

*2 (S.D. Fla. Aug. 18, 2017) (quoting *Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302,

1311 (S.D. Fla. 2011)).

The Property, of course, is in Cuba. There can be no dispute that, as Congress expressly found, the Cuban Government wrongfully confiscated the property of millions, including "thousands of United States nationals" and "thousands more Cubans who claimed asylum in the United States as refugees because of persecution and later became naturalized citizens of the United States." *See* 22 U.S.C. § 6081 (3). Nor is there any dispute about the genesis of the HBA itself, which was enacted after "Cuban MiG's shot down two U.S. civilian private planes in February 1996." *See Odebrecht Const., Inc. v. Sec'y, Florida Dept. of Transp.*, 715 F.3d 1268, 1277 (11th Cir. 2013) (citing 22 U.S.C. § 6046 ("Congressional findings condemning attack"). If any case calls out for "[p]leading on information [and] belief is still permissible where [ ] the facts are 'peculiarly within the possession and control of the defendant,'" this is it. If Plaintiffs were somehow inexplicably required to plead in avoidance of the statute of limitations, they have certainly done so properly.

Finally, any suggestion that photographs attached to complaint somehow support a limitations defense on their face is also baseless. While a photograph taken on a particular date may not necessarily support that use of the Property continued after a particular date, it certainly cannot support the opposite proposition – that use stopped on any particular date after the photograph was taken. Defendants' reference to an Internet blog on which a picture may have appeared also does not support dismissal. Plaintiffs have no control or affiliation with "blog" or its author and do not agree to the authenticity of any a blog. Nor was a blog ever mentioned in the complaint, except perhaps as the source of a specific photograph. Nor is there any logic to Defendants' suggestion that because a blog, written as of a specific date, mentions that a portion of the Property was not in operation as of that date, that the cessation of use of the Property at a time thereafter has somehow been established. To be clear Plaintiffs do not concede authenticity

of the blog and do not agree consideration of any blog on this Motion. Defendants' limitations arguments also cannot support dismissal.

   B.   *Defendants are Not Excused from the HBA by Habanos' Trafficking*

Defendants next argument for dismissal attempts to turn the HBA on its head. There is no dispute that one of the main goals, if not the principal goal, of Congress when passing the HBA.

> It is the purpose of statute **to deter third party foreign investors from trafficking in the confiscated property** (defined as '**purchas[ing] an equity interest in, manag[ing], or enter[ing] into joint ventures** using property and assets some of which were confiscated from United States nationals.')

*Glen v. Club Mediterranee S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (emphasis added) (quoting 22 U.S.C. § 6081(5)); *see Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 125 (2d Cir. 2000) ("Congress sought to discourage business arrangements" like the joint venture arrangement at issue in that case that sought to challenge a U.S. trademark in the Havana Club mark). *See* 22 U.S.C. § 6081(5) ("The Cuban Government is offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures using property and assets some of which were confiscated from United States nationals."); *id.* at (11) ("To deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures.").

Defendants nevertheless argue that, because Habanos – the very type of the joint venture arrangement that the HBA intends to deter – was involved in the trafficking alleged by Plaintiffs, the trafficking somehow ceases to be trafficking.  In support, Defendants cite to a portion of the HBA definitions, but ignore the ones that are directly on point. Defendants' argument again

13

ignores the statute and governing law. The Eleventh Circuit in *In Re Shek*, 947 F.3d 770 (2020), recently discussed guidelines for statutory interpretation:

> Statutory provisions are not written in isolation and do not operate in isolation, so we cannot read them in isolation. The plain meaning of a statutory provision derives not only from the "particular statutory language at issue," but also "the language and design of the statute as a whole." As one prominent treatise on statutory interpretation puts it, "[*c*]*ontext is a primary determinant of meaning*," and "[t]he entirety of the document thus provides the context for each of its parts." We must interpret statutes "harmoniously," reconciling separate sections so that they are compatible and not contradictory.
>
> Most importantly for present purposes, we must attempt to give effect to every word or provision in [in the statute]. . . . "Because legal drafters should not include words that have no effect, ***courts avoid a reading that renders some words altogether redundant***." This surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a "clause, sentence, or word ... superfluous, void, or insignificant."

*Shek*, 947 F.3d at 776 – 77 (emphasis added, citations omitted).

The Eleventh Circuit's admonition applies with full force here. Defendants point to a single sub-paragraph in support of this argument. 22 U.S.C. § 6023(13)(B)(iv). Ignoring the obvious purpose of the statute and legislative findings, as well as paragraphs in the same statute that are directly on point, Defendants argue that Habanos, and its joint venture partner and agents, cannot "traffic" under the HBA because, under sub-paragraph (13)(B)(iv): "trafficking does not include 'transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.'" *See* Motion at 15. The language quoted appears obviously designed to prevent claims against individual Cuban residents, other than government officials, living in residential property in Cuba

14

that may have been confiscated by the government, unless the property was the subject of a certified claim.[6]

Sub-paragraph (13)(B)(iv) certainly does not mean that Congress wiped out the entire purpose of the HBA in a single definition. To the contrary, as demonstrated above, Defendants ignore two sections of the HBA definitions that make clear that the HBA, in fact, is not self-annihilating. Defendants' arguments completely ignore that, under the HBA, the Habanos joint venture controlled by Cuba is an "agency or instrumentality" of Cuba.[7] As a result, Defendant Habanos, Imperial's partner and the WPP Defendants' principal, therefore *is* the Cuban Government.[8] There is no provision in the HBA that excuses Defendants from their trafficking. This argument too cannot support dismissal.

C. *Plaintiffs Properly Plead That Defendants Knowingly Trafficked in the RRHSC Property*

---

[6]    *See* 22 U.S.C. § 6023(12)(B) ("For purposes of subchapter III of this chapter, **the term "property"** does not include real property used for residential purposes **unless**, as of March 12, 1996--  (i) the claim to the property is held by a United States national and the **claim has been certified under title V of the International Claims Settlement Act** of 1949; **or** (ii) **the property is occupied by an official of the Cuban Government or the ruling political party in Cuba**.") (emphasis added).

[7]    Under the HBA, "The term 'agency or instrumentality of a foreign state' has the meaning given that term in section 1603(b) of Title 28. *See* 22 U.S.C. § 6023(1); *see also* 28 U.S.C. § 1603 (a) ("A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)"); *id*., § 1603 (b) ("An 'agency or instrumentality of a foreign state' means any entity-- (1) **which is a separate** legal person, **corporate or otherwise**, **and** (2) which is an organ of a foreign state or political subdivision thereof, or **a majority of whose** shares or **other ownership interest is owned by a foreign state** or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any **third country**.") (emphasis added).

[8]    *See* 22 U.S.C. § 6023(5) (A) ("The term 'Cuban Government' **includes** the government of any political subdivision of Cuba, and any **agency or instrumentality of the Government of Cuba**.") (emphasis added).

Defendants also argue that Plaintiffs do not properly plead that they "knowingly" trafficked in the confiscated Property. This argument also ignores the complaint and the HBA. Plaintiffs agree that Defendants must "knowingly" traffic in the confiscated Property. *See* 22 U.S.C. § 6023(13)(A). Defendants cite to the *Glen III* and *Glen IV* cases as support for the argument that general allegations of knowledge are insufficient. This may be true in *Glen III*, where the defendant American Airlines had a passive website selling hotel rooms. It may even be true in *Glen IV*, where the defendants were three groups of passive hotel websites and two credit card companies. But in the context of Plaintiffs' allegations, this argument cannot win the day. Nor do Plaintiffs merely plead that Imperial should generally have known that the tobacco industry as a whole was nationalized. Even though Imperial knows well that it was. To the contrary, again, one Defendant here is Habanos, an instrumentality of the Cuban Government that is statutorily deemed to be the Cuban Government itself, *and* a joint venture partner venture of Imperial. No further allegation of knowledge that the Cuban Government confiscated the RRHSC Property could possibly be necessary. And once more, Imperial cannot escape the knowledge of its joint venture partner, which should be deemed to be that of Imperial itself.  The same holds true for Habanos' agents, the WPP Defendants.

If more was somehow necessary, as Defendants acknowledge, Plaintiffs also plead that information about the confiscated Property was available to Defendants in corporate and property records. Defendants complaint that the nature of such records is not described also does not help their cause. First, the corporate records are not only described, but the relevant excerpt is also attached as exhibit 5 to the Am. Compl. The text of that exhibit is part of the publicly available Cuban "Official Gazetta." Plaintiffs allege and are certainly entitled to an inference that it was publicly available to Defendants. In relevant part, it provides that:

> First: The **Nationalization**, **by means of forced expropriation**, **is decreed**, **and** consequently **the Cuban State**, in complete authority, **is awarded all the interest in assets and business entities located in the national territory and the rights and actions arising from the exploitation of the same**, whatever the interest, title or mode of their ownership, of the following natural persons or judicial entities:
>
> . . . .
>
> 96. Ramón Rodriguez e Hijos, S. en C.

Official Cuban Gazetta (emphasis added). *See* translation at exhibit 5A, attached here for convenience.  While Plaintiffs were unable to obtain property records, there is certainly no basis for assuming that they would be significantly different that property records generally available in most countries. At a minimum, there is no basis for assuming that Imperial, which was well-aware of the HBA before purchasing its joint venture interests was unable to obtain information from its partner. The WPP Defendants too were well-aware of the HBA and had easy access to relevant records from its principal. In that regard, the HBA makes clear that the "knowingly" requirement "means with knowledge *or having reason to know*." See 22 U.S.C. § 6023 (13) (emphasis added).

Defendants also cite to *Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.*, 183 F. 3d 1277, 1286–88 (11th Cir. 1999), for the proposition that "Cuban corporations—including specifically joint ventures—must be treated as separate and apart from the Cuban Government." Significantly, however, *Alejandre*, decided in 1999 did not arise under the HBA. To the contrary, the HBA expressly decrees that Cuban joint ventures, at least those controlled by Cuba as alleged here, *must* be treated as the Cuban Government under the HBA. *See* 22 U.S.C. § 6023(5) (A) ("The **term 'Cuban Government' includes** the government of any political subdivision of Cuba, and **any agency or instrumentality of the Government of Cuba**.") (emphasis added). *See also* 22 U.S.C. § 6023(1); *see also* 28 U.S.C. § 1603.

Defendants finally contend that Plaintiffs have not alleged that "Defendants knew that a United States national held a claim to the RRHSC Property." *See* Motion at 19. This argument fails because there is no such requirement in the HBA. Nor could there be, as such a requirement would also effectively eliminate HBA claims. As there is no way that anyone could actually "know" who currently holds a claim, only perhaps who may have once held a certified claim. Instead, the statute actually states:

>  (13) Traffics
>
> (A)   As used in subchapter III, and except as provided in subparagraph (B), ***a person "traffics" in confiscated property if*** that person knowingly and intentionally—
>
> (i)     ***sells,*** transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii)    ***engages*** in a commercial activity using or otherwise benefiting from confiscated property, ***_or_***
>
> (ii)    ***causes,*** directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,
>
> without the authorization of any United States national who holds a claim to the property.

*See* 22 USC § 6023 (13). The structure of the statute makes clear that, in order to be deemed to have "trafficked" in confiscated property, a person must "knowingly" engage in the conduct described in subsections (13)(A)(i), (13)(A)(ii), ***_or_*** (13)(A)(iii) (emphasis added). There is no requirement in the statute that the trafficker knowingly acts "without the authorization of any United States national who holds a claim to the property." To the contrary, that phrase was

18

expressly kept outside of actual requirement of the statute which appear in numbered paragraphs ((13)(A)(i), (13)(A)(ii), **_or_** (13)(A)(iii)). This argument also cannot support dismissal.

    *D.*  Plaintiffs Properly Plead Ownership of the HBA Claim

      1.  The HBA Does Not Require That Confiscated Property Have Been Held by a U.S. National at the Time it Was Confiscated

Defendants next argue that Plaintiffs do not plead that the RRHSC limited partnership "was a United States national. . . . Nor does the Amended Complaint allege that a United States national owned the limited partnership when it, too, was confiscated." *See* Motion at 20. While both are true, neither is required by the HBA. Defendants argue that the HBA must be deemed require that RRHSC was a U.S. National because: "Any taking by Cuba of property belonging to its own nationals implicates the domestic takings rule." Motion at 21. They also cite to *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 709–11 (2021), which held that Germany was "immune from claims arising from expropriations the Nazi regime committed against German nationals."

Defendants' "domestic takings" arguments add nothing. First, the HBA does not purport to provide any claim against Cuba for its confiscation of domestic property. There is also no relevant "immunity" at issue. Habanos has not argued that it is immune from suit. And the *Exxon v Cimex* decision explains why it could not do so. Specifically, because Habanos, like Cimex, is being sued for quintessential commercial conduct in the U.S. In this case, marketing the products manufactured and stored at the RRHSC Property through U.S. social media portals in violation of U.S. law. Nor does the HBA require that the victim of confiscation was a U.S. National at the time the Property was taken. See 22 U.S.C § 6081 (3)(iii) (acknowledging protection for U.S. Nationals that fled to the U.S. as refugees. See also 22 U.S.C. § 6023 (15) (defining U.S. Nationals as "any" U.S. citizen, without temporal requirement).

      2.  Plaintiffs Properly Plead That They Own the HBA Claim

Defendants also argue that Plaintiffs do not own the claim at issue, because the Property was confiscated from RRHSC, not from Ramon Rodriguez Gutierrez ("RRG"). Defendants contend that, because RRG was a shareholder and not direct owner, he cannot assert the claim. This contention has been rejected by courts in this district. *See* Motion at 23 n. 17.  Further, it ignores the action confiscation at issue. As set out in exhibit 5A, the Cuban Government confiscated "extend[ed] the nationalization . . . to ***as many assets***, business entities, ***rights*** and ***stocks as are linked or related to those nationalized***, ***whatsoever the form and title of the bond of affinity to the nationalized entities***." (Emphasis added). In other words, the Cuban Government ignored and destroyed the corporate form and took all possible rights of RRG, leaving RRHSC only a shell. As the Exxon v Cimex decision explained, this type of total taking of all value does create a claim in the shareholders themselves. That claim was transferred to Plaintiffs.

Defendants finally add that Plaintiff Forns cannot assert a claim because he inherited his claim after 1996. They also refer to Frank and Raul Rodriguez and Cristina Conroy. But they acquired a portion of their claims before 1996, therefore have a claim no matter what. Defendants are correct that other courts have rejected a claim like Forns' claim. Those courts, however, did not consider binding Eleventh Circuit case law. *See U.S. v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993) ("*In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law*." (citing *James v. Home Constr. Co. of Mobile*, 621 F.2d 727, 729 (5th Cir.1980)). Like the FCA claim at issue there, neither the HBA nor its legislative history reveals the drafters' intent *with respect to survivability*. Like the claim at issue in James, the HBA claim is a remedial action. Therefore, survivability of the claim is governed by federal common law which expressly allows the transfer.

## Conclusion

20

For the foregoing reasons and based on the cited authorities, the Court should deny the Motion to Dismiss.

Respectfully submitted,

Rodriguez Tramont & Nuñez P.A.
By: /s/ *Paulino A. Núñez Jr.*
Paulino A. Núñez Jr.
Florida Bar No. 814806
Primary email: pan@rtgn-law.com
255 Alhambra Circle
Suite 1150
Coral Gables, FL 33134
Telephone: (305) 350-2300

Berenthal & Associates, P.C.
By: /s/ *James L. Berenthal*
James L. Berenthal
Florida Bar No.126035
email: jlb@berenthalaw.com
45 East 72nd Street
Suite 5-C
New York, NY 10021
Telephone: (212) 302-9494

## Certificate of Service

I HEREBY CERTIFY that on June 17, 2021, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send a notification of the filing to all counsel and parties of record.

/s/ *Paulino A. Núñez Jr.*
Paulino A. Núñez Jr.

.