**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 1:20-cv-23287(DPG)(AMO)

LUIS MANUEL RODRIGUEZ, et al.,

Plaintiffs,

v.

IMPERIAL BRANDS PLC, et al.,

Defendants.

**PLAINTIFFS' OBJECTIONS TO THE SUPPLEMENTAL REPORT AND**
**RECOMMENDATION ON DEFENDANTS IMPERIAL BRANDS PLC AND**
**WPP PLC'S  MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

# EXHIBIT B

Case 1:20-cv-23287-DPG Document 346-8 Entered on FLSD Docket 09/29/2023 Page 2 of 32

| | |
|---|---|
| **RODRIGUEZ TRAMONT & NUÑEZ, P.A.** | **BERENTHAL & ASSOCIATES, P.A.** |
| ATTORNEYS AT LAW | ATTORNEYS AT LAW |
| WWW.RTGN-LAW.COM | WWW.BERENTHALAW.COM |
| 255 ALHAMBRA CIRCLE, SUITE1150 | 777 THIRD AVENUE, SUITE 22D |
| CORAL GABLES, FLORIDA 33134 | NEW YORK, NY 10017-1426 |
| TELEPHONE: (305) 350-2300 | TELEPHONE: (212) 302-9494 |

March 31, 2020

**Via certified mail**

**Imperial Brands PLC**
121 Winterstoke Road
Bristol BS3 2LL
United Kingdom

**Altabana, S.L.**
c/o Imperial Brands PLC
121 Winterstoke Road
Bristol BS3 2LL
United Kingdom

**Corporación Habanos, S.A.**
c/o Imperial Brands PLC
121 Winterstoke Road
Bristol BS3 2LL
United Kingdom

**WPP PLC**
Sea Containers, 18 Upper Ground
London United Kingdom SE1 9GL

**Young & Rubicam LLC / VMLY&R**
601 Brickell Key Drive, Suite 1100
Miami, FL 33131

- also –

c/o WPP PLC
175 Greenwich St
31st Fl
New York, NY 10007

**Burson Cohn & Wolfe LLC**
601 Brickell Key Drive
Suite 900
Miami, FL 33131-2620

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 2

-   also  -

c/o WPP PLC
175 Greenwich St
31st Fl
New York, NY 10007

**Re: (1) Notice of Intent to Commence an Action Pursuant to the Cuban Liberty and Democratic Solidarity (Libertad) Act, also known as the Helms-Burton Act (the "Act") Due to Unlawful Trafficking in Property Confiscated by the Cuban Government; and, (2) Demand to Immediately Cease Unlawful Trafficking**

Dear Sir or Madam:

We represent Luis Manuel Rodriguez, Maria Teresa Rodriguez, Alfredo Ramon Forns, Ramon Alberto Rodriguez, Jessica Arias, Alicia Maria Fernandez, Raul Lorenzo Rodriguez, Christina Conroy, and Francisco Ramon Rodriguez, (collectively, the "Rodriguez Family"). As further detailed below, the Rodriguez Family are the rightful owners of the former Partagás cigarette factory building, known today as the "Empresa de Tabaco Torcido 'José Marti'" or the "H. Upmann" factory, located in the el Vedado neighborhood of Havana, Cuba, on 23rd Street between 14th and 16th (1255 23rd Street), el Vedado, Havana, Cuba.[1]

The purpose of this letter is to give each of you (sometimes collectively, "you") formal notice that the Rodriguez Family intends to commence an action pursuant to the Act against you as a defendant due to unlawful trafficking in property confiscated by the Cuban government. The reasons for the action are set out below. In accordance with Title 22 United States Code §6082, the Rodriguez Family demands that you immediately cease the unlawful trafficking in their property. A copy of the Summary of the Provisions of Title III of the Cuban Liberty and

---

[1]     *See* Exhibit 1.

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 3

Democratic Solidarity (LIBERTAD) Act of 1996, AG Order No. 2029-96, as published by the
Attorney General of the United States at 61 FR 24955-01, is attached to this letter.[2]

### The Confiscated Property

The Rodriguez Family are the heirs and successors of Ramón Rodriguez Gutiérrez
("RRG") and the owners of a 100% interest in Ramón Rodriguez e Hijos Sociedad en Comandita[3]
("RRHSC")[4], and as such the rightful owners of the former Partagás *cigarette* factory building (the
"RRHSC Property").[5] After taking control of power in 1959, the Castro Regime and Cuba's
revolutionary government systematically "nationalized" the major privately-owned business
enterprises in Cuba without compensation to the lawful owners of the property. In 1961, as part of
its takeover of the entire tobacco industry, the Castro government confiscated[6] ownership of the
RRHSC Property.[7] Before the RRHSC Property was confiscated, the Partagás Factory produced

---

[2]      *See* Exhibit 2.

[3]      Ramon Rodriguez and Sons, a Limited Partnership, a closely held partnership owned by
Ramón and his sons.

[4] *See* Exhibit 3.

[5]      This demand relates only to the building located at 1255 23rd Street, el Vedado, Havana,
Cuba. The Rodriguez Family does not own or claim an interest in two other buildings in Havana
that are referred to, respectively, as the "old" and the "modern," Partagás *cigar* factory buildings.
*See* attached "Partagás Factory" Clarification, Exhibit 4.

[6]      The word confiscated is used here as defined in the Act, 22 United States Code § 6023
(4)(A)(i) ("'confiscated' refers to-- (A) the nationalization, expropriation, or other seizure by the
Cuban Government of ownership or control of property, on or after January 1, 1959-- (i)without
the property having been returned or adequate and effective compensation provided.")

[7]      On June 30, 1961, by decision of the "Junta Central de Planificacion," Cuba's Central
(Economic) Planning Board, Cuba's revolutionary government confiscated ownership of RRHSC

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 4

world renowned cigarettes under the Partagás brand and had grown to become the third largest

manufacturer of cigarettes in Cuba with a 16.3% share of the market and over 400 employees.[8] In

1955, the structure of the westernmost portion of the factory, where the tobacco was stored for

aging, had succumbed to an overload. In place of the western wing, a modern mixed-use building

was erected at the corner of Calle 23 y 16 (23rd Street and 16th).[9] The new building's structure

included a ground level garage for the factory's fleet of trucks, a storage facility, a mezzanine suite

of executive offices and next to it, a six-story residential tower. Today, the Partagás Factory,

rebranded "Empresa de Tabaco Torcido 'José Martí,'" prominently displays the names Tabacuba

(the Cuban state tobacco monopoly company) and H. Upmann on its façade.

## Unauthorized Use of the Confiscated RRHSC Property

### A. Direct Use by Imperial and the Joint-Venture Subsidiaries it Controls

Imperial, both through its joint-venture subsidiaries, Altabana, S.L. (Altabana)[10] and

Corporación Habanos, S.A. (Habanos), and through Imperial's joint-venture partner in Habanos,

---

as part of it takeover of the entire tobacco industry. *See* excerpt at Exhibit 5. The Junta Central de Planificacion's decision and proclamation appears in Cuba's government register, the "Gaceta Oficial," No. 131 dated July 7, 1961, page 13203.

[8]  A picture of the Partagás **cigarette** factory building and one of the many depictions of the building prominently displayed on Partagás cigarette packages of the time appears at Exhibit 6. The footprint of the Partagás cigarette factory at the time that it was owned and operated by RRHSC is shown in the Google Maps satellite image that appears at Exhibit 7.

[9]  A picture of the modern mixed-use building that was erected as an annex to the main Partagás **cigarette** factory is shown at Exhibit 8.

[10]  Imperial describes Altabana as a joint venture incorporated in Spain "holding investments in subsidiary companies ***involved in the marketing and sale of Cuban cigars***." *See* Imperial 2019 Annual Report at 166 (emphasis added).

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 5

Tabacuba, has and continues to use the RRHSC Property without authorization from the Rodriguez Family. The unauthorized use of the RRHSC Property includes the production and shipping of millions hand-rolled cigars (sold under various premium brand names) manufactured at the factory, as well as use of the property for marketing and publicity of Habanos' products. The Tabacuba name also appears on the more modern, rebuilt portion adjacent to the factory, which is used as Tabacuba's executive offices and includes space used for shipping Habanos' products.[11]

Habanos itself has documented its possession, control of, management, and use of the RRHSC Property. In a February 2010 publicity piece entitled: "Cigar Factory Readings and Readers," Habanos referred to the factory "Standing on famous 23rd Street in Havana's bustling Vedado neighborhood right between the 14th and 16th streets," as the "humongous and modern H. Upmann cigar factory."[12] In a 2013 piece in "Habano World" entitled "Journey to the Heart of a Factory," Carlos Lazaro Valdes, identified as the "director" of the "H. Upmann Factory," was quoted as saying that "this company churns out some 18,000 Habanos a day ... He added that each year the factory produces some 4 million units of a brand that remains high on the preference lists around the world."[13] Imperial and its partner's commercial activity at, and use of, the confiscated RRHSC Property for marketing purposes includes Habanos' use of the Partagás / "H. Upmann" Factory for multiple "visit the factories" trips during the annual Habanos Festival celebrations.[14]

---

[11]    *See* pictures at Composite Exhibit 8.

[12]    *See* http://habanosnews.habanos.com/en/cigar-factory-readings-and-readers .

[13]    *See* http://habanosnews.habanos.com/en/journey-heart-factory .

[14]    *See* Composite Exhibit 9.

Case 1:20-cv-23287-DPG  Document 146-8  Entered on FLSD Docket 09/28/2020  Page 7 of 52

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 6

### B. Imperial's Use of U.S. Corporate Agents

Imperial, its partner, and the subsidiaries they jointly control through Altabana, have

expanded their use of and benefit from the Partagás Factory by retaining agents to market and

publicize the products produced at the confiscated RRHSC Property. The agents retained by

Imperial and Habanos include: WPP, PLC, (acting through its wholly owned and controlled

subsidiaries Young & Rubicam / VMLY&R ("Y&R")[15], Burson Cohn & Wolfe ("BCW")[16] and

Ogilvy[17]), Y&R, BCW, and Ogilvy, as well as Twitter, Inc., YouTube, LLC, and Instagram, LLC

---

[15]   *See* e.g.
- http://www.habanos.com/en/noticias/habanos-s-a-presenta-en-londres-el-cohiba-talisman-edicion-limitada-2017/
- http://www.habanos.com/en/noticias/vuelve-el-festival-del-habano-2017/
- http://www.habanos.com/en/noticias/habanos-s-a-presenta-el-hoyo-de-monterrey-petit-belicosos-en-cannes/
- http://www.habanos.com/en/noticias/el-xix-festival-del-habano-presenta-un-completo-programa-dedicado-al-conocimiento-y-disfrute-del-habano/
- http://www.habanos.com/en/noticias/vuelve-el-festival-del-habano-2017/
- http://www.habanos.com/en/noticias/habanos-s-a-presenta-el-hoyo-de-monterrey-petit-belicosos-en-cannes/
- http://www.habanos.com/en/noticias/musica-glamour-y-el-montecristo-mas-exclusivo-en-la-clausura-del-xix-festival-del-habano/
- http://www.habanos.com/wp-content/uploads/1902_NotaProgramaFestival_ENG.pdf
- http://www.habanos.com/wp-content/uploads/Press-Release-1-THE-XXI-HABANOS-FESTIVAL-KICKS-OFF.pdf
- http://habanosnews.habanos.com/es/fabricas-de-habanos-y-prestigio

[16]   See e.g.
- http://www.habanos.com/wp-content/uploads/Press-Release-3.-TRIBUTE-TO-HAVANA-ON-ITS-500TH-ANNIVERSARY.pdf
- http://www.habanos.com/en/noticias/inicia-la-xxii-edicion-del-festival-del-habano/

[17]   *See* e.g.
- http://www.habanos.com/wp-content/uploads/NP1_XIII-Festival-del-Habano_en.pdf
- http://www.habanos.com/wp-content/uploads/PR1_XV-Habanos-Festival.pdf

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 7

(Y&R, BCW, Ogilvy, Twitter, YouTube, and Instagram, collectively, the "U.S. corporate agents").

The work of the U.S. corporate agents on behalf of Imperial, Altabana and Habanos has included

marketing and publicizing both the Habanos' products made at and shipped from the RRHSC

Property[18] as well as the factory "visits."[19] WPP, acting in serial fashion first through Ogilvy

and later through Y&R, and BCW[20], has continuously marketed and publicized the RRHSC Property,

and the Habanos' products made at and shipped from there, since at least 2010.[21] Twitter,

YouTube, and Instagram have done so since at least 2017.[22]

**Trafficking in the Confiscated RRHSC Property in Violation of the Act**

The Act is designed in part "to protect United States nationals against confiscatory takings

and the wrongful trafficking in property confiscated by the Castro regime."[23] Each member of the

Rodriguez Family is a United States citizen and, therefore, a United States national as defined in

the Act.[24] For purposes of the Act, a person "traffics" in confiscated property if that person

---

[18]    *See* footnotes 15, 16 and 17.

[19]    *See* e.g. Composite Exhibit 9.

[20]    *See* Composite Exhibit 10.

[21]    *See* footnotes 15, 16 and 17.

[22]    *See* e.g.
- http://www.habanos.com/en/noticias/inicia-la-xxii-edicion-del-festival-del-habano/
- http://www.habanos.com/en/noticias/habanos-s-a-presenta-su-nueva-linea-retro-en-la-xxxv-edicion-de-la-feria-internacional-de-la-habana/

[23]    *See* 22 U.S.C. § 6022(6).

[24]    *See* 22 U.S.C. § 6023(15).

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 8

"knowingly"[25] and intentionally:

> (i)     sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, *leases*, receives, *possesses*, *obtains control of*, *manages*, *uses*, or otherwise acquires or holds an interest in confiscated property,

> (ii)    *engages in a commercial activity using or otherwise benefiting from* confiscated property, or

> (ii)    *causes*, *directs*, *participates in*, *or profits from*, *trafficking* (as described in clause (i) or (ii)) *by another person*, *or otherwise engages in trafficking* (as described in clause (i) or (ii)) *through another person*, without the authorization of any United States national who holds a claim to the property.

*See* 22 U.S.C. § 6023(13) (emphasis added).

### A. Direct Trafficking in the RRHSC Property

The conduct described above constitutes trafficking in the RRHSC Property by Imperial, Habanos, and Altabana. In particular, Imperial, Habanos, and Altabana (collectively, the "Direct Traffickers") knowingly and intentionally took possession of, obtained control of, managed, or used the confiscated RRHSC Property, without the authorization of the Rodriguez Family.[26] Each also has and continues to engage in a commercial activity using or otherwise benefiting from the confiscated RRHSC Property. Finally, the Direct Traffickers cause, direct, participate in, or profit from, trafficking of the RRHSC Property by Tabacuba, again without the authorization of the Rodriguez Family.

---

[25]    The term "knowingly" is defined in the Act as meaning "with knowledge or having reason to know." *See* 22 U.S.C. § 6023(9).

[26]    Habanos presumably also holds an express or implied leasehold interest in the RRHSC Property granted to it by the illegitimate custodian of the property, the Cuban monopoly companies, Tabacuba or Cubatabaco.

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 9

### B. *Trafficking in the RRHSC Property by and Through U.S. Corporate Agents*

In addition to trafficking in the RRHSC Property directly, the Direct Traffickers have expanded their trafficking by retaining agents to assist in and further their trafficking in the property. In particular, the Direct Traffickers retained WPP (through Y&R, BCW and Ogilvy), and the U.S. corporate Agents. WPP and the U.S. corporate Agents have and continue to, knowingly and intentionally, act as agents for the Direct Traffickers. Each has and continues to cause, direct, participate in, or profit from, the trafficking of the RRHSC Property by the Direct Traffickers and Tabacuba, all without the authorization of the Rodriguez Family.

Significantly, Imperial was well-aware before acquiring its interest in Habanos in 2007 that it would be acquiring "Altadis' 50% ownership interest in" Habanos "a company which distributes cigars manufactured in Cuba."[27] Imperial also knew that its partner, Tabacuba, acquired its interest in and control over the Cuban tobacco industry by "nationalizing" assets left behind when the rightful owners of the property fled the brutal Castro dictatorship.[28] Imperial of course acted intentionally to acquire its Habanos interest and thereafter approved of, and furthered, Tabacuba,

---

[27]    *See*    Imperial's    "Response"    to    SEC    inquiry    at    2. https://www.sec.gov/Archives/edgar/data/1072670/000110465907074649/filename1.htm.

[28]    In retelling the "history" of the Montecristo brand that Imperial now owns and controls, Imperial subsidiary, Altadis, U.S.A., explains:

> Following the Cuban Revolution, the ***cigar industry was nationalized*** **causing** Menendez and Garcia [the former owners], like ***many*** other ***Cubans, to flee*** to the Canary Islands in 1961.

*See* "The History of MonteCristo," published by Altadis U.S.A., Inc. (emphasis added), available at https://web.archive.org/web/20190715175618/http://montecristo.com/history.

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 10

Habanos, and Atabana's continued trafficking in the confiscated RRHSC Property. Moreover, Imperial understood that it would likely "be restricted . . . by the nationality of the personnel that" it could "involve in" the Cuban cigar business that it decided to acquire.[29] Notably, Imperial also understood the risk that the "cigar operations in Cuba" could trigger application of the Act.[30] Despite that, and despite its knowledge that "the nationality of the personnel" involved in its Cuban, i.e., trafficking, operations would affect its ability to avoid the Act, Imperial chose to hire, and to continuously employ over the course of a decade, its agent WPP, acting through WPP's subsidiaries and U.S. corporate Agents, to run its marketing and publicity campaigns for the Habanos and Altabanos products produced at the confiscated RRHSC Property. Imperial more recently, either directly or through Y&R or BCW, hired and employed additional U.S. corporate Agents, Twitter, YouTube, and Instagram, to strengthen and expand the marketing and publicity campaigns and thereby to make the trafficking even more profitable to Imperial and its agents.

### Liability for Trafficking in the Confiscated RRHSC Property

The Act makes clear that its purpose is to provide a "judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting" the confiscated property of United States nationals like the Rodriguez Family.[31] As it relates to property that, like the RRHSC Property, was not certified by the Foreign Claims Settlement

---

[29]    *See*    Imperial's    "Response"    to    SEC    inquiry    at    2.
https://www.sec.gov/Archives/edgar/data/1072670/000110465907074649/filename1.htm.

[30]    *See*    Imperial's    "Response"    to    SEC    inquiry
https://www.sec.gov/Archives/edgar/data/1072670/000110465907074649/filename1.htm.

[31]    *See* 22 U.S.C. § 6081(11).

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 11

Commission, the Act provides that traffickers are liable:

> for money damages in an amount equal to the sum of--

> (i)   the amount which is ***the greater of***—

> . . .

> > (II)   the amount determined under section 6083(a)(2) of this title, plus
> > interest; ***or***

> > (III)   ***the fair market value of that property, calculated as being either
> > the current value of the property***, or the value of the property when
> > confiscated plus interest, ***whichever is greater***; and

> (ii)   ***court costs and reasonable attorneys' fees.***

*See* 22 U.S.C. § 6082(a)(1)(A) (emphasis added). The Act also provides for "increased liability,"
specifically, damages equal to "3 times the amount determined applicable under paragraph
(1)(A)(i)," plus attorneys' fees and costs. *See* § 6082(a)(3)(B) – (C). The increased liability is
triggered if, "after the end of the 30-day period beginning on the date the notice is provided," the
person trafficking in confiscated property, here the RRHSC Property, thereafter "traffics in the
confiscated property." *See id.*, *see also* § 6082(a)(3)(D).

    As set out above, Imperial, Habanos, Altabana[32], WPP (through Y&R, BCW and Ogilvy),
Y&R and BCW, have repeatedly and extensively trafficked in the RRHSC Property. Imperial's
latest Annual Report confirms that revenues from the export and distribution of Cuban cigars by
just the principal Imperial-affiliated traffickers, Habanos and Altabana, totaled $1.353 billion[33]

---

[32]     *See* footnote 10, above.

[33]     *See* Imperial 2019 Annual Report, note 14 to Financial Statements at 123 (reporting that
Imperial's 50% of the revenues from its joint venture company Habanos was equal to 208 million
GBP    and    from    Altabana    was    equal    to    329    million    GBP).
https://www.imperialbrandsplc.com/content/dam/imperial-brands/corporate/investors/annual-

Notice of Intent to Commence Action and
Demand to Immediately Cease Unlawful Trafficking
Page | 12

during 2019 alone. The RRHSC Property is one of just four hand-made cigar factories operating

in Havana. Further, as documented above, the property and its proceeds have been trafficked by

Imperial, Habanos and its partners for over a decade and in all likelihood at least back to 2007

when Imperial acquired its interest in the Cuban cigar business. For purposes of this demand only,

the Rodriguez Family estimates that the current value of the RRHSC property is $135 million --

equal to just 10% of 2019 hand-made cigar revenues, and at the low end of valuation for this

property. The Rodriguez Family intends to commence an action against each of you as a defendant

in the United States District Court, Southern District of Florida, seeking damages in the amount of

$135 million, plus attorneys' fees and costs.

The Rodriguez Family hereby demand that you immediately cease your unlawful

trafficking in the RRHSC property. Should you fail to do so, please be advised that, after the end

of 30-days from the date of this notice, the Rodriguez Family intends to commence an action

against you as a defendant in the United States District Court, Southern District of Florida, seeking

damages in the amount of $405 million, plus attorneys' fees and costs.

Govern yourselves accordingly,


Sincerely,


Paulino A. Núñez Jr.                                    James L. Berenthal

---

report-and-accounts/2019/FULL%20ANNUAL%20REPORT%202019.pdf. These figures were
converted to dollars at the exchange rate of 1.26 reported as of March 13, 2020 and doubled to
reflect inclusion of the 50% of revenues retained by Tabacuba and the Cuban state.

# EXHIBIT 1

EXHIBIT 1

# THE PARTAGÁS FACTORY





The Partagás Factory continues to be operated to this day by the Cuban state-controlled tobacco monopoly, Tabacuba, manufacturing millions of cigars, cigarettes and related products, which are then distributed by Habanos, S.A. around the world.

The factory, rebranded *Empresa de Tabaco Torcido "José Martí"* prominently displays the names TABACUBA and H.UPMANN on its façade.

Case 1:20-cv-23287-DPG   Document 14-9   Entered on FLSD Docket 08/28/2020   Page 15 of 39

# EXHIBIT 2

**Summary of the Provisions of Title III of the Cuban Liberty and..., 61 FR 24955-01**

61 FR 24955-01, 1996 WL 260180(F.R.)
NOTICES
DEPARTMENT OF JUSTICE
[AG Order No. 2029-96]

Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996

Friday, May 17, 1996

**\*24955** AGENCY: Department of Justice.

ACTION: Notice.

SUMMARY: In accordance with the requirement of section 302(a)(8) of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, The United States Department of Justice is publishing this notice summarizing the provisions of Title III of the Act. Title III makes persons who knowingly and intentionally "traffic" in confiscated properties, as defined in the Act, subject to private civil damage suits in Federal district court.
EFFECTIVE DATE: This notice is effective May 17, 1996.

FOR FURTHER INFORMATION CONTACT:

David E. Bradley, Chief Counsel, Foreign Claims Settlement Commission, Department of Justice, Washington DC 20579, (202) 616-6975.

SUPPLEMENTARY INFORMATION: On March 12, 1996, President Clinton signed into law the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, P.L. 104-114 (also known as the "Helms-Burton Act"). Title III of the Act discourages foreign investment in properties that were expropriated by the Cuban Government on or after January 1, 1959, without compensation, from persons who are now Untied States nationals. Title III makes persons who knowingly and intentionally "traffic" in such confiscated properties subject to private civil damage suits in Federal district court.
The Act defines "trafficking" broadly, with several exceptions, as set forth below. A trafficker may be liable to the U.S. claimant for the value of the claim, plus interest, reasonable attorney's fees and court costs. In addition, under certain circumstances described below, a person who trafficks in U.S. claimed property may be liable to the claimant for triple the amount of the value of the claim, excluding interest, fees and court costs.

Title III is scheduled to take effect on August 1, 1996. However, the law does not immediately permit U.S. claimants to bring suit to recover from traffickers. First, traffickers will have a three month "grace period" beginning on the effective date during which they may dispose of their interest in the claimed property and avoid liability under Title III. Under the scheduled effective date, therefore, traffickers who dispose of their interests in confiscated property before November 1, 1996, will not be subject to liability to the owner of the claim. Second, until March 13, 1998, only those persons with claims that were certified by the Foreign Claims Settlement Commission ("FCSC") may bring a Title III lawsuit. Third, the Act provides the President with the authority to suspend the effective date for six months, and for additional six month periods, if he determines suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba. Additional requirements and conditions are described below.

Section 302(a)(8) of the Act requires the Attorney General to publish in the Federal Register not later than sixty days after enactment "a concise summary of the provisions of this title, including a statement of the liability under this title of a person trafficking in confiscated property, and the remedies available to United States nationals under this title." This notice and the accompanying Summary of the provisions of Title III fulfill the Attorney General's obligations under this section. The Department has coordinated the issuance of this Summary with the Department of State.

Interested persons should refer to the text of the Act itself or consult a private attorney for further information and

clarification.

For the reasons set forth in the preamble, and by the authority vested in me as Attorney general, I hereby issue the following Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996:

**Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

*1. Liability Under Title III*

(a) Under section 302(a)(1) of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAF) Act of 1996 (hereinafter "Title III") subject to certain requirements, conditions, and possible suspensions, a United States national with a claim to property expropriated by the Government of Cuba on or after January 1, 1959, may bring a private lawsuit in U.S. federal district court against a person who traffics in that property beginning three months after Title III's effective date. The scheduled effective date is August 1, 1996, subject to the President's authority to suspend Title III.

(b) Section 4(13) of the Act defines a trafficker as a person who knowingly and intentionally:

(i) Sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property;

(ii) Engages in a commercial activity using or otherwise benefiting from confiscated property; or

(iii) Causes, directs, participates in, or profits from trafficking by another person, or otherwise engages in trafficking through another person, without the authorization of any United States national who holds a claim to the property.

(c) Trafficking under section 4(13) does not include:

(i) The delivery of international telecommunication signals to Cuba;

(ii) The trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

(iii) Transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

(iv) Transactions and uses of property by a person who is both a citizen and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

(d) Section 4(11) defines "person" for purposes of the Libertad Act as any person or entity, including any agency or instrumentality of a foreign state.

(e) For purposes of Title III, "United States national" is defined under **\*24956** section 4(15) to mean (i) any United States citizen, or (ii) any other legal entity which is organized under the laws of the United States, or of any state, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

*2. Remedies Available Under Title III*

(a) Section 302(a)(1)(A) provides that, in addition to attorney's fees and court costs, a trafficker will be liable for money damages to the U.S. national who owns the claim to property being trafficked in the greater of the following amounts:

(i) The amount certified by the Foreign Claims Settlement Commission ("FCSC") plus interest;

(ii) If the claim has not been certified by the FCSC, the amount determined by the court in the course of a Title III action,

**Summary of the Provisions of Title III of the Cuban Liberty and..., 61 FR 24955-01**

plus interest; or

(iii) The fair market value of the property calculated according to either the current value of the property or the value of the property when confiscated plus interest, whichever is greater.

Interest is to be calculated from the date of confiscation of the property involved to the date on which the action is brought.

(b) Section 302(a)(2) establishes a presumption that the amount for which a person is liable to a U.S. national owning a claim certified by the FCSC is the amount so certified. This presumption will be rebuttable by clear and convincing evidence that one of the other measures of liability under section 302(a)(1)(A) is appropriate.

(c) Under section 302(a)(3), a person who traffics in property which either serves as the basis for a claim certified by the FCSC or is the subject of written notice at least thirty days before the initiation of an action will be subject to treble damages. Such person's liability, in addition to court costs and reasonable attorney's fees, will thus be triple the amount determined under section 302(a)(1)(A). *The notice required under section 302(a)(3) must be in writing and be posted by certified mail or personally delivered.* It must contain a statement of intention to commence a Title III action or to join the person as a defendant, the reasons for such action, a demand that the trafficking cease immediately, and a copy of this summary.

(d) Under section 302(a)(7), a Title III action may be settled and a judgment enforced without obtaining any license or permission of an agency of the U.S. Government. This section does not apply to assets blocked pursuant to authorities under section 5(b) of the Trading With the Enemy Act that were being exercised on July 1, 1977. In addition, no claim against the *Cuban Government will be considered a property interest the transfer of which requires a license or permission of an agency* of the United States.

### 3. Requirements and Conditions for a Title III Action

(a) Under section 302(a)(4), if the property was confiscated before March 12, 1996, the U.S. national bringing the claim must have owned the claim before March 12, 1996. If the property was confiscated on or after March 12, 1996, a U.S. national *who acquires ownership of a claim to the property after its confiscation by assignment for value may not bring a lawsuit* under Title III.

(b) Under section 302(a)(5), a U.S. national who was eligible to file a claim with the FCSC but did not do so may not bring an action under this title. Where the FCSC denied a U.S. national's claim that now serves as the basis for a Title III action, the court hearing the action will accept the FCSC's findings as conclusive. A U.S. national bringing an action on the basis of a claim that was not certified by the FCSC may not file a Title III lawsuit until March 13, 1998. Any person bringing an *action under Title III whose claim has not been certified by the FCSC has the burden of proving to the court that the interest* in the property that is the subject of the claim is not the subject of a claim so certified.

(c) Section 302(b) establishes that, in order for an action to be brought under Title III, the amount in controversy must exceed $50,000, not including interest, costs, and attorneys fees. This amount is exclusive of the increased liability damages under section 302(a)(3).

(d) Under section 302(c), *title 28 of the United States Code and the rules of court generally applicable to actions brought* under section 1331 of title 28 govern the procedure to be followed in Title III actions. Service of process on an agency or instrumentality of a foreign state in the court of a commercial activity or against individuals acting under color of law shall be made in accordance with section 1608 of title 28 of the United States Code.

(e) Under section 302(d), any judgment entered under Title III shall not be enforceable against an agency or instrumentality of either a transition government in Cuba or a democratically elected government in Cuba.

(f) *Section 302(e) amends section 1611 of title 28 of the United States Code by adding a new section, which states that the* property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

(g) Under section 302(f)(1), a U.S. national who brings an action under Title III may not bring any other action seeking

monetary or nonmonetary compensation by reason of the same subject matter.

(h) Section 302(f)(2)(A) establishes limits on further recovery by a U.S. national with a FCSC-certified claim depending on whether such Title III action leads to a recovery of a greater, equal or lesser amount than certified by the FCSC. If the claimant's recovery under Title III is equal to or greater than the amount certified by the FCSC, the U.S. national may not recover any payment on the claim under any claims settlement agreement between the United States and Cuba. If the U.S. national in a Title III action recovers less than the amount certified by the FCSC, the U.S. national may only receive payment in any claims settlement agreement between the United States and Cuba to the extent of the difference between the certified claim and the recovery. If there is no recovery, the U.S. national may still receive payment in a claims settlement agreement between the United States and Cuba and will be treated as any other certified claimant who does not bring an action under Title III.

(i) Section 302(f)(2)(B) provides that in the event some or all Title III actions are consolidated by judicial or other action so as to create a pool of assets available to satisfy such claims, FCSC-certified claims will be entitled to payment in full from such pool before any payment is made from such pool with respect to any claim not so certified.

(j) Under section 302(g), if the United States and the Government of Cuba reach a claims settlement agreement settling FCSC-certified claims, any amount paid by Cuba in such an agreement in excess of the payments made under section 302(f)(2) shall be deposited in the U.S. Treasury.

(k) Under section 302(h), the rights created pursuant to Title III may be suspended upon a presidential determination under section 203 that a transition government in Cuba is in place and may be terminated upon a presidential determination that a democratically elected government in Cuba is in power. Neither of these actions shall affect suits commenced before the dates of suspension or termination. While pending suits may proceed to judgment, such judgments **\*24957** will not be enforceable against a transition or democratically elected government in Cuba under section 302(d).

(l) Claimants bringing an action under Title III will be required to pay a uniform filing fee, to be established by the Judicial Conference of the United States, pursuant to section 302(i).

(m) Section 302(a)(6) provides that no court of the United States shall decline, based upon the act of state doctrine, to make a determination on the merits in an action brought under Title III.

(n) Section 305 provides that actions under section 302 may not be brought more than two years after the trafficking giving rise to the action has ceased to occur.

*4. Proof of Ownership of a Claim to Confiscated Property*
(a) Section 303(a) provides that certification of a claim by the FCSC is conclusive proof of ownership. In all other cases, the court has the discretion to appoint a special master, including the FCSC, to make determinations of the amount and ownership of the claim. Determinations made by administrative agencies or courts of a foreign government or international organization shall not be conclusive unless made pursuant to binding international arbitration to which the United States or the claimant submitted the claim.

(b) Section 303(b) amends the International Claims Settlement Act of 1949 by authorizing a U.S. district court to refer to the FCSC factual questions under Title III involving the amount and ownership by a U.S. national of a claim to confiscated property in Cuba.

*5. Consistency With International Claims Practice*
(a) Section 303(c) emphasizes that nothing in the LIBERTAD Act shall be construed to require or otherwise authorize the claims of Cuban nationals who became U.S. citizens after their property was confiscated to be included in a future negotiation and espousal of U.S. claims with a friendly government in Cuba when diplomatic relations are restored. Section 303(c) also states that the LIBERTAD Act shall not be construed as superseding, amending, or otherwise altering certifications that have been made under the FCSC's Cuba Claims Program.

(b) Section 304 amends the International Claims Settlement Act of 1949 to state that no person other than a certified claimant shall have a claim to, participate in, or otherwise have an interest in the compensation proceeds paid to a U.S. national by virtue of a certified claim.

### *6. Presidential Suspension Authority*
(a) Section 306(a) provides that, subject to the President's suspension authority, Title III takes effect on August 1, 1996.

(b) Section 306(b) provides the President with the authority to suspend the effective date of Title III beyond August 1, 1996, for up to six months, and for additional extensions up to six months, upon a determination and report to the appropriate congressional committees that a suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba. An initial determination and report must be submitted to the appropriate congressional committees at least 15 days before August 1, 1996. Additional suspensions or extensions are subject to the same reporting and determination requirements.

(c) Section 306(c) provides the President with the authority to suspend the right to bring an action under Title III after its effective date for up to six months, and for additional extensions up to six months, upon a determination and report that a suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba. Section 306(c) also emphasizes that after the effective date no persons may acquire a property interest in any potential or pending Title III action, nor shall pending actions commenced before the date of suspension be affected by a suspension.

(d) Section 306(d) provides that the President may rescind any suspension made under section 306(b) or section 306(c) upon reporting to the appropriate congressional committees that doing so will expedite a transition to democracy in Cuba.

Dated: May 11, 1996.

Janet Reno,

Attorney General.

[FR Doc. 96-12407 Filed 5-16-96; 8:45 am]

BILLING CODE 4410-01-M

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

EXHIBIT 3

# Ramón Rodríguez Gutiérrez



Born August 31, 1887 in Santa Cruz de la Llanera, Spain, Ramón Rodríguez Gutiérrez immigrated to Cuba circa 1917. In 1927, Ramón purchased the "Partagás" trademark for cigarettes and picadura (chopped tobacco leaves), and the Partagás cigarette factory (the "Partagás Factory") located in the el Vedado neighborhood of Havana, Cuba.



## The Partagás Factory:

Spanning the entire city block on 23rd Street between 14th and 16th (1255 23rd Street), el Vedado, Havana, Cuba, the Partagás Factory thrived under Ramón's leadership, producing world renown cigarettes under the Partagás brand. Operating under the name "Ramón Rodríguez e Hijos Sociedad en Comandita" (Ramon Rodríguez and Sons, a Limited Partnership), a closely held partnership owned by Ramón and his sons, the factory grew to become the third largest manufacturer of cigarettes in Cuba with over 400 employees.

# EXHIBIT 5

EXHIBIT 5

# Confiscation of RRHSC

After being in continuous operation since 1927, on June 30, 1961, by decision of the "Junta Central de Planificacion*", Cuba's Central (Economic) Planning Board, Cuba's revolutionary government confiscated ownership of RRHSC as part of it takeover of the entire tobacco industry. At the time of the confiscation, RRHSC was ranked as the 15th largest non-sugar related company in Cuba.



* Junta Central de Planificacion's decision and proclamation appears in Cuba's government register, the "Gaceta Oficial" No. 131 dated July 7, 1961, page 13203,

# EXHIBIT 6

EXHIBIT 6

# Ramón Rodríguez e Hijos, S. en C.

## The Partagás Factory :



RAMON RODRIGUEZ E HIJOS, S. EN C.
CALLE 23 ENTRE 14 Y 16
HABANA



# EXHIBIT 7

EXHIBIT 7

# THE PARTAGÁS FACTORY

Original footprint of the Partagás cigarette factory at the time that it was owned and operated by RRHSC



Partagas Factory (Satellite Image)

Case 1:20-cv-23287-DPG   Document 134-8   Entered on FLSD Docket 08/28/2020   Page 29 of 39

# COMPOSITE EXHIBIT 8

# PARTAGÁS FACTORY AND ANNEX

The TABACUBA name appears on the more modern, rebuilt portion adjacent to the factory, which are used as Tabacuba's executive offices.



EXHIBIT 4

# "Partagás Factory" Clarification

As defined, the term "Partagás Factory" refers to Ramón Rodríguez e Hijos, S. en C.'s Partagás **cigarette** factory that is located at 23rd Street between 14th and 16th, in el Vedado, Havana, Cuba. The Partagás Factory which is the subject of this letter is the building now known as the "H.Upmann" cigar factory". A picture of the building appears to the right of this paragraph.



There are two other buildings presently in Havana Cuba that are known as "Partagás" factories (to which no claim is made herein). The first is the "old" Partagás **cigar** factory, known as "Partagás Real Fabrica de Tabacos" and is located at 416 Industria, Habana, Cuba. It is our understanding that this building is no longer in operation as a factory, but continues to sell cigars. A picture of the building appears to the right of this paragraph.



The Partagás **cigar** factory operations were moved to a new building, the second of the Partagás factories, at the corner of Calle San Carlos in Central Havana (the building was formerly known as "El Rey del Mundo Factory" and is currently known as the "New" or "Modern" Partagás factory). A picture of the building appears to the right of this paragraph.

EXHIBIT 8B

# PARTAGÁS FACTORY AND ANNEX



# EXHIBIT 4

Case 1:20-cv-23287-DPG   Document 149-9   Entered on FLSD Docket 08/28/2020   Page 54 of 99

# COMPOSITE EXHIBIT 9

EXHIBIT 9A



## 2009 XI Habanos Festival

http://www.habanos.com/en/festival-habanos-noticias/festivales/xi-festival-del-habano/galeria-de-imagenes-del-xi/





EXHIBIT 9B



**2009 XI Habanos Festival**



Case 1:20-cv-23287-DPG Document 143-9 Entered on FLSD Docket 08/28/2020 Page 57 of 99

# COMPOSITE EXHIBIT 10

EXHIBIT 10A

# WPP

- Y&R, Ogilvy, Burson Cohn & Wolfe and VMLY&R, participate in the trafficked goods offered by Habanos, S.A. by providing "marketing and publicity" services for the cigars and other trafficked products made in the Partagás Factory.

- Y&R/VMLY&R and Ogilvy have engaged in, and profited from, trafficking the Partagás Factory products for many years, while BCW appears to have recently assumed responsibility for marketing Habanos S.A. products.



EXHIBIT 10B

# WPP

- WPP's wholly-owned subsidiaries, Ogilvy, Y&R and Burson Cohn & Wolfe, have facilitated Habanos, S.A.'s distribution of trafficked goods by providing "marketing and publicity services." WPP, through Ogilvy, Y&R and Burson Cohn & Wolfe, has done so since at least 2010.

- VMLY&R/Young & Rubicam/Burson Cohn & Wolfe, have at least one e-mail address dedicated to trafficking Habanos, S.A.'s goods and events: press.habanos@yr.com

